**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. _____**

ALEXANDRE DACCACHE, on
behalf of himself and all others
similarly situated,

             Plaintiffs,

                                           **CLASS ACTION**
v.                                           **JURY DEMAND**

RAYMOND JAMES FINANCIAL, INC.
d/b/a RAYMOND JAMES, RAYMOND
JAMES & ASSOCIATES, INC., ARIEL QUIROS,
WILLIAM STENGER, and JOEL BURSTEIN,

             Defendants.

_____/

### CLASS ACTION COMPLAINT

Plaintiff Alexandre Daccache, on behalf of himself and all others similarly situated, sues Raymond James Financial, Inc. d/b/a Raymond James, Raymond James & Associates, Inc., Ariel Quiros, William Stenger, and Joel Burstein, and states:

### INTRODUCTION

1.    Plaintiff Alexandre Daccache brings this action on behalf of a class of all investors in Jay Peak limited partnerships to recover funds misused, commingled, and stolen by Quiros and Stenger with the assistance of Raymond James and Burstein. Through their fraudulent scheme, Defendants have misused over $200 million and systematically looted over $50 million of the more than $350 million that has been raised from hundreds of investors through the U.S. Citizenship and Immigration Services' EB-5 Immigrant Investor Program.

2.    Investors who invested in the Jay Peak Limited Partnerships thought they were investing their funds in hotels, cottages, a biomedical research facility, and other projects. In

reality, while some of the funds were used for the projects, the majority of the funds were commingled, misused, and diverted to pay for other projects and to cover Quiros' personal expenses. The investors' money was also improperly converted into collateral for loans to Quiros by Raymond James.

3.     The fraudulent scheme involves seven limited partnership securities offerings connected to Jay Peak, Inc., a Vermont ski resort that is wholly owned by Miami-based Q Resorts, Inc., which in turn is owned by Miami businessman Quiros. These investments were not publicly traded.

4.     Quiros orchestrated, and Stenger, Raymond James, and Burstein enabled, an intricate web of transfers among various accounts at Raymond James to disguise the fact that most of the seven projects were either over budget or experiencing shortfalls. These shortfalls were due in large part to Quiros's theft of tens of millions of dollars of investor money for his own use.

5.     Since 2008, Quiros has misappropriated more than $50 million in investor money to, among other things: (1) finance his purchase of the Jay Peak resort, (2) back a personal line of credit to pay his income taxes, (3) purchase a luxury condominium, (4) pay taxes of a company he owns, and (5) buy an unrelated resort. Quiros also improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) that he set up in the name of the Jay Peak Limited Partnerships at Raymond James.

6.     The investors' funds were held in accounts at Raymond James, which were managed by Quiros' then son-in-law, Joel Burstein. As the broker for the accounts holding investor funds, Raymond James provided margin loans to Quiros which were collateralized with assets belonging to the investors.

7.     Raymond James and Burstein: (1) knew that the funds in the Raymond James accounts belonged to investors; (2) knew that the Jay Peak General Partners owed fiduciary duties to the investors in the Jay Peak Limited Partnerships; and (3) together with Quiros and Stenger aided and abetted the breach of fiduciary duty by margining investors' assets, helping Quiros steal the investors' funds for his own use, and commingling investors' funds in breach of the partnership agreements. Plaintiff and the Class seek to recover their losses through this action.

8.     There is a related action pending in this District before Judge Darrin P. Gayles, *SEC v. Quiros, Stenger, Jay Peak, Inc., et al.*, No. 16-21301-CV-DPG (S.D. Fla.). The SEC filed its Complaint for Injunctive and Other Relief in that action on April 12, 2016 against Quiros, Stenger, Jay Peak limited partnerships and general partners, and other entities charging the defendants with violations of numerous provisions of the federal securities laws. Also on April 12, 2016, the SEC filed, and Judge Gayles granted, an Emergency Motion for Temporary Restraining Order, Asset Freeze, and Other Relief. Judge Gayles has also appointed Michael Goldberg as Receiver over the SEC action's corporate and relief defendants, and their subsidiaries, successors and assigns, and entered a preliminary injunction against certain defendants.

## PARTIES AND RELEVANT NONPARTIES

### The Parties

**Plaintiff**

9.     Plaintiff Alexandre Daccache is a natural person over the age of 21 and otherwise *sui juris*. Mr. Daccache entered into a subscription agreement for the purchase of a limited partnership interest in Jay Peak Penthouse Suites L.P. dated August 13, 2010, and has been

damaged as a result of the Defendants' conduct alleged herein.

**Defendants**

10.     Defendant Raymond James Financial, Inc. d/b/a Raymond James, is a corporation organized and existing under the laws of the state of Florida. Raymond James is a diversified financial services holding company with subsidiaries engaged primarily in investment and financial planning, in addition to investment banking and asset management. Its stock is traded on the New York Stock Exchange.

11.     Defendant Raymond James & Associates, Inc. (together with Raymond James Financial, Inc., "Raymond James") is a corporation organized and existing under the laws of the state of Florida.

12.     Defendant Ariel Quiros is a citizen and resident of the State of Florida.  He is a natural person over the age of 21 and otherwise *sui juris*. In addition to being the sole owner, officer and director of Q Resorts, Inc., he is chairman of Jay Peak, Inc. Through those two companies, Quiros controlled each of the Jay Peak general partners and limited partnerships. He is a principal of the general partner of the Jay Peak Biomedical limited partnership offering, which is the seventh and most recent project offering.

13.     Defendant William Stenger is a resident of the state of Vermont.  He is a natural person over the age of 21 and otherwise *sui juris*. Stenger is the Director, President, and CEO of Jay Peak, Inc. He is the president and director of the general partner of the first Jay Peak project offering, and is the sole officer or director of the general partner of the second through sixth offerings. All six offerings were set up as limited partnerships. Stenger is, along with Quiros, a principal in the seventh offering's (Jay Peak Biomedical) general partner.

14.     Defendant Joel Burstein is a citizen of the State of Florida. He is a natural person

4

over the age of 21 and otherwise *sui juris*. Burstein is Quiros's former son-in law and the Miami Branch Manager and Vice President of Investments for the Raymond James South Florida Complex. He manages three Raymond James locations: Miami, Miami Beach and Dadeland.

**Nonparty Jay Peak Partnerships and Entities**

15.     Jay Peak, Inc. is a Vermont corporation with its principal place of business in Jay, Vermont. Jay Peak, Inc. operates the Jay Peak Resort in Jay, Vermont, which encompasses the first six projects for which Quiros and Stenger raised money. Jay Peak, in conjunction with others, has served as the manager or developer of the projects. Through Jay Peak, Inc., Quiros controlled each of the Jay Peak general partners and limited partnerships described below.

16.     Q Resorts, Inc. is a Delaware corporation with its offices in Miami, Florida. Q Resorts, Inc. is the 100% owner of Jay Peak, and Quiros is the sole owner, officer and director of Q Resorts, Inc. Q Resorts, Inc. acquired Jay Peak from a Canadian firm in 2008, and Quiros has since overseen the various Jay Peak projects through Q Resorts, Inc.

