UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CV-21575-FAM

ALEXANDRE DACCACHE,
on behalf of himself and all others
similarly situated,

    Plaintiffs,

v.

RAYMOND JAMES FINANCIAL, INC. d/b/a
RAYMOND JAMES, RAYMOND JAMES &
ASSOCIATES, INC., ARIEL QUIROS,
WILLIAM STENGER and JOEL BURSTEIN,

    Defendants.

_____/

## MOTION TO TRANSFER

Defendants Raymond James Financial, Inc., d/b/a Raymond James, and Raymond James & Associates, Inc. (collectively, "Raymond James"), file this motion to transfer this case to the Honorable Darrin P. Gayles before whom the related case *Securities and Exchange Commission v. Quiros, et al.,* Case No. 16-cv-21301-DPG (S.D. Fla) ("the SEC Litigation") is being litigated. The subject matter of this case and the earlier-filed SEC Litigation before Judge Gayles involve the same common core of central facts, namely an alleged fraudulent scheme involving funds deposited in Raymond James accounts that were purportedly misused, commingled and stolen through the U.S. Citizenship and Immigrations Service's EB-5 Immigration Investor Program.[1]

---

[1] Raymond James is filing similar motions to transfer in the following related actions, which have the same common nucleus of operative facts as this action and the SEC Litigation: *Carlos Enrique Hiller Sanchez v. Raymond James & Associates, Inc., et al.,*16-cv-21643-KMW (S.D. Fla.) (the "Hiller-Sanchez Action"); and *Michael I. Goldberg, as Receiver  v. Raymond James Financial, Inc., etc., et al.,* 16-CV-21831-JAL (S.D. Fla.) (the "Receiver's Action").  In addition, *James B. Shaw, et al. v. Raymond James Financial, Inc., et al.,* 16-cv-129 (D.C. Ver.) (the

Transferring this case so that all related cases are before the same Court would promote judicial economy and avoid the danger of inconsistent rulings on the same issues.

The SEC does not object to the requested transfer, Burstein and Quiros support the transfer, and Michael I. Goldberg (the "Receiver") takes no position and will not be filing a response to this motion. However, the class Plaintiffs oppose the requested transfer.

In further support of this Motion, Raymond James states as follows:

1. On April 12, 2016, the SEC filed its action against Ariel Quiros ("Quiros"), William Stenger ("Stenger"), Jay Peak, Inc., Q Resorts, Inc., Jay Peak Hotel Suites L.P., Jay Peak Hotel Suites Phase II L.P., Jay Peak Management, Inc., Jay Peak Penthouse Suites L.P., Jay Peak GP Services, Inc., Jay Peak Golf and Mountain Suites L.P., Jay Peak GP Services Golf, Inc., Jay Peak Lodge and Townhouses L.P., Jay Peak GP Services Lodge, Inc., Jay Peak Hotel Suites Stateside L.P., Jay Peak GP Services Stateside, Inc., Jay Peak Biomedical Research Park L.P., AnC Bio Vermont GP Services, LLC, Q Burke Mountain Resort, Hotel and Conference Center, L.P., Q Burke Mountain Resort GP Services, LLC, and Jay Construction Management, Inc., GSI of Dade County, Inc., North East Contract Services, Inc. and Q Burke Mountain Resort, LLC (collectively, the "Jay Peak Entities"), alleging that the Quiros, Stenger and the Jay Peak Entities misappropriated and misused millions of dollars in Raymond James accounts raised through the U.S. Citizenship and Immigrations Service's EB-5 Immigration Investor Program.

---

"Shaw Action") is currently pending in Vermont. The class in the Shaw Action is defined in the same way as the class alleged in the Daccache Action.

2. On April 14, 2016, the State of Vermont, through Susan L. Donegan, Commissioner of the Vermont Department of Financial Regulation, and Attorney General William H. Sorrell, filed a civil enforcement action (the "VDFR Action") against Quiros, Stenger and various Jay Peak Entities, captioned as *VDFR v. Quiros, et. al*, Case No. 217-4-16 (Vt. Sup. Ct.), making many of the same allegations as the SEC Litigation.