17.     Jay Peak Hotel Suites L.P. ("Suites Phase I") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2006 and May 2008, Suites Phase I raised $17.5 million from 35 investors through an EB-5 offering of limited partnership interests to build a hotel.

18.     Jay Peak Hotel Suites Phase II L.P. ("Hotel Phase II") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between March 2008 and January 2011, Hotel Phase II raised $75 million from 150 investors through an EB-5 offering of limited partnership interests to build a hotel, an indoor water park, an ice rink, and a golf club house.

19.     Jay Peak Management, Inc. is a Vermont corporation which is the general partner

of Suites Phase I and Hotel Phase II. It is also a wholly-owned subsidiary of Jay Peak. Stenger is the company's president.

20.    Jay Peak Penthouse Suites L.P. ("Penthouse Phase III") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between July 2010 and October 2012, Penthouse Phase III raised $32.5 million from 65 investors through an EB-5 offering of limited partnership interests to build a 55-unit "penthouse suites" hotel and an activities center.

21.    Jay Peak GP Services, Inc. is a Vermont corporation and the general partner of Penthouse Phase III. Stenger, listed as the director, is its only principal.

22.    Jay Peak Golf and Mountain Suites L.P. ("Golf and Mountain Phase IV") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2010 and November 2011, Golf and Mountain Phase IV raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build "golf cottage" duplexes, a wedding chapel, and other facilities.

23.    Jay Peak GP Services Golf, Inc. is a Vermont corporation and the general partner of Golf and Mountain Phase IV. Stenger, listed as the director, is its only principal.

24.    Jay Peak Lodge and Townhouses L.P. ("Lodge and Townhouses Phase V") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between May 2011 and November 2012, Lodge and Townhouses Phase V raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build 30 vacation rental townhouses, 90 vacation rental cottages, a café, and a parking garage.

25.    Jay Peak GP Services Lodge, Inc. is a Vermont corporation and the general partner of Lodge and Townhouses Phase V. Stenger, listed as the director, is its only principal.

26.    Jay Peak Hotel Suites Stateside L.P. ("Stateside Phase VI") is a Vermont limited

partnership with its principal place of business in Jay, Vermont. Between October 2011 and December 2012, Stateside Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests to build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center.

27.     Jay Peak GP Services Stateside, Inc. is a Vermont corporation and the general partner of Stateside Phase IV. Stenger, listed as the director, is its only principal.

28.     Jay Peak Biomedical Research Park L.P. ("Biomedical Phase VII") is a Vermont limited partnership with its principal place of business in Newport, Vermont. Since November 2012, Biomedical Phase VII has raised approximately $83 million from 166 investors through an EB-5 offering of limited partnership interests to construct a biomedical research facility. Other than site preparation and groundbreaking, no work has been done on the facility.

29.     AnC Bio Vermont GP Services, LLC is a Vermont limited liability company and the general partner of Biomedical Phase VII. Its managing members are Quiros and Stenger.

30.     Suites Phase I, Hotel Phase II, Penthouse Phase III, Golf and Mountain Phase IV, Lodge and Townhouses Phase V, Stateside Phase VI, and Biomedical Phase VII are collectively referred to as the "Jay Peak Limited Partnerships".

31.     Jay Peak Management, Inc., Jay Peak GP Services, Inc., Jay Peak GP Services Golf, Inc., Jay Peak GP Services Lodge, Inc., Jay Peak GP Services Stateside, Inc., and AnC Bio Vermont GP Services, LLP are collectively referred to as the "Jay Peak General Partners".

32.     The Jay Peak Limited Partnerships and their corresponding Jay Peak General Partners are listed below:

| Jay Peak Limited Partnerships | Jay Peak General Partners |
|---|---|
| **"Suites Phase I"** <br> Jay Peak Hotel Suites L.P. <br> To build a hotel. Hotel is completed and operating. | Jay Peak Management, Inc. <br> Wholly-owned subsidiary of Jay Peak, Inc. <br> President: Stenger |
| **"Hotel Phase II"** <br> Jay Peak Hotel Suites Phase II L.P. <br> To build a hotel, an indoor water park, an ice rink, and a golf clubhouse. Construction is complete and the facilities are operating. | |
| **"Penthouse Phase III"** <br> Jay Peak Penthouse Suites L.P. <br> To build a 55-unit penthouse suites hotel and an activities center, including a bar and restaurant. <br> Construction is complete and the facilities are operating. | Jay Peak GP Services, Inc. <br> Director and only principal: Stenger |
| **"Golf and Mountain Phase IV"** <br> Jay Peak Golf and Mountain Suites L.P. <br> To build golf cottage duplexes, a wedding chapel, and other facilities. <br> Construction is complete and the facilities are operating. | Jay Peak GP Services Golf, Inc. <br> Director and only principal: Stenger |
| **"Lodge and Townhouse Phase V"** <br> Jay Peak Lodge and Townhouses L.P. <br> To build 30 vacation rental townhouses, 90 vacation rental cottages, a café, and a parking garage. <br> Construction is complete and the facilities are operating. | Jay Peak GP Services Lodge, Inc. <br> Director and only principal: Stenger |
| **"Stateside Phase VI"** <br> Jay Peak Hotel Suites Stateside L.P. <br> To build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center. <br> Only hotel has been built. A small amount of work has been done on building the cottages and work has not yet begun on the recreation and medical centers. | Jay Peak GP Services Stateside, Inc. <br> Director and only principal: Stenger |
| **"Biomedical Phase VII"** <br> Jay Peak Biomedical Research Park, L.P. <br> To build a biomedical research facility. Other than site preparation and groundbreaking, no work has been done on the facility. | AnC Bio Vermont GP Services, LLP <br> Managing members: Quiros and Stenger |

33.     Though varying in certain details, the structures of the Jay Peak Limited Partnerships were materially the same, and all were a sham used by the Defendants in their fraudulent scheme. The Defendants improperly commingled funds from the Jay Peak Limited Partnerships, rendering the partnership form a sham.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), (codified in 28 U.S.C. §§ 1332, 1453, 1711-1715).  Plaintiff is a citizen of Brazil and a permanent resident of the State of Florida. Defendants are citizens of Florida and Vermont. The amount in controversy exceeds $5,000,000, and there are hundreds of members of the putative class. In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

35.     This Court also has federal question jurisdiction under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d), and supplemental state law jurisdiction.

36.     This Court has personal jurisdiction over Defendants Quiros and Burstein because they are Florida citizens and residents. This Court has jurisdiction over Defendant Stenger because he participated in tortious acts directed towards Florida. This Court has jurisdiction over the Raymond James Defendants because they are Florida corporations, are doing business in Florida, and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion of their services. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

37.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, Plaintiff Daccache resided in the Southern District of Florida and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

38.      All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

### The Fraudulent Scheme

39.     Jay Peak began offering and selling securities in the form of limited partnership interests in December 2006. Since that time it has raised over $350 million from hundreds of investors from at least 74 countries in seven separate offerings – the Jay Peak Limited Partnerships.