3. On April 13, 2016, Judge Gayles entered an order in the SEC Litigation appointing Michael I. Goldberg as Receiver over the Jay Peak Entities. On May 20, 2016, the Receiver filed an action on behalf of the Jay Peak Entities, against Quiros, Joel Burstein ("Burstein") and Raymond James (the "Receiver's Action"), alleging that the defendants misused millions of dollars raised through the U.S. Citizenship and Immigrations Service's EB-5 Immigration Investor Program. The Receiver's Action, styled *Michael I. Goldberg, as Receiver v. Raymond James Financial, Inc., etc., et al.,* 16-CV-21831-JAL (S.D. Fla.), is pending before the Honorable Joan A. Lenard. The Receiver recently notified Judge Gayles of the Receiver's Action. *See* **Exhibit "A,"** Receiver's Notice of Filing (attaching Receiver's Complaint).

4. Here, Plaintiff Alexandre Daccache filed the instant lawsuit on May 3, 2016 against Quiros, Stenger, Burstein and Raymond James (the "Daccache Action") to recover funds that were allegedly "misused, commingled and stolen" through the U.S. Citizenship and Immigrations Service's EB-5 Immigration Investor Program. *See* Complaint, D.E. 1 at ¶1.

5. The Daccache Action, the Hiller-Sanchez Action and the Receiver's Action all substantially overlap.[2] The Plaintiffs in the Daccache Action, the Hiller-Sanchez Action and the

---

[2] The class as defined in the Hiller-Sanchez Action is included in the class as defined in the Daccache Action. It appears that counsel in the Hiller-Sanchez Action has agreed to have the Hiller-Sanchez Action heard along with the Daccache class action. *See* **D.E. 6**, Plaintiff's

3

Receiver's Action all take aim at the same or similar Defendants (Quiros, Stenger, Burstein and Raymond James) for the same underlying conduct. Moreover, the Plaintiffs' litigation objectives are identical — to recover the allegedly misused funds from the Defendants. Likewise, the SEC seeks disgorgement of ill-gotten gains.

6. Significantly, while Raymond James and Burstein are not named as parties in the SEC Litigation, the activity in the Raymond James accounts is at the heart of the SEC Litigation. The great majority of the factual allegations in the SEC Litigation involve alleged impropriety with respect to activity in the Raymond James accounts. *See* SEC Complaint, 16-cv-21301-DPG, D.E. 1 at ¶34 ("In addition, the Raymond James & Associates, Inc. ("Raymond James") account executive and brokerage office through which Quiros opened the Raymond James accounts used to perpetrate the fraud were located in Coral Gables, Florida.").

7. Indeed, eighty paragraphs of the SEC Litigation recite in great detail many of the transactions that occurred in the Raymond James accounts. *See id*. at ¶¶54-133. As noted in the Complaint in the Hiller-Sanchez Action, the Daccache Action "makes many of the same allegations in the SEC and VDFR Complaints. The Daccache Class Action asserts claims . . . that appear to overlap with the claims asserted in the SEC and VDFR Complaint. Like the SEC

---

Motion to Appoint Interim Class Counsel, at p.2, n.1 ("Since Sanchez was filed, counsel for the two cases have met and conferred, the firms have agreed to work together for the benefit of the investor class, and, based upon these discussions, the attorneys at Bennett Aiello, who are counsel in the Sanchez case, have agreed to support KTT's request to be appointed interim class counsel with the understanding that they will become co-counsel to KTT, with KTT serving as lead class counsel."); *see* Hiller-Sanchez Action, Case No. 16-cv-21643-KMW, **D.E. 11,** Hiller-Sanchez's Notice of Plaintiff's Consent to Transfer Based Upon Earlier Filed and Related Class Action Pending in Judicial District (noting that the two matters appear to involve overlapping facts and questions of law and submitting that a transfer would reduce the potential risk of inconsistent rulings and likelihood of duplicative judicial labor). Therefore, Hiller-Sanchez is not addressed separately, in detail, here.

and VDFR Complaints, the Daccache Complaint indicates that RJAI [Raymond James] and Mr. Burstein were involved in the fraud perpetrated by Quiros." *See* Hiller Sanchez Action, D.E. 1 at ¶11(a).