40.     Foreign applicants invest both to earn a return on their investment and to obtain their permanent green cards through the EB-5 Immigrant Investor Program created by Congress in 1990. The Program provides prospective immigrants with the opportunity to become permanent residents by investing in the U.S. To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million (depending on the type of investment) in a commercial enterprise approved by the U.S. Citizenship and Immigration Service. Once the applicant has invested, he or she may apply for a conditional green card, which is good for two years. If the investment creates or preserves at least ten jobs during those two years, the foreign applicant may apply to have the conditions removed from his or her green card. The applicant can then live and work in the U.S. permanently. An applicant only has to invest $500,000 if he or she invests

through a Regional Center. As a Regional Center, the State of Vermont has approved Jay Peak as an EB-5 project.

41.     The proponents of Jay Peak and Stenger conveyed the idea that investors would purchase real estate and other projects such as hotels, suites, recreational facilities, and a biomedical research facility. They sought EB-5 investors and had a pool of people who would be willing to invest large amounts of money into their scheme. Stenger and Jay Peak gave marketing materials to the Investors. Each project or group of projects was structured as a separate limited partnership, which had its corresponding general partners. *See* chart at para. 32. For every one investor and member of the Class, the Jay Peak General Partners owed fiduciary duties to their corresponding limited partners in the Jay Peak Limited Partnerships.

42.     Investors received offering materials from Jay Peak and Stenger stating that the monies invested would be used for legitimate purposes, when in reality, the monies were misused, commingled, and stolen.

43.     Stenger told investors that he anticipated the individual projects would each make a 2%-6% annual return once they were complete and operating. The offering materials that Jay Peak provided to investors also touted their potential returns. For example, Plaintiff Daccache received information from Jay Peak stating that investors would realize a guaranteed 4% minimum return, with a projected 6% average return.

44.     Investors in each of the Jay Peak Limited Partnerships generally received from Jay Peak, and often from Stenger, offering materials consisting of a private placement memorandum, a business plan, and a limited partnership agreement. Among the documents included in each business plan is one showing the cost of each project and the use of investor funds. The "use of proceeds" document details exactly how Jay Peak and/or the specific Jay Peak

Limited Partnership intended to spend all investor funds raised, including on land acquisition, site preparation, and construction. The document also lists the management contribution in each offering and how Jay Peak would spend that money.

45.     For example, the Penthouse Phase III use of proceeds document that was given to Mr. Daccache, found under the term "Investor Funds Source and Application" in the business plan given to investors, stated Jay Peak would spend almost $28.1 million of the $32.5 million invested on construction of the Penthouse Suites hotel. Included in this amount was approximately $900,000 for cost overruns and approximately $2.8 million for construction supervision fees. The remaining $4.4 million was for the accompanying recreation and learning centers and a café and bar (Jay Peak was to contribute another $5 million). At most Jay Peak could receive approximately $3.7 million of the $32.5 million for its own use.

46.     Stenger reviewed, was responsible for, and had authority over the contents of the offering documents in Phases I-VI, including the limited partnership agreements and the use of proceeds documents. Quiros reviewed the contents of the Phase I-VI offering documents, was familiar with them, and understood he had to abide by them. He also approved the use of proceeds document in Phases III-VI. Both Stenger and Quiros, as principals of the general partner for Biomedical Phase VII, reviewed and approved the contents of that project's offering documents, including the limited partnership agreement and the use of proceeds document.

47.     Each limited partnership agreement, which all investors either signed or adopted, contains several restrictions on Jay Peak's and the general partners' use of investor money. Generally, each limited partnership agreement prevents the general partner from, without consent of the limited partners: (1) borrowing from or commingling investor funds; (2) acquiring any property with investor funds that does not belong to the limited partnership, other than as

specifically authorized in the agreement; or (3) mortgaging, conveying or encumbering partnership property that was not real property.

48.     Investors made a $500,000 investment each in a particular Jay Peak Limited Partnership project. Investors also paid administrative fees, usually $50,000.

49.     Each Jay Peak Limited Partnership had an escrow account at People's United Bank in Vermont (formerly known as the Chittenden Trust Company). Stenger was a signatory on all of the People's Bank accounts and routinely authorized the transfer of funds into and out of those accounts.

50.     The initial $500,000 investment normally was deposited into the People's Bank account for the specific project in which the investor was participating. For example, Mr. Daccache's $500,000 investment was deposited into the People's Bank account for Penthouse Phase III.

51.     Once the Immigration Service approved the investor's initial or provisional green card, Stenger typically had the $500,000 transferred to a Raymond James account that was set up in the name of the particular project through Raymond James' Coral Gables office. Stenger had no signatory or other authority over the Raymond James accounts. Quiros opened all of the Raymond James accounts, and had sole authority over them.

52.     As described in detail below, the Defendants routinely violated the provisions stated above in paragraph 47 when they misused, misappropriated, embezzled, and commingled investors' funds from the Jay Peak Limited Partnership projects. Instead of using investors' funds as described in the use of proceeds documents, the Defendants frequently caused investor funds to flow in a circular manner among various accounts and entities, which allowed them to misuse and misappropriate investor funds.

**Raymond James and Burstein Substantially Assisted Quiros and Stenger's Fraudulent Scheme.**

53.     The Raymond James broker listed on the accounts was Joel Burstein, Quiros' son-in-law at the time. Burstein began his career at Raymond James in 1999, and obtained several broker licenses. To qualify for these licenses, Burstein had to demonstrate that he possessed an adequate understanding of the securities industry. In 2013, Burstein became the branch manager of the Miami, Dadeland and Miami Beach offices of Raymond James. Burstein is now the Miami Branch Manager and Vice President of Investments for the Raymond James South Florida Complex.

54.     Once the Raymond James accounts received transfers from the People's Bank accounts, Quiros alone directed use of the funds.

55.     Quiros and Stenger, with Burstein and Raymond James' help, oversaw and directed use of all investor funds and the development and construction of any projects. Investors played no role in the development, construction, or operation of the facilities.

**Raymond James and Burstein Allowed Quiros to Use Investor Funds to Purchase Jay Peak.**

56.     Jay Peak was originally owned by a Canadian firm, Mont Saint-Sauveur International, Inc. ("MSSI"), which oversaw the Phase I securities.

57.     From January through June 2008, Quiros negotiated and finalized a stock transfer agreement between MSSI and Q Resorts, Inc. (Quiros's own company) in which MSSI agreed to transfer the real estate and other assets of Jay Peak to Q Resorts, Inc. The agreement was signed on June 13, 2008, and the parties closed on the deal ten days later, June 23, 2008, for a final price of $25.7 million.

58.     In preparation for the closing, Quiros asked MSSI representatives to open

brokerage accounts at Raymond James with Burstein, his son-in-law, in the names of the Suites Phase I and Hotel Phase II limited partnerships. MSSI representatives agreed, and Stenger opened a Suites Phase I account at Raymond James on May 20, 2008. A month later, on June 20, 2008, he opened a Hotel Phase II account at Raymond James.