8. All the cases also involve overlapping issues, witnesses, exhibits, and similar transactions, happenings, or events. Specifically, factual and legal issues are present in all the cases regarding funds which were invested by foreigners under the EB-5 Immigration Investor Program and which Quiros and Stenger allegedly misused, commingled or misappropriated through an elaborate scheme involving accounts at Raymond James.

9. Further demonstrating substantial overlap, it appears that significant portions of the SEC's Complaint have been copied verbatim in the other actions:

*Allegations of misappropriation:*

**SEC Litigation (the Prior Action):**

Since 2008, Quiros has misappropriated more than $50 million in investor money to, among other things: (1) finance his purchase of the Jay Peak resort; (2) back a personal line of credit to pay his income taxes; (3) purchase a luxury condominium; (4) pay taxes of a company he owns; and (5) buy an unrelated resort. He improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) he set up in the name of the Defendant companies [the Jay Peak Limited Partnerships] at a brokerage firm [Raymond James]. (SEC Complaint at ¶ 4)

**Receiver's Action:**

Since 2008, Quiros has misappropriated more than $50 million in investor money to, among other things: (1) finance his purchase of the Jay Peak resort; (2) back a personal line of credit to pay his income taxes; (3) purchase a luxury condominium; (4) pay taxes of a company he owns; and (5) buy an unrelated resort. He improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) he set up in the name of the Jay Peak Limited Partnerships at a Raymond James. (Receiver's Complaint at ¶ 5)

**Daccache Action:**

Since 2008, Quiros has misappropriated more than $50 million in investor money to, among other things: (1) finance his purchase of the Jay Peak resort; (2) back a personal line of credit to pay his income taxes; (3) purchase a luxury condominium; (4) pay taxes of a company he owns; and (5) buy an unrelated resort. He improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) he set up in the name of the Jay Peak Limited Partnerships at a Raymond James. (Daccache Complaint at ¶ 5).

*Allegations regarding EB-5 Offerings*

**SEC Litigation (the Prior Action):**

Jay Peak began offering and selling securities in the form of limited partnership interests in December 2006. Since that time it has raised more than $350 million from more than 700 investors from at least 74 countries in seven separate offerings. (SEC Complaint at ¶ 41)

**Receiver's Action:**

Jay Peak began offering and selling securities in the form of limited partnership interests in December 2006. Since that time it has raised more than $350 million from hundreds of investors in at least 74 countries in seven separate offerings—the Jay Peak Limited Partnerships. (Receiver's Complaint at ¶ 41)

**Daccache Action:**

Jay Peak began offering and selling securities in the form of limited partnership interests in December 2006. Since that time it has raised more than $350 million from hundreds of investors in at least 74 countries in seven separate offerings—the Jay Peak Limited Partnerships. (Daccache Complaint at ¶ 39)

*Allegations regarding the limited partnership agreements*

### SEC Litigation (the Prior Action):

Among other key provisions, each limited partnership agreement -- which all investors either signed or adopted -- contains several provisions regarding how Jay Peak and the general partner can use of investor money. Generally, each limited partnership agreement prevents the general partner from, without consent of the limited partners: (1) borrowing from or commingling investor funds; (2) acquiring any property with investor funds that does not belong to the limited partnership; or (3) mortgaging, conveying or encumbering partnership property that was not real property. (SEC Complaint at ¶ 49)

### Receiver's Action:

Each limited partnership agreement, which all investors either signed or adopted, contains several restrictions on Jay Peak's and the general partners' use of investor money. Generally, each limited partnership agreement prevents the general partner from, without consent of the limited partners: (1) borrowing from or commingling investor funds; (2) acquiring any property with investor funds that does not belong to the limited partnership, other than as specifically authorized in the agreement; or (3) mortgaging, conveying or encumbering partnership property that was not real property. (Receiver's Complaint at ¶ 49)