59.     Quiros testified under oath in front of the SEC that "Raymond James was a great supporter of mine. They're the ones who developed my banking structure in 2008…[Raymond James] put this structure together for me." Quiros also testified that Raymond James put together the margin loans for Quiros to acquire Jay Peak.

60.     As admitted by Burstein in his testimony in front of the SEC, Burstein and Quiros discussed financing the purchase of Jay Peak using a margin loan. Frank Amigo (Burstein's supervisor and current Managing Director for Raymond James's South Florida Complex) also participated in that conversation. Quiros, Burstein, and Amigo discussed how the margin loan would work – Raymond James would use the investors' funds in the Raymond James accounts, collateralize those investors' funds per Quiros's authorization, and give Quiros a loan based on the assets available. They also discussed holding investors' funds in the form of Treasury bills and the amount of collateral Quiros could utilize with Treasury bills. Raymond James allowed Quiros to collateralize 90% of the investors' funds in the Jay Peak Limited Partnership accounts at Raymond James. Accordingly, Raymond James allowed Quiros to borrow 90% of the investors' funds in the Jay Peak Limited Partnership accounts. Raymond James was protected – if Quiros did not pay back the margin loan, Raymond James would take the investors' funds in the form of Treasury Bills and be made whole.

61.     On June 16 and 17, 2008, in preparation for closing, MSSI transferred $11 million in Suites Phase I investor funds from People's Bank to Raymond James. Three days later, on

June 20, MSSI transferred $7 million in Hotel Phase II investor funds from People's Bank to Raymond James.

62.     In conjunction with those transfers, MSSI representatives on June 18, 2008 wrote a letter to Burstein, with copies to Quiros and Stenger, among others, stating that:

- The funds in the MSSI Raymond James Suites Phase I account were investor funds. "These funds were invested by immigrant investors in this limited partnership and must be held and/or used strictly in accordance with the limited partnership agreement, a copy of which I understand has already been provided to you. **You confirmed that these funds will not be used in any manner, including as collateral or a guarantee, to finance [Q Resorts, Inc.'s purchase of] the Jay Peak Resort.**" (emphasis added).

- Any money transferred to the Raymond James Hotel Phase II account similarly consisted of investor funds. "**Once again these funds may not be used in any manner, including as collateral or a guarantee, to fund the purchase of the Jay Peak Resort.**" (emphasis added).

Raymond James knew that the monies in the Jay Peak Limited Partnership accounts were investors' funds and could not be used by Quiros for Quiros's purchase of Jay Peak.

63.     Despite the fact that MSSI clearly explained to Quiros and Stenger that they could not use investor money to purchase Jay Peak, Quiros – aided by transfers made by Stenger and by Burstein and Raymond James – did exactly that. Over the next two months Quiros, through Q Resorts, Inc. used $21.9 million of investor funds – $ 12.4 million from Suites Phase I and $9.5 million from Hotel Phase II – to fund the vast majority of his purchase of Jay Peak.

64.     Quiros began his fraudulent use of investor funds on June 17, the day before the MSSI letter, when he opened two accounts at Raymond James under his name and control, one each for Suites Phase I and Hotel Phase II. On the day of closing, June 23, MSSI transferred the $11 million in its Suites Phase I account at Raymond James to Quiros' new Suites Phase I account. The same day, MSSI transferred the $7 million in its Hotel Phase II account at Raymond James to Quiros' new Hotel Phase II account. MSSI closed the two Raymond James

accounts within days, leaving Quiros in total control of investor money. Stenger, as the sole principal of the Suites Phase I and Hotel Phase II general partners, knew he was supposed to control investor funds. Yet he willingly allowed Quiros to take control of the funds, abdicating the responsibilities clearly laid out for him in the limited partnership agreements.

65.     Also on the day of closing, June 23, 2008, Quiros transferred $7.6 million of Suites Phase I investor funds from the Suites Phase I Raymond James account and $6 million of Hotel Phase II investor funds from the Hotel Phase II Raymond James account to another account (previously empty) that he had just opened at Raymond James in the name of Q Resorts. He completed his first fraudulent transfer the same day when he wired $ 13.544 million from the Q Resorts account to the law firm representing MSSI as partial payment for the Jay Peak purchase.

66.     Over the next three months, Quiros made four additional payments totaling $5.5 million from the Q Resorts account to the same law firm as continued payment for the Jay Peak purchase. The specific payments were $1.5 million on July 1, 2008, $1 million on August 29, 2008, $500,000 on September 5, 2008, and $2.5 million on September 26, 2008.

67.     Quiros made three additional transfers from the Q Resorts account totaling $2.9 million – $2 million on June 25, 2008, $628,684 on June 26, 2008, and $263,000 on September 3, 2008 – all to the law firm that had represented Q Resorts, Inc. in the purchase.

68.     Quiros and Q Resorts, Inc. made all of these payments improperly using investor funds. For example, to fund the $2 million June 25, 2008 payment to Q Resorts' law firm, Quiros transferred $2 million derived from Suites Phase I investor funds from the Suites Phase I Raymond James account to the Q Resorts account, then immediately wired that $2 million to the Q Resorts' law firm. The next day he arranged the transfer of just under $300,000 each from the

Suites Phase I and Hotel Phase II Raymond James accounts to the Q Resorts account, which he used to send $628,684 to the law firm.

69.     Stenger facilitated many of these payments by transferring additional money to the Raymond James accounts. For example, on July l, 2008, Stenger authorized the transfer of $1 million of Suites Phase I investor funds from a Suites Phase I account at People's Bank to the Q Resorts account at Raymond James. The same day he authorized the transfer of $600,000 in Hotel Phase II investor funds from the Hotel Phase II account at People's Bank to the Q Resorts account. Quiros turned right around and wired $1.5 million of that money to the law firm representing MSSI.

70.     Subsequent transactions followed a similar pattern - Stenger transferring Suites Phase I or Hotel Phase II money from People's Bank either to the Suites Phase I and Hotel Phase II accounts or the Q Resorts account at Raymond James, and Quiros using that money to pay either the Q Resorts or MSSI's law firm. In addition, to facilitate some of these payments, Quiros transferred Phase I and II investor funds between the Suites Phase I and Hotel Phase II accounts at Raymond James.

71.     The limited partnership agreements and the use of proceeds documents for Phases I and II, all provided to investors before they invested, prohibited this use of investor funds. For example, there was nothing in the use of proceeds document allowing Quiros or Suites Phase I to use $12.4 million of Phase I investor money to purchase Jay Peak. Likewise, the Hotel Phase II use of proceeds document given to investors, entitled Estimated and Projected Cost of Development, showed a detailed breakdown of how Jay Peak would spend the $75 million it raised from investors. There was nothing in this document that allowed Quiros or Hotel Phase II to use $9.5 million of Phase II investor funds to buy Jay Peak.