### Daccache Action:

Each limited partnership agreement, which all investors either signed or adopted, contains several restrictions on Jay Peak's and the general partners' use of investor money. Generally, each limited partnership agreement prevents the general partner from, without consent of the limited partners: (1) borrowing from or commingling investor funds; (2) acquiring any property with investor funds that does not belong to the limited partnership, other than as specifically authorized in the agreement; or (3) mortgaging, conveying or encumbering partnership property that was not real property. (Daccache Complaint at ¶ 47)

*Allegations regarding Quiros' use of investor funds to purchase Jay Peak*

### SEC Litigation (the Prior Action):

Quiros began incurring margin loan debt in the Suites Phase I and Hotel Phase II accounts almost immediately after closing on the purchase of Jay Peak. On June 25, 2008, in an apparent attempt to give the appearance that investor

funds remained in the Suites Phase I account at Raymond James, Quiros directed the purchase of $11 million in Treasury Bills. That $11 million purchase matched the $11 million of Suites Phase I investor funds MSSI had transferred to Quiros' Suite Phase I account. But as described in paragraph 69, by this time Quiros had transferred $7.6 million of the $11 million out of the account to pay for the purchase of Jay Peak. There was only $3.4 million in investor funds left in the Suites Phase I account. Therefore, Quiros' Suite Phase I account had to incur a margin loan balance of $7.6 million to buy Treasury Bills (the difference between the $3.4 million in the account and the full $11 million purchase). (SEC Complaint at ¶ 85)

**Receiver's Action:**

Quiros began incurring margin loan debt in the Suites Phase I and Hotel Phase II accounts almost immediately after closing on the purchase of Jay Peak. Raymond James and Burstein actively helped Quiros hide the fact that investors' monies were missing from the Jay Peak Suites Phase I and Hotel Phase II accounts because Quiros had improperly used investor funds to purchase Jay Peak. On June 25, 2008, in an apparent attempt to give the appearance that investor funds remained in the Suites Phase I account at Raymond James, Quiros directed the purchase of $11 million in Treasury Bills. That $11 million purchase matched the $11 million of Suites Phase I investor funds MSSI had transferred to Quiros' Suite Phase I account. But as described in paragraph 69, by this time Quiros had transferred $7.6 million of the $11 million out of the account to pay for the purchase of Jay Peak. There was only $3.4 million in investor funds left in the Suites Phase I account. Therefore, Quiros' Suite Phase I account had to incur a margin loan balance of $7.6 million to buy Treasury Bills (the difference between the $3.4 million in the account and the full $11 million purchase). (Receiver's Complaint at ¶ 83)

**Daccache Action:**

Quiros began incurring margin loan debt in the Suites Phase I and Hotel Phase II accounts almost immediately after closing on the purchase of Jay Peak. Raymond James and Burstein actively helped Quiros hide the fact that investors' monies were missing from the Jay Peak Suites Phase I and Hotel Phase II accounts because Quiros had improperly used investor funds to purchase Jay Peak. On June 25, 2008, in an apparent attempt to give the appearance that investor funds remained in the Suites Phase I account at Raymond James, Quiros directed the purchase of $11 million in Treasury Bills. That $11 million purchase matched the $11 million of Suites Phase I investor funds MSSI had transferred to Quiros' Suite Phase I account. But as described in paragraph 69, by this time Quiros had transferred $7.6 million of the $11 million out of the account to pay for the purchase of Jay Peak. There was only $3.4 million in investor funds left in

the Suites Phase I account. Therefore, Quiros' Suite Phase I account had to incur a margin loan balance of $7.6 million to buy Treasury Bills (the difference between the $3.4 million in the account and the full $11 million purchase). (Daccache Complaint at ¶ 80)

10. Rather than proceeding before several different Courts, it would be more efficient for all of the cases to be transferred to one Court where the claims can be coordinated before a single judge. This would avoid: (i) duplicative proceedings on the same issues; (ii) multiple or inconsistent adjudications; (iii) multiple or inconsistent recoveries; (iv) duplicative discovery, including duplicative depositions; and (v) the review of potential settlements by multiple courts.