72.     The use of investor funds to purchase Jay Peak also contravened prohibitions in the Phase I and II limited partnership agreements. Each agreement contained a Section 5.02, entitled "Limitations on the Authority of the General Partner." That section in each agreement prevented the general partner from borrowing or commingling investor funds and from making the type of purchase Quiros and Q Resorts, Inc. made of Jay Peak without investor consent.

**Raymond James and Burstein Used Investors' Funds as Collateral to Loan Money to Quiros.**

73.     Burstein, Raymond James, and Quiros discussed using margin loans on the Jay Peak Limited Partnership accounts. Raymond James collateralized the investors' funds (in the form of Treasury bills) per Quiros's authorization, and gave Quiros a loan based on the assets available. Quiros could collateralize 90% of the Jay Peak Limited Partnership investors' funds in Treasury bills – meaning, Quiros could borrow 90% of whatever investors' funds were in the Jay Peak Limited Partnership accounts. Quiros, Stenger, Raymond James, and Burstein knew that the investors' funds in the Jay Peak Limited Partnership accounts were being used as collateral for the margin loans.

74.     Quiros and Raymond James' use of margin loans began in June 2008. When Quiros opened the Raymond James Suites Phase I and Hotel Phase II accounts, Quiros signed a credit agreement with Raymond James to allow both accounts to hold margin balances - meaning the accounts could borrow money (which would have to be paid back with interest) and hold negative cash balances. Put another way, the accounts went into debt to Raymond James when they incurred margin balances.

75.     The credit agreement Quiros signed pledged amounts in both Suites Phase I and Hotel Phase II accounts, as well as all of the assets of the Suites Phase I limited partnership, as collateral for any margin loans the accounts incurred. As Jay Peak began new offerings, Quiros

opened new accounts at Raymond James in the name of each new Jay Peak Limited Partnership, to which Stenger transferred investor funds from the corresponding account at People's Bank where investors deposited their money.

76.     For example, investors in Penthouse Phase III sent their investments to an escrow account at People's Bank in the name of Penthouse Phase III. Stenger had signatory authority and control over that account. When the offering began, Quiros opened an account at Raymond James in the name of Penthouse Phase III, over which only he had signatory authority and control. Once Penthouse Phase III investors had their conditional green cards approved, Stenger approved the transfer of those investors' $500,000 deposits to the Penthouse Phase III Raymond James account, thereby giving up control over that money to Quiros. Each time this happened, Stenger violated terms of the limited partnership agreements and caused the Jay Peak General Partners to breach their fiduciary duty to the investors in the Jay Peak Limited Partnerships. Stenger, as the principal of the general partner in Phases I-VI, had ultimate responsibility for the overall management and control of the business assets and the affairs of the six limited partnerships, and the obligation to place partnership funds in accounts in the names of the partnerships. Stenger abdicated these responsibilities by giving Quiros complete control of the partnerships' funds and by placing investor funds in accounts to which he did not have access.

77.     The process in Phases II and IV-VII worked the same way. Furthermore, each time he opened a new Raymond James account, Quiros signed a new credit agreement pledging the assets of that account - in each case comprised of or derived from investor funds – as collateral for the margin loans he continued to hold at Raymond James. Quiros signed a credit agreement on February 6, 2009, pledging investor funds in the Suites Phase I and Hotel Phase II Raymond James accounts as collateral for the margin loans. He signed one on October 1, 2010,

expanding the list of accounts to Penthouse Phase III and Q Resorts, Inc. Quiros signed a credit agreement on February 10, 20l1, adding the account for Golf and Mountain Phase IV. He signed the next one on August 25, 2011, adding the account for Lodge and Townhouses Phase V. On February 28, 2012, he signed a credit agreement adding the account for Stateside Phase VI as collateral for the margin loans. And on August 5, 2013, Quiros signed a credit agreement adding the accounts for Biomedical Phase VII and another Quiros entity.

78.     Thus, in every offering, Quiros put investor funds at risk by pledging them as collateral for the margin loans. Raymond James could have insisted on payment of the margin loans, and Quiros would have had no choice but to pay them off with investor funds slated for use to construct the various projects unless he could come up with a replacement source of funding. And, as described below, Quiros eventually paid off the margin loans using investor funds.

79.     Quiros's establishment of the margin loans violated the terms of each of the Jay Peak Limited Partnership agreements (which Stenger and/or Jay Peak provided to all investors). Those agreements specifically prohibited the projects' general partners from encumbering or pledging investor funds as collateral without the express approval of the investors. Furthermore, none of the offering documents the Defendants provided to investors said that any of the limited partnerships, general partners, Quiros, Stenger, Q Resorts, Inc., or Jay Peak could pledge investor funds as collateral for loans. In fact, the use of proceeds document in every offering, which set forth exactly how the investors' money would be spent, did not provide for use of investor funds as collateral for or to pay off margin loans. Neither Stenger nor Quiros ever told any investors the companies in which they were investing could use or were using their money in this fashion.

80.     Quiros began incurring margin loan debt in the Suites Phase I and Hotel Phase II accounts almost immediately after closing on the purchase of Jay Peak. Raymond James and Burstein actively helped Quiros hide the fact that investors' monies were missing from the Jay Peak Suites Phase I and Hotel Phase II accounts because Quiros had improperly used investor funds to purchase Jay Peak. On June 25, 2008, in an apparent attempt to give the appearance that investor funds remained in the Suites Phase I account at Raymond James, Quiros directed the purchase of $11 million in Treasury Bills. That $11 million purchase matched the $11 million of Suites Phase I investor funds MSSI had transferred to Quiros' Suites Phase I account. But, by this time Quiros had transferred $7.6 million of the $11 million out of the account to pay for the purchase of Jay Peak, there were only $3.4 million in investor funds left in the Suites Phase I account. Therefore, Quiros's Suites Phase I account had to incur a margin loan balance of $7.6 million to buy Treasury Bills (the difference between the $3.4 million in the account and the full $11 million purchase). Under terms of the credit agreement Quiros had signed, that $7.6 million was actually a debt to Raymond James. Thus, Suites Phase I investors did not have a claim to the $11 million in Treasury Bills, and the $3.4 million in investor funds still in the Suites Phase I account was at risk of being forfeited to Raymond James if there was a margin call.

81.     Quiros undertook the same acts in the Hotel Phase II account at Raymond James on the same day. On June 25, 2008, he ordered the purchase of $7 million in Treasury Bills in that account. Again, this amount matched the $7 million of Hotel Phase II investor funds MSSI had transferred to Quiros's Hotel Phase II account. But again, Quiros had already transferred $6 million of that amount out of the account to pay for Q Resorts, Inc.'s purchase of Jay Peak. There was only $1 million in investor funds left in the Hotel Phase II account. Therefore, Quiros' Hotel Phase II account had to incur a margin loan balance of $6 million to buy Treasury Bills

(the difference between the $1 million in the account and the $7 million purchase). Under the terms of the credit agreement Quiros had signed, that $6 million was actually a debt to Raymond James. Hotel Phase II investors did not have a claim to the full $7 million in Treasury Bills, and the $1 million in investor funds still in the Hotel Phase II account was at risk of being forfeited to Raymond James if there was a margin call.