11. In addition, the SEC Litigation has progressed significantly. In fact, there are already over 160 docket entries in the SEC Litigation. *See* **Exhibit "B,"** Docket Sheet from SEC Litigation. Multiple hearings, including three full days of evidentiary hearings, have already taken place before Judge Gayles, in which Judge Gayles considered well over 100 exhibits consisting of thousands of pages. *See id.* Judge Gayles is therefore already well-versed with the issues in this case. Accordingly, there is an overriding logic and rationale to having the present case proceed before Judge Gayles, where the Court's familiarity with the parties and the issues will allow for the just, prompt and efficient resolution of the continuing dispute.

15. This request for a transfer is made in the interests of judicial economy and not for the purposes of delay. If the present lawsuits are allowed to proceed before several Courts, there will be a significant duplication of labor, resulting in a waste of the Courts' resources. Transferring the related cases to Judge Gayles is the only way for all of the related cases to be heard by the same judge.

16. Counsel for Raymond James certifies that it has conferred in good faith with counsel to all of the parties. The SEC does not object to the requested transfer, Burstein and Quiros support the transfer, and the Receiver takes no position and will not be filing a response to this motion. However, the class Plaintiffs oppose the requested transfer.

WHEREFORE, Raymond James respectfully requests that this Court enter an order transferring this case to Judge Gayles on the grounds that it involves the same or substantially identical transactions, happenings, and events as the earliest filed SEC Litigation.

Dated: June 9, 2016

Respectfully submitted,

s/ *Stanley H. Wakshlag*
Stanley H. Wakshlag
E-mail: swakshlag@knpa.com
Deborah S. Corbishley
E-mail: dcorbishley@knpa.com
Ryan Zagare
E-mail: rzagare@knpa.com
Janelle M. Ans
E-mail: jans@knpa.com
Kenny Nachwalter, P.A.
Four Seasons Tower
Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Telephone:   (305) 373-1000
Facsimile:    (305) 372-1861
*Counsel for Defendants, Raymond James Financial, Inc. d/b/a Raymond James and Raymond James & Associates, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this on June 9, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing documents are being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in the manner stated in the service list attached.

s/ *Stanley H. Wakshlag*
Stanley H. Wakshlag

**SERVICE LIST**
**US District Court, Southern District of Florida**
**Case No. 16-CV-21575-FAM**
*Alexandre Daccache v. Raymond James Financial, Inc.., et al.*

Harley S. Tropin
hst@kttlaw.com
Thomas A. Tucker Ronzetti
tr@kttlaw.com
Tal J. Lifshitz
tjl@kttlaw.com
Dyanne Elyce Feinberg
def@kttlaw.com
Maia Aron
ma@kttlaw.com
Rachel Sullivan
rs@kttlaw.com
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd., 9th floor
Miami, FL 33134
*Counsel for Plaintiffs*
**VIA CM/ECF**

James D. Sallah
jds@sallahlaw.com
Jeffrey L. Cox
jlc@sallahlaw.com
Joshua A. Katz
jak@sallahlaw.com
Sallah Astarita & Cox, LLC
One Boca Place
2255 Glades Road
Suite 300 E
Boca Raton, FL 33431
*Counsel for Defendant Joel Burstein*
**VIA CM/ECF**

Karen Linda Stetson
karen.stetson@gray-robinson.com
Jonathan Gaines
jonathan.gaines@gray-robinson.com
Gray Robinson P.A.
333 SE Second Avenue
Suite 3200
Miami, FL 33131

and

John S. Durrant *(pro hac vice)*
jsd@msk.com
Mitchell Silberberg & Knupp LLP
11377 West Olympic Blvd.
Los Angeles, CA 90064-1683

and

Travis Meserve *(pro hac vice)*
txm@msk.com
Mitchell Silberberg & Knupp LLP
12 East 49th Street
30th Floor, New York, NY 10017
*Counsel for Defendant Ariel Quiros*
**VIA CM/ECF**