82.     Quiros continued to make use of the margin loans in the Suites Phase I and Hotel Phase II accounts at Raymond James to pay the remainder of the purchase price for Jay Peak between June and September 2008.

83.     From October 2008 until February 2009, Quiros continued to maintain the margin loan balances in his Suites Phase I and Hotel Phase II accounts at Raymond James, with investor funds pledged as collateral in violation of the Phase I and II use of proceeds documents and the limited partnership agreements. By February 2009, the combined margin loan balances of the two accounts had reached $23.8 million. Stenger had continued to authorize transfers of investor funds from the People's Bank Phase I and II accounts to the Raymond James accounts, which then became collateral for the margin loans.

84.     That month, Quiros consolidated the two margin loans into one (Margin Loan III), and signed a new credit agreement that continued to pledge Phase I and II investor funds to back the margin loan balance. Over the next three years, Quiros signed the aforementioned credit agreements pledging investor funds from Phases III-VI as collateral. He also used more than $105 million of investor funds from Phases I-V towards paying down Margin Loan III, broken down as follows: approximately $2.2 million from Suites Phase I, approximately $51.6 million from Hotel Phase II, approximately $32.5 million from Penthouse Phase III, approximately a net amount of $15.8 million from Golf and Mountain Phase IV, and approximately $5.6 million

from Lodge and Townhouses Phase V.

85.     Margin Loan III continued to be backed by Suites Phase I and Hotel Phase II investor funds, putting them at risk, until February 2012. In addition, during this same time, Quiros and Stenger commingled Suites Phase I investor funds with other projects. For example, on October 3, 2011, Stenger authorized a transfer of $49,000 from the Penthouse Phase III account at People's Bank to the People's Bank Suites Phase I account. And on February 23, 2012, Stenger authorized a transfer of almost $62,000 from the Suites Phase I account to the Hotel Phase II account, both at People's Bank.

86.     Because Quiros continued spending money from the margin loan account at Raymond James, the Margin Loan III balance remained at approximately $23 million in February 2012. On February 24, 2012, Quiros transferred approximately $22.4 million of investor funds from the Q Resorts account at Raymond James to pay off the $23.4 million balance. The $22.4 million of investor funds is brown down as follows: approximately $5.8 million of this amount came from Stateside Phase VI, and approximately $16.6 million of this amount came from Lodge and Townhouses Phase V.

87.     However, just four days after paying off Margin Loan III, on February 28, 2012, Quiros opened yet another margin loan account in the name of Jay Peak at Raymond James (Margin Loan IV). This time he signed a credit agreement pledging investor funds in accounts from Lodge and Townhouses Phase V and Stateside Phase VI as collateral for the margin loan balances. In August 2013, he added the accounts of Jay Construction Management, Inc. (an entity controlled by Quiros) and Biomedical Phase VII, and reconfirmed the account of Q Resorts, Inc. to a new credit agreement.

88.     From February 2012 through March 2014, Quiros used more than $6.5 million of

investor funds from Phases V-VI towards paying down the Raymond James Margin Loan IV. However, because Quiros spent approximately $25.5 million on the new margin loan account on various project-related and non-project expenses, the Margin Loan IV balance was approximately $19.4 million in February 2014.

89.     On April 12, 2013, Quiros transferred $3 million in Biomedical Phase VII investor funds to his wholly owned company GSI of Dade County, Inc. Six weeks later, on May 30, 2013, he used $2.2 million of that money to buy a luxury condominium at Trump Place in New York City.

90.     Raymond James then demanded that Quiros pay off Margin Loan IV. In response, on March 5, 2014, Quiros transferred approximately $18.2 million of investor funds derived from a Biomedical Phase VII account at People's Bank, which he used as part of a $19 million pay off of this margin loan. Quiros took funds from the Biomedical Phase VII account at Raymond James and sent them to People's Bank, then People's Bank sent the funds to Quiros's Jay Construction account at Raymond James, and Quiros took the money out of the Jay Construction account at Raymond James to pay off the margin loan. All told, Quiros essentially used the money in the Biomedical Phase VII account that was collateral for the margin loan to pay off the margin loan. The $19 million that went to pay off the margin loan at Raymond James did not go to build the Biomedical Phase VII project, as intended. The pay down and pay off of this margin loan was a major contributor to the Biomedical Phase VII project shortfalls.

91.     The margin loans at Raymond James operated from 2008 to 2014. These margin loans were always collateralized by investors' funds.

92.     In mid-2014, Raymond James proceeded to close the Jay Peak Limited Partnership accounts.

**Raymond James and Burstein Knew the Quiros and Jay Peak Transactions Were Extraordinary.**

93.     The high number of transactions in the Jay Peak Limited Partnership accounts at Raymond James was out of the ordinary to Burstein.

94.     In fact, Burstein and Raymond James were concerned about the high volume of wires in one of Quiros's account in 2011. Raymond James's Anti-Money Laundering department evaluated the account and vetted it.

95.     The multiple Jay Peak Limited Partnership accounts being used as collateral for one loan was the only time Burstein had cross-margined multiple accounts to collateralize a single loan.

**Raymond James and Burstein Were Rewarded for Helping Quiros and Stenger's Fraud.**

96.     Raymond James' role in commingling funds it knew belonged to investors, and in helping Quiros and Stenger embezzle investor funds, was neither passive nor ministerial. Raymond James played an active, instrumental role by (1) allowing Quiros to use funds that Raymond James knew Quiros was not supposed to use to buy Jay Peak from MSSI; (2) setting up margin loans for Quiros to commingle and steal investors' funds in the Jay Peak Limited Partnerships accounts; and (3) giving carte blanche to Quiros to do whatever he wanted with the Jay Peak Limited Partnerships investor funds, including paying himself and paying off both a $23 million margin loan and a $19 million margin loan to Raymond James.

97.     In return, Raymond James and Burstein made substantial profits. Raymond James earned interest of over $2 million on the margin loans on the Jay Peak Limited Partnership accounts. Because Quiros and Raymond James executed various margin loans as high as $23 million, Raymond James interest profits were high. Because Raymond James profited from the Jay Peak Limited Partnerships accounts, Raymond James and Burstein provided Quiros with

substantial services and aided and abetted the Jay Peak General Partners' breaches of fiduciary duty to the Jay Peak Limited Partnerships.

**The Collapse of Jay Peak and Regulatory Proceedings Against Quiros, Stenger, and Others**

98.     There is a related action filed by the SEC pending before Judge Darrin P. Gayles. On April 12, 2016, the SEC commenced the *SEC v. Quiros, Stenger, Jay Peak, Inc., et al*. action, case number 16-21301-CV-Gayles, by filing a Complaint for Injunctive and Other Relief in the Southern District of Florida against numerous individuals and entities involved with Quiros. Also on April 12, 2016, the SEC filed an Emergency Motion for Temporary Restraining Order, Asset Freeze, and Other Relief. That same day, Judge Gayles entered the temporary restraining order and asset freeze. On April 13, 2016, Judge Gayles appointed Michael Goldberg as Receiver over that action's corporate and relief defendants, and their subsidiaries, successors and assigns. On April 21, 2016. Judge Gayles entered a preliminary injunction against certain defendants.

**Plaintiff Alexandre Daccache**

99.     Plaintiff Alexandre Daccache entered into a subscription agreement for the purchase of a limited partnership interest in Penthouse Phase III on August 13, 2010. He invested $500,000 and paid a $50,000 administrative fee during the Class Period, and has been damaged as a result of the Defendants' conduct alleged herein.

100.     There are no material differences between these Defendants' actions and practices directed to Mr. Daccache and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

### A.      Class Definition

101.     Plaintiff brings this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other persons similarly situated.  Plaintiff seeks to represent the following class:

> All persons who invested in the Jay Peak Limited Partnerships. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

102.     These persons' losses did not come to light until the SEC filed its Complaint in April 2016.

103.     Plaintiff reserves the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

104.     Defendants subjected Plaintiff and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

### B.      Numerosity

105.     The proposed class is so numerous that joinder of all members would be impracticable.  Defendants' conduct as alleged herein injured hundreds of investors in the state of Florida and nationwide. The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants. The precise number of class members numbers can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. Plaintiff does not anticipate any difficulties in the management of the action as a class action.

## C.    <u>Commonality</u>

106.    Questions of law and fact are common to Plaintiff's and class members' claims. These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

a.    Whether the Jay Peak General Partners owed fiduciary duties to the investors in the Jay Peak Limited Partnerships and, if so, whether they breached those duties by their conduct;

b.    Whether Quiros, Stenger, Raymond James, and Burstein knew of the Jay Peak General Partners' breaches of fiduciary duties to the investors in the Jay Peak Limited Partnerships;

c.    Whether Raymond James, Burstein, Stenger, and Quiros provided substantial assistance to the Jay Peak General Partners or encouraged their wrongdoing;

d.    Whether Defendants had knowledge that their conduct would assist the Jay Peak General Partners in breaching their fiduciary duties to the investors in the Jay Peak Limited Partnerships;

e.    Whether Defendants conspired to advance the Jay Peak General Partners' breaches of fiduciary duty, and if so, whether Defendants committed overt acts in furtherance of their conspiracy;

f.    Whether Defendants used the mails and wires in furtherance of the Jay Peak scheme;

g.    Whether Defendants formed a RICO enterprise;

h.    Whether Plaintiff and the Class were injured by reason of Defendants' conduct.

### D.     Typicality

107.    Plaintiff is a member of the Class he seeks to represent.  Plaintiff's claims are typical of the Class's claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' wrongful conduct.

### E.     Adequacy of Representation

108.    Plaintiff is an adequate representative of the class he seeks to represent and will fairly and adequately protect the interests of that class. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiff and the unnamed class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

109.    To prosecute this case, Plaintiff has chosen the undersigned law firm, which is experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### F.     Requirements of Fed. R. Civ. P. 23(b)(3)

110.    The questions of law or fact common to Plaintiff's and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiff and the unnamed Class members are based on the Defendants' misappropriation of the Class members' investment funds.

111.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

112.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.    Superiority**

113.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a) Joinder of all class members would create extreme hardship and inconvenience for the affected investors as they reside all across the states and abroad;

(b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## COUNT I
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### (against Quiros)

Plaintiff re-alleges and incorporates paragraphs 1-113 above as if fully set forth herein.

114.    The Jay Peak General Partners owed fiduciary duties to the investors in their corresponding Jay Peak Limited Partnerships.

115.    The Jay Peak General Partners breached their fiduciary duties by commingling Plaintiff and the Class's monies, misappropriating them, and misusing them.

116.    Through Q Resorts, Inc. and Jay Peak, Inc., Quiros controlled each of the Jay

Peak General Partners and Jay Peak Limited Partnerships for Phases I to VI. Quiros is also a managing member of the general partner of Phase VII.  Quiros, either with knowledge, general awareness, or recklessness substantially assisted in these breaches of fiduciary duty.

117.    As a result of the breaches of fiduciary duty, Plaintiff and the Class suffered damages.

118.    By reason of the foregoing, Plaintiff and the Class are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT II
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (against Stenger)

Plaintiff re-alleges and incorporates paragraphs 1-113 above as if fully set forth herein.

119.    The Jay Peak General Partners owed fiduciary duties to the investors in their corresponding Jay Peak Limited Partnerships.

120.    The Jay Peak General Partners breached their fiduciary duties by commingling Plaintiff and the Class's monies, misappropriating them, and misusing them.

121.    Stenger was either the president, director, or managing member of the Jay Peak General Partners. Stenger, either with knowledge, general awareness, or recklessness substantially assisted in these breaches of fiduciary duty.

122.    As a result of the breaches of fiduciary duty, Plaintiff and the Class suffered damages.

123.    By reason of the foregoing, Plaintiff and the Class are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT III
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (against Raymond James Defendants and Burstein)

Plaintiff re-alleges and incorporates paragraphs 1-113 above as if fully set forth herein.

124.    The Jay Peak General Partners owed fiduciary duties to the investors in their corresponding Jay Peak Limited Partnerships.

125.    The Jay Peak General Partners breached their fiduciary duties by commingling Plaintiff and the Class's monies, misappropriating them, and misusing them.

126.    The Raymond James Defendants and Burstein, either with knowledge, general awareness, or recklessness substantially assisted in these breaches of fiduciary duty.

127.    As a result of the breaches of fiduciary duties, Plaintiff and the Class suffered damages.

128.    By reason of the foregoing, Plaintiff and the Class are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT IV
## CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY
### (against all Defendants)

Plaintiff re-alleges and incorporates paragraphs 1-113 above as if fully set forth herein.

129.    Defendants Quiros, Stenger, Raymond James, and Burstein are parties to a civil conspiracy.

130.    Defendants Quiros, Stenger, Raymond James, and Burstein conspired to do an unlawful act.

131.    Defendants Quiros, Stenger, Raymond James, and Burstein conspired to have the Jay Peak General Partners breach their fiduciary duties to the investors (including Plaintiff) in the Jay Peak Limited Partnerships by commingling Plaintiff and the Class's monies,

misappropriating them, and misusing them.

132.    Defendants Quiros, Stenger, Raymond James, and Burstein committed overt acts in furtherance of their conspiracy, including: (a) Quiros misused investors' funds to purchase Jay Peak; (b) Quiros misused and misappropriated investors' funds by using them as collateral for loans, to pay off margin loans, and by misappropriating them for personal expenses; (c) Stenger misused investors' funds by commingling them and authorizing the transfer of funds to Quiros; (d) Raymond James and Burstein allowed Quiros to use investor funds to purchase Jay Peak, and (e) Raymond James and Burstein provided Quiros with margin loans collateralized by Plaintiff's and investors' funds for Quiros to misappropriate and misuse.

133.    Defendants' conspiracy and their respective overt acts caused Plaintiff and the Class to suffer damages, including but not limited to the loss of Plaintiff and the Class's investments in the Jay Peak Limited Partnerships.

## COUNT V
## Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (against all Defendants)

Plaintiff re-alleges and incorporates paragraphs 1-113 as if fully set forth herein.

134.    At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

135.    The RICO enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included Quiros, Stenger, Raymond James, Burstein, and the Jay Peak Limited Partnerships.

136.    The members of the RICO enterprise had a common purpose: to increase and

maximize their profits by illegally diverting funds that they knew belonged to investors for improper and unauthorized purposes. Defendants shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

137.   Quiros, Stenger, Raymond James, Burstein, and the Jay Peak Limited Partnerships conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.  The RICO enterprise functioned over a period of years as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity alleged herein.

138.   Quiros, Stenger, Raymond James, Burstein, and the Jay Peak Limited Partnerships each directed and controlled the enterprise's affairs as alleged in paragraphs 41-47, 49, 51-52, 54-55, 58-70, 73-91, 96-97, *supra*, including, *inter alia*:

    a.   Quiros devised the above-described scheme to defraud investors and divert their invested funds for his own personal gain using the Jay Peak Limited Partnerships;

    b.   Quiros and Stenger knowingly wired money out of accounts holding investors' funds for unauthorized purposes and for Quiros's own personal gain;

    c.   Raymond James and Burstein assisted in the diversion and misuse of investors' funds, knowing that these funds belonged to investors and not to Quiros or Stenger;

    d.   Stenger told investors that their investments in the individual projects would yield 2%-6% annually, knowing that the funds would be diverted for unauthorized uses

and Defendants' personal gain;

e.  Stenger and the Jay Peak Limited Partnerships routinely authorized the transfer of funds out of the Jay Peak Limited Partnerships' People's United Bank escrow accounts that held investors' funds;

f.  Raymond James provided margin loans to Quiros which were collateralized with assets belonging to the investors;

g.  Raymond James and Burstein facilitated an intricate web of transfers among various accounts at Raymond James to disguise the fact that the majority of the seven projects were either over budget or experiencing shortfalls;

h.  Quiros also improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) he set up in the name of the Jay Peak Limited Partnerships at Raymond James;

i.  Stenger reviewed, was responsible for, and had authority over the contents of the offering documents in Phases I-VI, including the limited partnership agreements and the use of proceeds documents.

j.  Quiros reviewed the contents of the Phase I-VI offering documents, was familiar with them, and understood he had to abide by them. He also approved the use of proceeds document in Phases III-VI; and

k.  Raymond James, Quiros, and Burstein devised a plan to collateralize investors' funds for loans to Quiros.

139.  Defendants used the mails and wires in furtherance of the scheme to defraud.  As set forth in ¶¶ 42-44, 49, 51-52, 54-55, 60-70, 76, 80-81, 83-90, 96 *supra*, Stenger provided materials to investors using the mails and the Defendants wired investor funds among various

accounts, and for Quiros's personal expenses.

140.    As part of and in furtherance of the scheme to defraud, Defendants made material omissions and misrepresentations to Plaintiff and Class members with the intent to deceive them. For example, the Penthouse Phase III offering materials, which included a partnership agreement, given to Plaintiff Daccache, provide that the general partner was prevented, without consent of the limited partners, from: (1) borrowing from or commingling investor funds; (2) acquiring any property with investor funds that does not belong to the limited partnership, other than as specifically authorized in the agreement; or (3) mortgaging, conveying or encumbering partnership property that was not real property. None of the offering documents provided to Plaintiff Daccache disclosed that his funds would be diverted for purposes not authorized by his limited partnership agreement. Plaintiff Daccache received information from Jay Peak stating that investors would realize a guaranteed 4% minimum return, with a projected 6% average return. This document did not disclose that the investors would not receive this return, and that the investors' funds would be commingled and misused.

141.    Jay Peak and Stenger also gave marketing materials to Plaintiff and the Class representing that investors' funds would be used to purchase real estate and other projects such as hotels, suites, and a biomedical research facility, when in fact, their funds would be used for unauthorized and illegitimate purposes.  The offering materials given by Jay Peak to Plaintiff Daccache in 2010 stated that his investment would be used to build the Penthouse Suites project, but his $500,000 investment was diverted from the Penthouse Suite account and used for other purposes, and specifically for Defendants' personal gain.

142.    Jay Peak and Stenger also gave investors a "use of proceeds" document detailing exactly how Jay Peak and/or the Jay Peak Limited Partnership intended to spend all investor

funds raised, including on land acquisition, site preparation, and construction. The document also listed the management contribution in each offering and misrepresented how Jay Peak would spend that money.  For example, the Penthouse Phase III use of proceeds document given to Mr. Daccache stated that Jay Peak would spend almost $28.1 million of the $32.5 million invested on construction of the Penthouse Suites hotel. Included in this amount was approximately $900,000 for cost overruns and approximately $2.8 million for construction supervision fees. The remaining $4.4 million was to be used for the accompanying recreation and learning centers and a café and bar. At most Jay Peak could receive approximately $3.7 million of the $32.5 million for its own use.  In reality, however, the investments in Penthouse Phase III were commingled and misused.

143.    Defendants had a duty to correct their misrepresentations and the mistaken impressions that arose from their omissions of material fact. Their misrepresentations and omissions were material, as they helped Defendants advance their scheme and conceal their fraud, and were designed to lull Plaintiff and Class members into believing that their investments were legitimate.  Plaintiff and the Class would not have invested in the Jay Peak Limited Partnerships had Defendants disclosed the true nature of their scheme, or the purposes for which investors' funds would be used.

144.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce investment materials and numerous wire transfers misappropriating Investors' funds.

145.    Because the scheme was not disclosed, and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, the Plaintiff and the Class could take no action to avoid the misuse and embezzlement of their funds, causing the Plaintiff and the Class to

suffer damages in the form of the loss of their investments.

## COUNT VI
## Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)
## (against all Defendants)

Plaintiff re-alleges and incorporates paragraphs 1-113 and 134-145 as if fully set forth herein.

146.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

147.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

148.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff and Class members suffered damages in the form of loss of their investments.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands judgment against Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and his counsel to be representatives of the Class;

(2)    Awarding Plaintiff and the Class compensatory damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(3)     Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses;

(4)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

(5)     Awarding such other and further relief the Court deems just, proper and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 3rd day of May, 2016.

By: /s/ *Thomas A. Tucker Ronzetti, Esq.*

Thomas A. Tucker Ronzetti, Esq.
tr@kttlaw.com
Harley S. Tropin, Esq.
hst@kttlaw.com
Dyanne E. Feinberg
def@kttlaw.com
Maia Aron, Esq.
ma@kttlaw.com
Tal J. Lifshitz, Esq.
tjl@kttlaw.com
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Telephone:  (305) 372-1800
Facsimile:   (305) 372-3508
*Counsel for Plaintiffs*

FC647804