**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:16-CV-21575-FAM**

ALEXANDRE DACCACHE, CARLOS
ENRIQUE HILLER SANCHEZ, PHILIP
CALDERWOOD, JOSE ANTONIO PIETRI,
JOSE R. CASSERES-PINTO, TONGYI WANG,
JAMES B. SHAW, JOHANNES EIJMBERTS,
and LORNE MORRIS, on behalf of themselves
and all others similarly situated,

       Plaintiffs,

v.

                                     **CLASS ACTION**
                                     **JURY DEMAND**

RAYMOND JAMES & ASSOCIATES, INC.,
PEOPLE'S UNITED FINANCIAL, INC.,
as successor-in-interest to Chittenden Trust Company,
PEOPLE'S UNITED BANK, ARIEL QUIROS,
WILLIAM STENGER, and JOEL BURSTEIN,

       Defendants.

_____/

**AMENDED CLASS ACTION COMPLAINT**

      Plaintiffs Alexandre Daccache, Carlos Enrique Hiller Sanchez, Philip Calderwood, Jose

Antonio Pietri, Jose R. Casseres-Pinto, Tongyi Wang, James B. Shaw, Johannes Eijmberts, and

Lorne Morris, on behalf of themselves and all others similarly situated, sue Raymond James &

Associates, Inc. ("Raymond James"), People's United Financial, Inc., as successor-in-interest to

Chittenden Trust Company, People's United Bank (together, "People's Bank"), Ariel Quiros,

William Stenger, and Joel Burstein, and state:

## INTRODUCTION

1.     Plaintiffs bring this action on behalf of a proposed Class of 836 individuals who invested over $400 million in a series of related projects at the Jay Peak and Q Burke ski resorts in Vermont.  The Jay Peak and Q Burke projects were eligible for the EB-5 Immigrant Investor Program, which Congress created to enable investors to gain permanent U.S. residency by investing in projects that create or preserve jobs in the United States.  Plaintiffs and all members of the Class invested in the projects to secure both a return on their investments and permanent U.S. residency. Unbeknownst to investors, however, the Jay Peak and Q Burke projects (together, the "EB-5 Projects") were a front for a Ponzi scheme masterminded by Defendant Ariel Quiros, who, together with his co-Defendants Raymond James, Joel Burstein, William Stenger, and People's Bank, diverted investor funds to Raymond James accounts controlled by Quiros.  Once transferred to Raymond James, investors' funds were commingled and misappropriated to cover shortfalls on projects other than those selected by the individual investors, and to pay for Quiros's personal expenses.  All told, Defendants misappropriated more than $200 million from the EB-5 Project investors, and the assets have no net value.

2.     Defendants' scheme operated as follows:  Quiros and Stenger would send potential investors offering materials for one or more of the Jay Peak and Q Burke projects, all of which were structured as limited partnerships.  The offering materials for the projects were uniformly fraudulent in that they concealed from investors that Quiros did not consider himself obligated to use investors funds in the manner contemplated under a plain language reading of the offering materials, and for the purposes specified in the offering materials, and instead considered himself free to and did use investor funds for such purposes as covering shortfalls in other projects and for his own personal use.  Once investors committed to a project, they sent their investment funds to

an escrow account designated for that project at People's Bank. People's Bank then released the funds to accounts controlled by Quiros at Raymond James, in violation of the terms of the offering materials executed by the investors. The accounts at Raymond James were established, and their management overseen, by Quiros's son-in-law, Joel Burstein, who was also Miami Branch Manager and Vice President of Investments of Raymond James' South Florida Complex. Once the funds were under Quiros's control, Quiros — with Raymond James' and Burstein's knowing assistance — commingled the investors' funds and diverted them to other projects and his own accounts.

3.      Since 2008, Quiros has misappropriated millions in investor money to, among other things: (1) finance his purchase of the Jay Peak and Q Burke resorts; (2) back a personal line of credit to pay his income taxes; (3) purchase a luxury condominium; and (4) pay taxes of a company he owns. Quiros also improperly used additional investor funds to pay down and pay off margin loans that he had established without authority to do so. The margin loans at Raymond James helped enable Quiros to improperly apply investor funds intended for later EB-5 Projects to earlier EB-5 Projects, in typical Ponzi-scheme fashion. The margin loans extended by Raymond James were not disclosed to investors.

4.      Quiros orchestrated, and Stenger, Raymond James, Burstein, and People's Bank assisted the fraud by implementing an intricate web of transfers among various accounts at People's Bank and Raymond James to disguise the fact that most of the EB-5 Projects were either over budget or experiencing shortfalls. The financial institutions knew that the significant shortfalls were due in large part to Quiros's misuse of millions of dollars of investor money.

5.      These transfers, as tracked by Vermont regulators, are depicted in the diagram below, which shows the movement and commingling of funds between an EB-5 Project escrow

account at People's Bank (gray), Raymond James' accounts (red), Quiros's loan accounts (blue), investor return accounts (pink), and Jay Peak accounts (green). The intricate web of transfers reveals the enormous volume of transactions necessary to carry out the Defendants' fraudulent Ponzi scheme. An interactive version of this chart can be found online at http://www.dfr.vermont.gov/sites/default/ext/sl/dev/full-page-funds-map.html.



6.      The United States Securities and Exchange Commission (the "SEC") conducted a two-year investigation of the Jay Peak and Q Burke scheme, which concluded with a civil enforcement action styled *SEC v. Quiros, et al.*, No. 16-21301-CV-DPG (S.D. Fla.) (the "SEC Enforcement Action").  The SEC Enforcement Action charges Quiros, Stenger, and the businesses affiliated with them with masterminding and operating a "massive" Ponzi scheme that violated numerous provisions of the federal securities laws.  The court-appointed Receiver in the SEC Enforcement Action has also filed a civil action against Raymond James, Burstein, and Quiros. *See Goldberg v. Raymond James Financial, Inc., et al.*, No. 1:16-cv-21831-JAL (S.D. Fla.).

7.      On June 29, 2016, Raymond James entered into a consent order with the Vermont Department of Financial Regulation, under which it agreed to pay a penalty of $5.95 million for alleged misconduct relating to the Jay Peak, Q Burke, and related accounts held at Raymond James.

8.      This Class Action is brought by investors to recover their losses resulting from the Jay Peak and Q Burke Ponzi scheme.

## PARTIES AND RELEVANT NONPARTIES

### The Parties

#### Plaintiffs

9.      Plaintiff Alexandre Daccache is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Daccache is a citizen of Brazil and a permanent resident of the State of Florida, who resides in this judicial district.  Mr. Daccacche entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Penthouse Suites L.P. on or about August 13, 2010, and has been damaged as a result of the Defendants' conduct alleged herein.

10.     Plaintiff Carlos Enrique Hiller Sanchez is a natural person over the age of 21 and is otherwise *sui juris*.  Mr. Hiller is a citizen of Venezuela who currently resides in this judicial district.  Mr. Hiller entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Biomedical Research Park L.P. on or about April 17, 2013, and has been damaged as a result of the Defendants' conduct alleged herein.

11.     Plaintiff Philip Calderwood is a natural person over the age of 21 and is otherwise *sui juris*.  Mr. Calderwood is now a United States citizen, but was previously a citizen of the United Kingdom.  Mr. Calderwood currently resides in this judicial district.  Mr. Calderwood entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites Phase II L.P. on or about July 17, 2008, and has been damaged as a result of the Defendants' conduct alleged herein.

12.     Plaintiff Jose Antonio Pietri is a natural person over the age of 21 and is otherwise *sui juris*.  Mr. Pietri is a citizen of Venezuela and currently resides in this judicial district.  Mr. Pietri entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Biomedical Research Park L.P. on or about August 20, 2013, and has been damaged as a result of the Defendants' conduct alleged herein.

13.     Plaintiff Jose R. Casseres-Pinto is a natural person over the age of 21 and is otherwise *sui juris*.  Dr. Casseres-Pinto is a citizen of Venezuela who resides in Smyrna, Georgia. Dr. Casseres-Pinto entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Biomedical Research Park L.P. on or about February 11, 2013, and has been damaged as a result of the Defendants' conduct alleged herein.

14.     Plaintiff Tongyi Wang is a natural person over the age of 21 and is otherwise *sui juris*.  Mr. Wang is a citizen of Canada who resides in Montreal, Canada.  Mr. Wang entered into

a subscription agreement for the purchase of a Limited Partnership interest in Q Burke Mountain Resort, Hotel, and Conference Center L.P. on or about December 4, 2015, and has been damaged as a result of the Defendants' conduct alleged herein.

15.     Plaintiff James B. Shaw is a natural person over the age of 21 and is otherwise *sui juris*.  Mr. Shaw is a citizen of the United Kingdom who resides in Beverly, Massachusetts.  Mr. Shaw entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites Phase II L.P. on or about May 7, 2010, and has been damaged as a result of the Defendants' conduct alleged herein.

16.     Plaintiff Johannes Eijmberts is a natural person over the age of 21 and is otherwise *sui juris*.  Mr. Eijmberts is a citizen of the Netherlands who resides in Boston, Massachusetts.  Mr. Eijmberts entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites Stateside, LP on or about March 12, 2012, and has been damaged as a result of the Defendants' conduct alleged herein.

17.     Plaintiff Lorne Morris is a natural person over the age of 21 and is otherwise *sui juris*.  Mr. Morris is a citizen of Canada who currently resides in Brooklyn, New York.  Mr. Morris entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites Stateside, LP on or about March 8, 2012, and has been damaged as a result of the Defendants' conduct alleged herein.

**Defendants**

18.     Defendant Raymond James & Associates, Inc. is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in St. Petersburg, Florida.  The fraudulent transactions described in this complaint were authorized and implemented through Raymond James & Associates branch offices in Miami, Florida.

19.     Defendant People's United Financial, Inc., is a diversified financial services company.   On January 2, 2008, People's United Financial, Inc. acquired the Chittenden Corporation, the bank holding company for the Chittenden Trust Company.   At the time of the acquisition, the Chittenden Trust Company acted as escrow agent for the investor funds for the EB-5 Projects.  People's United Financial, Inc. is liable as successor-in-interest for the actions of the Chittenden Trust Company from the date of the acquisition through the date of the consolidation of the Chittenden Trust Company into People's United Bank as set forth below.

20.     People's United Bank is a federally chartered savings bank headquartered in Bridgeport, Connecticut, and is a subsidiary of People's United Financial, Inc.  In July 2008, the Board of Directors of People's United Financial, Inc. and the Board of Directors of People's United Bank approved a plan to consolidate the acquired Chittenden entities with and into People's United Bank.  The consolidation of the Chittenden entities and People's United Bank received regulatory approval on October 29, 2009, and occurred on some date between January 1, 2009 and July 2010, when People's United Financial, Inc. "re-branded" its legacy Chittenden franchises as People's United Bank.  At that time, People's United Bank's Burlington, Vermont branch acted as escrow agent for the EB-5 Projects.

21.     Defendant Quiros is a citizen of the State of Florida, residing in Key Biscayne, Florida.  He is a natural person over the age of 21 and is otherwise *sui juris*.

22.     Defendant Stenger is a citizen of the State of Vermont, residing in Newport, Vermont.  He is a natural person over the age of 21 and is otherwise *sui juris*. Stenger is the Director, President, and CEO of Jay Peak, Inc.

23.     Defendant Burstein is a citizen of the State of Florida, residing in Miami, Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Burstein is Quiros's former

son-in-law and the Miami Branch Manager and Vice President of Investments for the Raymond James South Florida Complex. Burstein currently manages three Raymond James locations in Florida: Miami, Miami Beach, and Dadeland.

**Relevant Nonparties**

24.    Jay Peak, Inc. is a Vermont corporation with its principal place of business in Jay, Vermont.  Jay Peak, Inc. operates the Jay Peak Resort in Jay, Vermont, the location of the first six EB-5 Projects for which Quiros and Stenger raised money.

25.    Q Resorts is a Delaware corporation with its offices in Miami, Florida. Q Resorts is the 100% owner of Jay Peak, Inc., and Quiros is the sole owner, officer, and director of Q Resorts. Q Resorts acquired the stock of Jay Peak, Inc., from a Canadian company, Mont Saint-Sauveur International, Inc., in 2008.  In January 2008, Quiros was able to gain access to the operations of Jay Peak Resort while negotiating a contract to purchase the stock of Jay Peak, Inc.

26.    Jay Peak Hotel Suites L.P. ("Phase I") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2006 and May 2008, Suites Phase I raised $17.5 million from 35 investors through an EB-5 offering of limited partnership interests to build a hotel.  Phase I began offering and selling securities in the form of limited partnership interests in December 2006, when Jay Peak, Inc. was still owned by Mont Saint-Sauveur International, Inc.

27.    Jay Peak Hotel Suites Phase II L.P. ("Phase II") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between March 2008 and January 2011, Phase II raised $75 million from 150 investors through an EB-5 offering of limited partnership interests to build a hotel, an indoor water park, an ice rink, and a golf club house.

28.     Jay Peak Management, Inc. is a Vermont corporation, which is the general partner of Phases I and II. It is also a wholly-owned subsidiary of Jay Peak, Inc.  Stenger is the company's president.

29.     Jay Peak Penthouse Suites L.P. ("Phase III") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between July 2010 and October 2012, Phase III raised $32.5 million from 65 investors through an EB-5 offering of limited partnership interests to build a 55-unit "penthouse suites" hotel and an activities center.

30.     Jay Peak GP Services, Inc. is a Vermont corporation and the general partner of Phase III.  Stenger, listed as the director, is its only principal.

31.     Jay Peak Golf and Mountain Suites L.P. ("Phase IV") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2010 and November 2011, Phase IV raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build "golf cottage" duplexes, a wedding chapel, and other facilities.

32.     Jay Peak GP Services Golf, Inc. is a Vermont corporation and the general partner of Phase IV.  Stenger, listed as the director, is its only principal.

33.     Jay Peak Lodge and Townhouses L.P. ("Phase V") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between May 2011 and November 2012, Phase V raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build 30 vacation rental townhouses, 90 vacation rental cottages, a café, and a parking garage.

34.     Jay Peak GP Services Lodge, Inc. is a Vermont corporation and the general partner of Phase V.  Stenger, listed as the director, is its only principal.

35.     Jay Peak Hotel Suites Stateside L.P. ("Phase VI") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between October 2011 and December 2012, Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests to build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center.

36.     Jay Peak GP Services Stateside, Inc. is a Vermont corporation and the general partner of Phase VI.  Stenger, listed as the director, is its only principal.

37.     Jay Peak Biomedical Research Park L.P. ("Phase VII") is a Vermont limited partnership with its principal place of business in Newport, Vermont. From November 2012 through April 2016, Phase VII has raised approximately $83 million from 166 investors through an EB-5 offering of limited partnership interests to construct a biomedical research facility.

38.     AnC Bio Vermont GP Services, LLC is a Vermont limited liability company and the general partner of Phase VII. Its managing members are Quiros and Stenger.

39.     Phases I through VII are collectively referred to as the "Jay Peak Limited Partnerships."  Each investor in Phases I through VII became a Limited Partner.

40.     Jay Peak Management, Inc., Jay Peak GP Services, Inc., Jay Peak GP Services Golf, Inc., Jay Peak GP Services Lodge, Inc., Jay Peak GP Services Stateside, Inc., and AnC Bio Vermont GP Services, LLC are collectively referred to as the "Jay Peak General Partners."

41.     Q Burke Mountain Resort, LLC ("Q Burke LLC") wholly owns Burke 2000, LLC, which in turn owns Burke Mountain Operating Company ("BMOC").

42.     Quiros is the 100% owner of Q Burke LLC.

43.     Q Burke Mountain Resort Hotel and Conference Center, L.P. (the "Q Burke Limited Partnership" or "Phase VIII") is a Vermont limited partnership with its principal place of

business in East Burke, Vermont.   Between June 2013 and April 2016, Phase VIII raised approximately $53 million from 106 investors through an EB-5 offering of Limited Partnership interests to build a hotel with 112 rooms, a conference center and outdoor pool.

44.     Each investor in Phase VIII was a Limited Partner.

45.     Each of the Jay Peak Limited Partnerships and the Q Burke Limited Partnership are referred to as a "Limited Partnership" or collectively as the "Limited Partnerships." Each of the Jay Peak General Partners and the Q Burke General Partner are referred to as a "General Partner" or collectively as the "General Partners."

## JURISDICTION AND VENUE

46.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA") (*codified in* 28 U.S.C. §§ 1332, 1453, 1711-1715).  Diversity exists among the Plaintiffs and Defendants, there are hundreds of members of the putative Class, and the amount in controversy exceeds $5 million.  28 U.S.C. § 1332(d)(2).  In determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative Class members are aggregated.  28 U.S.C. § 1332(d)(6).

47.     This Court has personal jurisdiction over Defendants Quiros and Burstein because they are Florida citizens and residents. This Court has jurisdiction over Defendant Stenger because he participated in tortious acts committed in Florida.  This Court has jurisdiction over Raymond James because it is a Florida corporation, is doing business in Florida, and has registered with the Florida Secretary of State, or does sufficient business in Florida, has sufficient minimum contacts with Florida, or otherwise intentionally availed itself of the Florida consumer market through the promotion of its services. This Court has personal jurisdiction over People's Bank because these Defendants participated in tortious acts committed in Florida or caused damage to investors in

Florida as alleged herein, and otherwise have sufficient minimum contacts with Florida arising from the specific conduct committed in or directed to Florida alleged herein.

48.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business, engaged in misconduct, and/or may be found in this District.  Venue is also proper here because at all times relevant hereto, Plaintiffs Daccache, Hiller, Calderwood, and Pietri resided in the Southern District of Florida and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

49.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

### The Initiation of the Ponzi Scheme

50.     Jay Peak is a ski resort in the Green Mountains of Vermont, which was owned and operated by Mont Saint-Sauveur International, Inc. ("MSSI") from 1978 until mid-2008.

51.     Quiros and Stenger began negotiating with MSSI to acquire and further develop the Jay Peak resort in 2007.  Funds for the project were raised through the EB-5 Immigrant Investor Program — a program created by federal law that provides prospective immigrants the opportunity to become permanent U.S. residents by investing in U.S. enterprises that create jobs in this country. To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million (depending on the location of the project) in a commercial enterprise in which the immigrant investor invests. Once the applicant has invested, he or she may apply for a conditional green card, which is good for two years. If the investment creates or preserves at least ten jobs during those two years, the foreign applicant may apply to have the conditions removed from his or her green card. The applicant can then live and work permanently in the United States.  If too few jobs are created with

the money invested, the immigrant investor will not be able to become a permanent resident in the United States.

52.     During the first half of 2008, Quiros met with Burstein, then the South Florida Complex Administrative Manager at Raymond James, and Frank Amigo, Burstein's supervisor. During this meeting, Quiros, Burstein, and Amigo discussed a financial structure for the Limited Partnerships that they would implement to raise financing for the EB-5 Projects.  The financial structure devised by Raymond James and Burstein was contrary to what was represented in the offering materials, and the projects' actual financial structure was never disclosed in the offering materials provided to the investors or elsewhere.

**Raymond James and Burstein Improperly Allowed Quiros to Use Investor Funds to Purchase Jay Peak, Inc.**

53.     Even though Raymond James and Burstein understood from the outset that each of the Limited Partnerships would solicit funds for an EB-5 Project that was supposed to create jobs for a specific number of investors, Raymond James, through Burstein and Amigo, agreed that investors' funds would be transferred from escrow accounts at People's Bank or its predecessors to accounts at Raymond James, over which Quiros would have exclusive authority.  This would allow Quiros to control and use investors' deposits and capital contributions without any regard for what investors were told in the applicable offering materials.  Raymond James and Burstein even allowed Quiros to misuse capital contributions by the investors in Phases I and II to acquire Jay Peak, Inc. despite their awareness that funding the purchase was a prohibited use of investor funds.

54.     Burstein, Quiros, and Amigo made plans to finance the purchase of Jay Peak, Inc. from MSSI using a margin loan.  Quiros, Burstein, and Amigo discussed how the scheme would work.  Investor funds would be used to purchase Treasury bills.  Raymond James would then lend

money to Quiros using the investor money as collateral. Investors were not told their money would serve as collateral for the loans. The Treasury bills would, in fact, become collateral for the margin loan, and the margin loan would permit Quiros to borrow up to 90% of the value of the Treasury bills in the accounts of the Limited Partnerships at Raymond James.

55.     Raymond James intended to protect itself — if Quiros failed to repay the loan, Raymond James would seize the investors' collateral. Investors were not similarly protected, however. Raymond James defines margin loans as "a personal line of credit that enables you to take advantage of our low borrowing rates and use eligible securities as collateral." http://www.raymondjames.com/MRGNACC.htm. Raymond James discloses that margin loans have an elevated degree of risk in that Raymond James can appropriate the funds that have been pledged as collateral "without contacting" the account holder.

56.     Quiros, Burstein, and Raymond James were able to put their plan into action once MSSI and Q Resorts finalized the Jay Peak, Inc. stock transfer agreement on June 13, 2008. In preparation for the closing, Quiros asked MSSI representatives to open brokerage accounts at Raymond James in the names of Phases I and II. MSSI representatives agreed, and Stenger opened an account at Raymond James for Phase I on May 20, 2008. A month later, on June 20, 2008, he opened an account at Raymond James for Phase II.

57.     On June 16 and 17, 2008, in preparation for closing, MSSI authorized and People's Bank transferred $11 million in escrowed investor funds in the Phase I account at People's Bank to the Phase I account at Raymond James. Three days later, on June 20, MSSI authorized and People's Bank transferred $7 million in escrowed investor funds in the Phase II account at People's Bank to the Phase II account at Raymond James.

58.     Also on June 17, 2008, Quiros opened two accounts at Raymond James under his control for Phases I and II.  On June 23, the day of the closing, before Quiros tendered the purchase price to MSSI, MSSI transferred the $11 million in its own Phase I account at Raymond James to Quiros's Phase I account. MSSI subsequently transferred the $7 million in its Phase II account at Raymond James to Quiros's Phase II account, leaving him in total control of investor money for both phases.

59.     Stenger, as the sole principal of the General Partners for Phases I and II, should have known that the General Partner was supposed to maintain control of the investor funds. Yet he ceded control of the funds to Quiros, in violation of the Limited Partnership Agreements for Phases I and II.

60.     Raymond James and Burstein also knew that the monies in the MSSI accounts for Phases I and II were escrowed funds that could not be used by Quiros to purchase Jay Peak, Inc. On June 18, 2008, MSSI representatives wrote a letter to Burstein, copying Quiros and others, confirming that the funds in the MSSI Raymond James Suites Phase I account were investor funds and cautioning Raymond James and Burstein about the permissible use of the funds, stating:

> These funds were invested by investors in this limited partnership and must be held and/or used strictly in accordance with the limited partnership agreement, a copy of which I understand has already been provided to you. **You confirmed that these funds will not be used in any manner, including as collateral or a guarantee, to finance [Q Resorts' purchase of] the Jay Peak Resort.**" (Emphasis added).

61.     MSSI representatives further wrote to Burstein, Quiros, and others on June 18, 2008 that any money transferred to the Raymond James Hotel Phase II account similarly consisted of investor funds: "**Once again these funds may not be used in any manner, including as collateral or a guarantee, to fund the purchase of the Jay Peak Resort.**" (Emphasis added).

62.     Despite the fact that MSSI had clearly explained to Quiros and others that they could not use investor money to purchase Jay Peak, Inc., Quiros – with the assistance of Stenger, and the knowing assistance of Burstein, and Raymond James – did exactly that.  Over the next two months Quiros, through Q Resorts, would use $21.9 million of investor funds – $ 12.4 million from Phase I and $9.5 million from Phase II – to fund the vast majority of his purchase of Jay Peak, Inc.

63.     On June 23, 2008, Quiros transferred $7.6 million of Phase I investor funds from the Phase I account at Raymond James and $6 million of Phase II investor funds from the Phase II account at Raymond James to a third account that he had just opened at Raymond James in the name of Q Resorts. The same day, Quiros wired $13.544 million from the Q Resorts account to the law firm representing MSSI as partial payment for the stock purchase.

64.     Over the next three months, Quiros made four additional payments totaling $5.5 million from the Q Resorts account to the same law firm as continued payment for the stock purchase. The specific payments were $1.5 million on July 1, 2008, $1 million on August 29, 2008, $500,000 on September 5, 2008, and $2.5 million on September 26, 2008.

65.     Quiros made three additional transfers from the Q Resorts account totaling $2.9 million – $2 million on June 25, 2008, $628,684 on June 26, 2008, and $263,000 on September 3, 2008 – all to the law firm that had represented Q Resorts in the stock purchase.

66.     Quiros and Q Resorts made all of these payments improperly using investor funds. For example, to fund the $2 million June 25, 2008 payment to Q Resorts' law firm, Quiros transferred $2 million in investor funds from the Phase I account at Raymond James to the account of Q Resorts at Raymond James, from which $2 million was immediately wired to the Q Resorts' law firm. The next day Quiros arranged the transfer of just under $300,000 from each of Phase I

17

and II accounts at Raymond James to the Q Resorts account at Raymond James, which funds he used to send $628,684 to the law firm.

67.     Stenger facilitated many of these payments by transferring additional money from People's Bank to the Raymond James accounts. For example, on July l, 2008, Stenger authorized the transfer of $1 million of escrowed investor funds from the Phase I account at People's Bank to the Q Resorts account at Raymond James. The same day, he authorized the transfer of $600,000 in escrowed investor funds from the Phase II account at People's Bank to the Q Resorts account at Raymond James. Once the transfers were complete, Quiros wired $1.5 million of that money to the law firm representing MSSI.

68.     The Limited Partnership Agreements and the use of proceeds documents for Phases I and II, which offering materials were provided to all investors before they invested, prohibited such use of investor funds. For example, there was nothing in the use of proceeds document allowing Quiros or Phase I to use $12.4 million of Phase I investor money to purchase Jay Peak, Inc. Likewise, the Phase II use of proceeds document given to investors, entitled Estimated and Projected Cost of Development, showed a detailed breakdown of how Phase II would spend the $75 million it raised from investors. There was nothing in this document that allowed Quiros or Phase II to use $9.5 million of investor funds to buy Jay Peak, Inc.

69.     The Jay Peak assets have no net value.  The SEC's expert in the enforcement action puts the resort's current value at $44 million, and further reduced the value of the resort to about $41.6 million to account for repairs that need to be made to certain projects at the resort.  Jay Peak also has at least $60 million in debt.  Therefore, Jay Peak has negative value, with no funds available for investors in any phase.

70.     The use of investor funds to purchase Jay Peak, Inc. also contravened prohibitions in the Phase I and II Limited Partnership Agreements. Each agreement contained a Section 5.02, entitled "Limitations on the Authority of the General Partner." That section in each agreement prevented the General Partner from borrowing or commingling investor funds and from permitting Quiros and Q Resorts to purchase Jay Peak, Inc. without investor consent.

71.     Thus, from the outset of Quiros's involvement with Jay Peak, Inc., he — with Stenger's assistance and the knowing assistance of Raymond James, Burstein, and People's Bank — disregarded restrictions on the use of investor funds, and deployed investors' money as he saw fit.  Quiros's misappropriation and misuse of investor funds continued through each of the EB-5 Projects at issue.

**Raymond James and Burstein Used Investors' Funds from Subsequent Phases as Collateral for Margin Loans to Quiros**

72.     When Quiros opened the Raymond James Phases I and II accounts, he signed a credit agreement with Raymond James that allowed both accounts to hold margin balances — the accounts could borrow money (which would have to be paid back with interest) and hold negative cash balances.  Put another way, the accounts went into debt to Raymond James when they incurred margin balances.

73.     After purchasing Jay Peak, Inc. with margin loans from Raymond James, Quiros continued to use the Phase I and II margin accounts and therefore maintained large margin loan balances that needed to be paid down.  The credit agreement Quiros signed pledged investors' funds in both Phase I and Phase II accounts at Raymond James, as well as all of the other assets of Phase I, as collateral for any margin loans the accounts incurred.  As investors began to invest in each new offering, Quiros opened new accounts at Raymond James in the name of each Limited Partnership.  These new accounts were controlled by Quiros instead of the appropriate General

Partner. Stenger then transferred investor funds from accounts at People's Bank (initially Chittenden Trust Company) where investors had deposited their money to the accounts controlled by Quiros.

74. For example, investors in Phase III sent their investments to an escrow account at People's Bank in the name of Phase III. Stenger had signatory authority and control over that account. When the offering began, Quiros opened an account at Raymond James in the name of Phase III, over which only he had signatory authority and control. Stenger approved the transfer of those investors' $500,000 deposits from People's Bank to the Phase III Raymond James account, and People's Bank transferred those funds, thereby handing control of that money over to Quiros. Each time this happened, Stenger violated terms of the applicable Limited Partnership Agreement and caused a General Partner to breach its fiduciary duty to the investors in the Limited Partnership.

75. The processes for all subsequent phases of the EB-5 Projects worked the same way. Each time Quiros opened a new Raymond James account, he signed a new credit agreement pledging the assets of that account — in each case comprised of investor funds — as collateral for the margin loans he continued to hold at Raymond James.

76. Quiros signed a credit agreement on February 6, 2009, pledging investor funds in the Phase I and Phase II Raymond James accounts as collateral for the margin loans. He signed one on October 1, 2010, expanding the list of accounts to Phase III and Q Resorts. Quiros signed another credit agreement on February 10, 20l1, adding the account for Phase IV. He signed the next one on August 25, 2011, adding the account for Phase V. On February 28, 2012, he signed a credit agreement adding the account for Phase VI as collateral for the margin loans. And on August

5, 2013, Quiros signed another credit agreement adding the accounts for Phase VII and another Quiros entity.

77.     Quiros's establishment of the margin loans violated the terms of the written Limited Partnership Agreement applicable to each Limited Partnership.  Those agreements specifically prohibited the General Partners from encumbering or pledging investor funds as collateral without the express approval of the investors.  Furthermore, none of the offering materials that the Defendants gave to investors provided that any of the Limited Partnerships, General Partners, Quiros, Stenger, Q Resorts, or Jay Peak, Inc. could pledge investor funds as collateral for loans. In fact, the use of proceeds document in every offering, which set forth exactly how the investors' money would be spent, did not provide for use of investor funds as collateral for or to pay off margin loans.  Neither Quiros nor Stenger ever told any investors that the Limited Partnerships in which they were investing could use or were using their money in this fashion.

78.     Raymond James and Burstein helped Quiros hide the fact that investors' monies were missing from the Phases I and II accounts because Quiros had improperly used investor funds to purchase Jay Peak, Inc.  On June 25, 2008, to give the false appearance that investor funds remained in the Phase I account at Raymond James, Quiros directed Burstein and Raymond James to purchase $11 million in Treasury Bills. That $11 million purchase matched the $11 million of investor funds transferred from the Phase I account opened by MSSI at Raymond James to the Phase I account that Quiros had opened at Raymond James.  However, by this time, Quiros had transferred $7.6 million of the $11 million out of the Phase I account he had opened at Raymond James to make a partial payment for his purchase of the stock of Jay Peak, Inc., and there was only $3.4 million in investor funds left in that account. Therefore, the Phase I account opened by Quiros at Raymond James had to incur a margin loan (Margin Loan I) in the amount of $7.6 million to

buy Treasury Bills (the difference between the $3.4 million in the account and the full $11 million purchase). Under the terms of the credit agreement Quiros had signed, that $7.6 million was actually a debt to Raymond James. Thus, the Phase I investors did not have a claim to the $11 million in Treasury Bills, and the $3.4 million in investor funds still in the Phase I account were at risk of being forfeited to Raymond James in the event of a margin call.

79.     Quiros implemented a similar scheme in the Phase II account he had opened at Raymond James on the same day. On June 25, 2008, he ordered the purchase of $7 million in Treasury Bills in that account. Again, this amount matched the $7 million of investor funds transferred from the Phase II account opened by MSSI at Raymond James to the Phase II account that Quiros had opened at Raymond James. But again, Quiros already had transferred $6 million of that amount out of the account he had opened for Phase II to make another partial payment for Q Resorts' purchase of Jay Peak, Inc. There were only $1 million in investor funds left in the Phase II account opened by Quiros at Raymond James. Therefore, this Phase II account had to incur another margin loan (Margin Loan II) in the amount of $6 million to buy Treasury Bills (the difference between the $1 million in the account and the $7 million purchase). Under the terms of the credit agreement Quiros had signed, that $6 million was actually a debt to Raymond James. Phase II investors did not have a claim to the full $7 million in Treasury Bills, and the $1 million in investor funds in this Phase II account were at risk of being forfeited to Raymond James in the event of a margin call.

80.     Quiros continued to make use of the margin loans secured by the Phases I and II accounts he had opened at Raymond James to pay the remainder of the purchase price for the stock of Jay Peak, Inc. between June and September 2008.

81.     From October 2008 until February 2009, Quiros continued to maintain substantial balances on the margin loans secured by the investor funds in the Phases I and II accounts that he had opened at Raymond James, in violation of the use of proceeds documents and the Limited Partnership Agreements for these Limited Partnerships.  By February 2009, the combined margin loan balances of the two accounts had reached $23.8 million.  Stenger continued to transfer investor funds from the People's Bank Phases I and II accounts to the Raymond James accounts, which then became collateral for the margin loans.

82.     That same month, with Burstein and Raymond James' knowing assistance, Quiros consolidated the two margin loans into one (Margin Loan III), and signed a new credit agreement that continued to pledge the investor funds in the Phases I and II accounts at Raymond James to secure Margin Loan III. Over the next three years, Quiros signed the aforementioned credit agreements pledging investor funds from Phases III-VI as collateral.  He also used more than $105 million of investor funds from Phases I-V to pay down Margin Loan III, broken down as follows: approximately $2.2 million from Phase I, approximately $51.6 million from Phase II, approximately $32.5 million from Phase III, approximately $15.8 million from Phase IV, and approximately $5.6 million from s Phase V.  All of these payments were made without regard to which of the Limited Partnerships received the benefit of the advances made under Margin Loan III.  In some instances, monies advanced under Margin Loan III benefited Quiros but none of the Limited Partnerships.

83.     Margin Loan III continued to be backed by the investor funds in the Phases I and II accounts at Raymond James, putting all of these funds at risk, until February 2012.  In addition, during this same time, Quiros and Stenger commingled Phase I investor funds with funds from other Limited Partnerships dedicated to other EB-5 Projects. For example, on October 3, 2011,

Stenger authorized a transfer of $49,000 from the Phase III account at People's Bank to the Phase I account at People's Bank. And on February 23, 2012, Stenger authorized a transfer of almost $62,000 from the Phase I account to the Phase II account, both at People's Bank.

84. Because Quiros continued spending money through Margin Loan III, the balance for this loan remained at approximately $23 million in February 2012. On February 24, 2012, Quiros transferred approximately $22.4 million of investor funds from the Q Resorts account at Raymond James to pay off the $23.4 million balance. The $22.4 million of investor funds is broken down as follows: approximately $5.8 million of this amount came from Phase VI and approximately $16.6 million from Phase V.

85. However, just four days after paying off Margin Loan III, on February 28, 2012, Quiros opened yet another margin loan account in the name of Jay Peak, Inc. at Raymond James (Margin Loan IV), again with the knowing assistance of Burstein and Raymond James. This time, he signed a credit agreement pledging investor funds in the Raymond James accounts for Phases V and VI as collateral for the margin loan balance. In August 2013, he added the accounts of Jay Construction Management, Inc. ("JCM"), another entity controlled by Quiros, and Phase VII, and reconfirmed the account of Q Resorts to a new credit agreement.

86. From February 2012 through March 2014, Quiros used more than $6.5 million of investor funds from Phases V-VI towards paying down Margin Loan IV. However, because Quiros charged approximately $25.5 million on Margin Loan IV for various project-related and non-project expenses, the Margin Loan IV balance was approximately $19.4 million in February 2014.

87. On April 12, 2013, Quiros transferred $3 million in investor funds from the Phase VII account at Raymond James to his wholly owned corporation, GSI of Dade County, Inc.

("GSI").  Six weeks later, on May 30, 2013, he used $2.2 million of that money to buy a luxury condominium at Trump Place in New York City.  From June 2013 to July 2014, Quiros transferred another $5.5 million in investor funds from the Phase VII account at Raymond James to GSI, through North East Contract Services, LLC ("NECS"), a company controlled by Quiros's long-time business associate, William Kelly.

88.     Between March and June of 2013, Quiros transferred $4.2 million from the Phase VII account to pay corporate taxes to the State of Vermont and the IRS for JCM, even though Phase VII was in no way responsible for these tax liabilities.

89.     Raymond James then demanded that Quiros pay off Margin Loan IV.  In response, on March 5, 2014, Quiros transferred approximately $18.2 million of investor funds derived from a Phase VII account at People's Bank, which he used as part of a $19 million pay-off of Margin Loan IV. Quiros took funds from the Phase VII account at Raymond James and sent them to People's Bank, which transmitted the funds to the JCM account that Quiros had opened at Raymond James.  Quiros then withdrew the money from the JCM account at Raymond James to pay off Margin Loan IV.  The $19 million that went to pay off Margin Loan IV at Raymond James should have been spent on the EB-5 Project for Phase VII as intended. The pay-down and pay-off of this margin loan were major contributors to the shortfall in Phase VII.

90.     The margin loans at Raymond James operated from 2008 to 2014, when Raymond James closed the accounts for the Limited Partnerships.  During this seven-year period, the margin loans were always collateralized by investors' funds.

### The Jay Peak/Q Burke Offering Materials

91.     Quiros and Stenger produced and adopted standardized offering materials for the EB-5 Projects — including an offering memorandum, subscription documents, business plan, and Limited Partnership Agreement — which were designed to conceal their fraudulent scheme and lull investors into believing that their investments were legitimate.  The offering materials were given to every investor and described the particular project in which they were investing, the purpose for which their investment would be used, and touted the likely success of the project. The offering materials uniformly failed to disclose the ways in which Quiros intended to and actually did use the money invested in the projects.

92.     Stenger reviewed, was responsible for, and had authority over the contents of the offering materials for all of the Limited Partnerships.  Quiros also reviewed all of the offering materials and approved their contents.

93.     The offering materials for each of the Limited Partnerships stated that the monies invested by investors would be used by each of the Limited Partnerships to purchase real estate, construct a specific improvement or set of improvements, and then operate the improvements once built.

94.     None of the offering materials disclosed that the monies invested in the Limited Partnerships were being and would be misused and commingled by Quiros, with Stenger's assistance.  Further, there was no disclosure that Quiros considered himself free to, or that Quiros and Stenger did, transfer investor funds to accounts controlled by Quiros at Raymond James, or that Raymond James would and did establish these accounts to facilitate the misuse and commingling of investor funds.  Nor was there any disclosure that an investment in one Limited

Partnership could be used for an EB-5 Project undertaken by another Limited Partnership, or for Quiros's personal financial gain.

95.     The offering materials for each EB-5 Project represented that the project would generate an annual return once completed and operating.   Further, the offering materials anticipated that the investors would receive cash from the sale of the improvement or a fractional interest in the improvement once the Limited Partnership's specific EB-5 Project was completed and permanent green cards were obtained.

96.     Among the documents included in each business plan was one showing the projected cost of each project and the specific allocation of investor funds.   These "Use of Proceeds" documents detailed exactly how each Limited Partnership would spend all investor funds raised for the Limited Partnership to pay for land acquisition, site preparation, and construction.   None of the use of proceeds documents stated that the sponsors considered themselves free to apply the funds invested in one Limited Partnership to another Limited Partnership or commingle such funds with the monies invested for another Limited Partnership or use the funds to pay Quiros's personal expenses; and none of the use of proceeds documents for later offerings stated that the sponsors had actually applied funds from later Limited Partnerships to earlier Limited Partnerships, commingled funds among Limited Partnerships and used funds for payment of Quiros's personal expenses.

97.     The offering materials for each of the Limited Partnerships included a written Limited Partnership Agreement.   These agreements restricted the use of investor money.   Each Limited Partnership Agreement prevented the General Partner, without consent of the Limited Partners in each Limited Partnership, from: (1) borrowing from or commingling investor funds; (2) acquiring any property with investor funds that does not belong to the Limited Partnership,

other than as specifically authorized in the agreement; or (3) mortgaging, conveying or encumbering Limited Partnership property that was not real property.

98.     Defendants' conduct, as alleged above, violated the letter and spirit of the offering materials for each EB-5 Project.  By signing the subscription agreements included in the offering materials, each investor affirmed that he or she had reviewed the materials and relied upon their contents.

**Escrow Accounts at People's Bank**

99.     Also among the offering materials given to investors was an Escrow Agreement with People's Bank (initially Chittenden Trust Company, later People's United Bank).  In order to purchase a Limited Partnership interest in any phase, each investor was required to (1) enter into an Escrow Agreement; and (2) transfer funds to People's Bank, with $500,000 as the Limited Partnership investment and an additional sum, usually $50,000, for administrative fees.

100.     The Escrow Agreements and the offering materials provided that People's Bank would release the escrowed funds to the specific limited partnership in which the investor had purchased an interest, not to another limited partnership or to Quiros, and only for development of the particular EB-5 Project applicable to that specific limited partnership, not for use by another limited partnership or by Quiros.

101.     Each investor in the Limited Partnerships, including Plaintiffs, deposited these funds into a People's Bank escrow account corresponding to the specific EB-5 Project in which the investor was participating.  People's Bank's involvement as escrow agent for the investments lent the scheme an air of legitimacy and helped to convince investors that their funds were secure. Indeed, each time an investor wired money to People's Bank, the confirmation identified the beneficiary of the wire as the specific limited partnership to which the investor had contributed

funds, not Quiros or any other person or entity.  Stenger, on behalf of the appropriate General Partner for the Limited Partnership to which the investor was contributing funds, was the signatory on each of the accounts at People's Bank and was the person who routinely authorized the transfer of funds into and out of the escrow accounts.

102.    People's Bank was obligated to act diligently under applicable federal regulations to protect against money laundering and to protect the interests of the investors.  The stated purpose of the escrow arrangement was to hold investor funds "for the benefit" of investors and the Limited Partnerships are recognized as third-party beneficiaries of the escrow arrangement.

103.    People's Bank was obligated to make the funds available for the EB-5 Project, as specified in the offering materials for the limited partnership in which the investor was investing, not the EB-5 Project of another limited partnership or personal expenses of Quiros.

### The Transfer of Escrowed Funds to Raymond James

104.    Quiros and Stenger did not, however, fund the projects through People's Bank.  Instead, People's Bank released the investor funds held in escrow to a Raymond James brokerage account, initially in the name of the EB-5 Project that the investor had chosen.

105.    Quiros opened the Raymond James accounts through Burstein, a Raymond James Vice President who was also Quiros's son-in-law at the time.  Upon transfer of the funds from People's Bank to Raymond James, Quiros exercised complete control over the funds.

106.    The Phase I, Phase II, and Phase III offering materials provided that the General Partners could only hold investor funds in *bank* accounts, and the Phase I and II documents required the transferee bank accounts to be "insured by an agency of the federal government."  As a brokerage firm, Raymond James is neither a bank nor is FDIC-insured.  Thus, with respect to these phases, the transfer of investor funds from the escrow accounts at People's Bank in Vermont to

the accounts at Raymond James was expressly prohibited by the offering materials, and People's Bank had knowledge of this restriction as the offering materials were expressly referenced in the Escrow Agreements.

107.   The transfers from the escrow accounts held by People's Bank to the Raymond James accounts not only facilitated the improper commingling of investor funds, but also alerted People's Bank that the transfers were fraudulent or otherwise impermissible by releasing funds held for investment in one phase of an EB-5 Project to a brokerage account designated for another phase of an EB-5 Project.  For example:

- On June 16 and 17, 2008, in two separate transactions, MSSI transferred $11 million from the Phase I Escrow Account at People's Bank to an MSSI Phase I account at Raymond James. MSSI then transferred the funds from the Phase I account at Raymond James to Quiros's Phase I account at Raymond James.

- On June 20, 2008, MSSI transferred $7 million from the Phase II Escrow Account at People's Bank to the MSSI Phase II account at Raymond James. MSSI then transferred the funds from the Phase II account at Raymond James to Quiros's Raymond James account.

- On July 1, 2008, $1 million was transferred from the Phase I escrow account at People's Bank to the Q Resorts account at Raymond James.

- On July 1, 2008, $600,000 was transferred from the Phase II escrow account at People's Bank to the Q Resorts account at Raymond James.

- On September 4, 2008, $1 million was transferred from the Phase II Escrow Account at People's Bank to the Phase II Investor account at Raymond James.

- On September 15, 2008, $3 million was transferred from the Phase II Escrow Account at People's Bank to the Phase II Investor account at Raymond James.

- On September 22, 2008, $1.5 million was transferred from the Phase II Escrow Account at People's Bank to the Phase II Investor account at Raymond James.

- On October 3, 2011, $49,000 was transferred from the Phase III escrow account at People's Bank to the Phase I investor account at People's Bank.

- On February 23, 2012, $62,000 was transferred from the Phase I escrow account at People's Bank to the Phase II investor account at People's Bank.

108.    People's Bank knew that these and other transfers were improper because the Limited Partnership Agreement for each Limited Partnership required that upon release of an investor's capital contributions to a Limited Partnership the investment was to be "immediately and irrevocably" committed to the EB-5 Project.  Thus, there were many red flags that alerted People's Bank to illegal conduct in the administration and use of investor funds, including, but not limited to, the significant number of transfers in and out of the People's Bank escrow accounts to effect commingling of partnership funds and transfers to a non-bank.

**Improprieties Relating to Q Burke**

109.    Phase VIII was established to raise EB-5 investor funds, purportedly to purchase approximately three acres of land at the Q Burke ski resort area and to develop the hotel and other facilities on the property.  As of September 30, 2015, Phase VIII had raised approximately $53.5 million from foreign investors to purchase the land and construct the hotel, among other facilities. The offering materials for Phase VIII specifically provide that Q Burke, the entity through which Quiros acquired the Burke Mountain ski resort, was to contribute $3.155 million towards the build-out of the hotel in exchange for two commercial units in the hotel. This contribution was never made; instead, funds invested in Phase VIII were applied to cover Q Burke's obligation to fund the construction.

110.    In or around March 2015, Quiros engaged in a series of intercompany transactions whereby investor funds from Phase VIII were used to collateralize a $15 million line of credit from Citibank. Specifically, $2.47 million was wired from Phase VIII to another entity owned by Quiros, who, in turn, wired the money to NECS and thereafter to JCM. Those funds were commingled with approximately $10.5 million raised in an earlier offering and ultimately used to secure a $15 million personal line of credit for Quiros. The personal line of credit was used to pay,

31

among other things: (1) Quiros's personal income taxes; (2) payments to Limited Partners of unrelated prior offerings; (3) costs of Jay Peak operations; and (4) Phase VI construction costs.

111.    Between October 2013 and June 2015, approximately $1,213,626 was wired from Phase VIII to JCM and approximately $3.4 million to NECS.  Those funds were utilized to pay expenses not associated with Phase VIII or were commingled with funds from the earlier Limited Partnerships and were used, in part, to pay for construction expenses associated with Phases V and VI.

112.    Q Burke's wholly owned subsidiary, BMOC, regularly received funds flowing through related companies to fund operating shortfalls and pay expenses for the hotel on behalf of Phase VIII. Although BMOC recorded these transactions, in excess of $5 million, as inter-company loans payable to Q Burke, the funds in many cases came from GSI.

113.    These transfers make it clear that the Q Burke Entities were yet another vehicle used by Defendants Quiros, Burstein, and Raymond James to engage in a series of complicated and convoluted transactions aimed at carrying out their scheme to misuse, commingle, and steal investor money.

**Raymond James and Burstein Concealed the Fraud**

114.    From 2008 through 2014, Raymond James and Burstein helped Quiros conceal the fraud facilitated by the financial structure that they had designed and implemented for Quiros.

115.    Initially, in 2008 or 2009, employees and agents of Jay Peak, Inc. and the General Partners were able to review monthly statements for the accounts of the Limited Partnerships at Raymond James.

116.    Once these employees and agents of the Limited Partnerships began to question in 2009 what appeared to be a pattern of commingling depicted in the monthly statements, Quiros

told Burstein and Raymond James to cease providing access to the monthly statements to these individuals, making it far more difficult for them to detect the extent of the rampant commingling of assets and liabilities of the Limited Partnerships.

117.    Burstein and Raymond James willingly followed Quiros's instruction, refusing to provide monthly account statements to these employees and agents, including, for example, the controller for Jay Peak, Inc.  Eventually, the initial controller concluded he could no longer perform his treasury function and resigned.

118.    Similarly, the controller from 2010-2011, like his predecessor, reported that he too was denied access to monthly statements for the accounts of the Limited Partnerships at Raymond James.  Nevertheless, the second controller still deduced that the assets and liabilities of Phase I and II were commingled based upon monthly statements he had received for the bank account of Phase I at People's Bank.  This controller noticed and was disturbed by large transfers from the Phase II to the Phase I Raymond James' account.  The second controller brought this information to the attention of and sought clarification from multiple persons, including, without limitation, Burstein, but this inquiry was ignored. Eventually, the second controller also concluded that he could no longer perform his treasury function and resigned.

119.    In or about 2011, Quiros opened an account for JCM at Raymond James.  The JCM account was one of the non-segregated, pooled accounts that was used to commingle funds among the Limited Partnerships, and to pay vendors for goods and services unrelated to the Limited Partnership.  The intricate web of transactions involving JCM was another way that Raymond James obfuscated and concealed the commingling of funds belonging to the different Limited Partnerships.

120.     Burstein and the Anti-Money Laundering Department at Raymond James discussed the impropriety of this arrangement based upon the large volume of transactions that were being generated in the account of JCM.  Raymond James decided to facilitate the continued commingling of the assets and liabilities of the Limited Partnerships, so long as an invoice was obtained for each payment, but without any regard from which Limited Partnership the invoice was paid, thus turning a blind eye to the commingling of funds.

## Raymond James and Burstein Profited from Quiros's Fraud.

121.     Raymond James' and Burstein's roles in commingling funds belonging to investors, and in helping Quiros misappropriate investor funds, were active and substantial.  Both Raymond James and Burstein knew that Quiros's scheme was fraudulent, in part because the high number of transactions in the accounts of the Limited Partnerships at Raymond James was out of the ordinary and raised red flags that alerted Raymond James and Burstein to the fraudulent scheme.

122.     As described above, Raymond James and Burstein also played active and instrumental roles in the scheme by, among other things: (1) allowing Quiros to use investor funds that Raymond James knew Quiros was not supposed to use to buy Jay Peak, Inc. from MSSI; (2) setting up margin loans that permitted Quiros to commingle and steal investors' funds from the Limited Partnerships' accounts at Raymond James; and (3) giving carte blanche to Quiros to do whatever he wanted with the investor funds in the Limited Partnerships' accounts, including paying himself and paying off both a $23 million margin loan and a $19 million margin loan to Raymond James.

123.     In return, Raymond James and Burstein made substantial profits.  Raymond James' interest profits on the margin loans were high because Quiros and Raymond James had executed margin loans in amounts as high as $23 million. Raymond James earned more than $2 million in

interest on the margin loans on the Limited Partnership accounts.  Burstein shared in these profits in his capacity as Miami Branch Manager and Vice President of Investments of Raymond James' South Florida Complex.

### Applicable Banking Regulations

124.    People's Bank, Raymond James, and Burstein knowingly violated federal banking regulations by their conduct relating to the Jay Peak and Q Burke scheme.  Banks are required under federal law to know their customers and understand their banking behavior.  Under relevant banking regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer."  31 C.F.R. § 1020.220(a)(1), (2).  In order to do so, banks are required to collect information about the holder of each account.  Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

125.    The Financial Industry Regulatory Authority ("FINRA") likewise imposes know your customer requirements on its registered members, including Raymond James and Burstein, and mandates "reasonable diligence, in regard to the opening and maintenance of every account," including the obligation "to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer."

126.    Both People's Bank and Raymond James are bound to comply with the Bank Secrecy Act ("BSA"), a federal statute designed to detect and prevent money laundering.  Raymond James must also comply with the Florida Control of Money Laundering and Terrorist Financing in Financial Institutions Act, Fla. Stat. § 644.50.

127.    In accordance with their federal and state regulatory compliance obligations, banks must develop, administer, and maintain a program that ensures compliance with the BSA.  The

35

program must be approved by the bank's board of directors and noted in the board meeting minutes.  It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance; (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

128.     Banks must develop a customer due diligence program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and which provides the bank with a way to identify unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

129.     Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid.  Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

130.     Banks must also identify a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA.  The compliance officer must designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

131.     The federal government established the Federal Financial Institutions Council ("FFIEC") in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions.  The FFIEC's Bank Secrecy Anti-Money Laundering Manual contains an overview of BSA and anti-money laundering compliance program

requirements, risks and risk management expectations, industry sound practices, and examination procedures. The FFIEC manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies such as the Federal Reserve, Federal Deposit Insurance Corporation (FDIC), and the Office of the Comptroller of Currency. *See* FFIEC BSA/AML Examination Manual p. 5 (2010).

132.    Banks must also ensure that their employees follow BSA guidelines. Banks make compliance a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations. Accordingly, banks are required to train all personnel whose duties may require knowledge of the BSA on the requirements under the BSA.

133.    Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual, including: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the accountholder's business; (4) transfers of funds among related accounts; (5) loans that are secured by account deposits; (6) loans that lack a legitimate business purpose, provide the bank with excessive fees for assuming little or no risk, or obscure movement of funds; and (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities.

### Raymond James' Failure to Timely Comply with FINRA Requirements

134.    In or about October 2013, FINRA reviewed the accounts at Raymond James for the Limited Partnerships and the margin loans. FINRA objected to the cross-collateralization of these accounts to secure the multi-purpose margin loans that Quiros began using in 2008.

135.    Because the financial structure that the Defendants designed and implemented commingled assets and liabilities of separate entities without any regard for the rights of investors, FINRA insisted that Raymond James put an end to the multi-purpose, cross-collateralized margin loans.

136.    Burstein and other Raymond James managers and senior employees learned of FINRA's objection.

137.    Despite the managers' involvement, it was not until months later, in or about March 2014, that Raymond James took any action in response to FINRA's directive.  At that time, Raymond James permitted Quiros to pay off the outstanding balance of Margin Loan IV without making any effort to reverse the commingling that the Defendants had designed and implemented over the preceding six-year period.

138.    Instead of reversing the commingling, Raymond James allowed Quiros to use $18.2 million of capital contributions from the Limited Partners in Phase VII and other funds to pay off Margin Loan IV.

139.    In May 2016, FINRA brought disciplinary proceedings against Raymond James, alleging violations of various Anti-Money Laundering regulations with regard to various transactions, including transactions relating to the EB-5 Projects.  FINRA charged that Raymond James "allowed certain red flags of potentially suspicious activity to go undetected or inadequately investigated."  Raymond James agreed to pay an $8 million fine to FINRA.  In connection with the fine, Raymond James entered into a Letter of Acceptance, Waiver and Consent to FINRA's charges that Raymond James' "failure to reasonably monitor journaling between accounts, combined with its failure to reasonably monitor incoming wires and inadequate investigation of

red flags" raised in the handling of an account held by JCM, constituted a violation of FINRA regulations.

<u>**Plaintiffs' Investments in the Jay Peak and Q Burke Scheme**</u>

140.    Plaintiffs Daccache, Hiller, Calderwood, Pietri, Casseres-Pinto, Wang, Calderwood, Shaw, Eijmberts, and Morris sustained damages as a result of their investments in the Jay Peak and Q Burke scheme.  The details of each Plaintiff's investment follow.

*Alexandre Daccache*

141.    On or about July 13, 2010, Mr. Daccache entered into a subscription agreement for purchase of a Limited Partnership interest in Phase III.

142.    On July 13, 2010, Mr. Daccache executed an investor escrow agreement between himself and People's Bank.

143.    On or about July 28, 2010, Mr. Daccache paid $550,000 to the Phase III escrow account at People's Bank d/b/a Chittenden Trust Company for the purchase of one Limited Partnership unit in Phase III, of which $50,000 went toward an administrative fee.

144.    In making this investment, Mr. Daccache reviewed and relied on the offering materials for this investment.

145.    The business plan for Phase III stated that the investment made by Mr. Daccache would be used to build the Penthouse Phase III suites.

146.    The Limited Partnership Agreement for Phase III stated that: (i) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts at "with such bank or banks as shall be determined by the General Partner" in the name of the Limited Partnership, which accounts were to be controlled by the General Partner; (iii) the General Partner would not borrow from the funds

of the Limited Partnership; and (iv) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

147.    Nowhere did the offering materials provided to Mr. Daccache disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

148.    On October 5, 2010, Phase III issued a certificate to Mr. Daccache to evidence his purchase of a Limited Partnership interest in the Limited Partnership.

149.    Mr. Daccache first learned that the SEC was investigating the Jay Peak and Q Burke Projects in November 2015, but learned for the first time of the SEC's Enforcement Action and that Phase III was a "Ponzi" scheme in April 2016.

150.    Mr. Daccache has been damaged in that all or a portion of the funds that he invested in Phase III were misused, commingled, and used as collateral for margin loans.

151.    There are no material differences between these Defendants' actions and practices directed to Mr. Daccache and their actions and practices directed to the Class.

### *Carlos Enrique Hiller Sanchez*

152.    On or about April 17, 2013, Mr. Hiller made a refundable deposit of $10,000 into an escrow account at People's Bank to purchase a Limited Partnership unit in Phase VII.

153.    On or about May 14, 2013, Mr. Hiller entered into a subscription agreement for purchase of a Limited Partnership interest in Phase VII.

154.    On or about May 14, 2013, Mr. Hiller executed an investor escrow agreement between himself and People's Bank, and paid $540,000 into an escrow account at People's Bank, which was the balance of the purchase price and the administrative fee for one Limited Partnership unit in Phase VII.

155.    In making this investment, Mr. Hiller reviewed and relied on the offering materials for this investment.

156.    The business plan for Phase VII stated that Mr. Hiller's investment would be used to build a "world class" biomedical research facility with clean rooms, a sterile environment, and high-tech equipment for scientists' research efforts.

157.    The Limited Partnership Agreement for Phase VII stated that: (a) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (b) investors' funds would be deposited into accounts with banks or financial institutions in the name of the Limited Partnership, which would be controlled by the General Partner; (c) the General Partner would not borrow the funds of the Limited Partnership; and (d) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the finds of another person.

158.    Nowhere did the offering materials provided to Mr. Hiller disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

159.    On May 17, 2013, Phase VII issued a certificate to Mr. Hiller to evidence his purchase of a Limited Partnership interest in Phase VII.

160.    On or around April 15, 2016, Mr. Hiller learned for the first time of the SEC's enforcement action and that Phase VII in which he invested was part of a Ponzi scheme.

161.    Mr. Hiller has been damaged in that all or a portion of the funds that he invested in Phase VII were misused, commingled, and used as collateral for margin loans.

162.    There are no material differences between these Defendants' actions and practices directed to Mr. Hiller and their actions and practices directed to the Class.

*Philip Calderwood*

163.    On or about July 16, 2008, Mr. Calderwood wired the sum of $50,000 to an escrow account at Chittenden Trust Company to purchase a Limited Partnership unit in Phase II.

164.    On or about July 17, 2008, Mr. Calderwood wired $500,000 to an escrow account at Chittenden Trust Company.

165.    These sums constituted the purchase price and the administrative fee for his Limited Partnership unit in Phase II.

166.    In making this investment, Mr. Calderwood reviewed and relied on the offering materials for this investment.

167.    The business plan for Phase II stated that the investment made by Mr. Calderwood would be used to build particular facilities and amenities in connection with the Phase II project.

168.    The Limited Partnership Agreement for Phase II stated that: (i) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts "with such bank or banks whose deposits are insured by an agency of the federal government," in the name of the Limited Partnership, which accounts were to be controlled by the General Partner; (iii) the General Partner would not borrow from the funds of the Limited Partnership; and (iv) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

169.    Nowhere did the offering materials provided to Mr. Calderwood disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

170.    In or about April 2016, Mr. Calderwood learned for the first time of the SEC's Enforcement Action and that Phase II in which he had invested was a "Ponzi" scheme.

42

171.     Mr. Calderwood has been damaged in that all or a portion of the funds that he invested in Phase II were misused, commingled, and used as collateral for margin loans.

172.     There are no material differences between these Defendants' actions and practices directed to Mr. Calderwood and their actions and practices directed to the Class.

### Jose Antonio Pietri

173.     On or about June 19, 2013, Mr. Pietri made a refundable deposit of $10,000 to an escrow account at People's Bank to purchase a Limited Partnership unit in Phase VII.

174.     On or about August 15, 2013, Mr. Pietri wired $550,000 to an escrow account at People's Bank, which was the purchase price and the administrative fee for one Limited Partnership unit in Phase VII.

175.     Thereafter, at his request, Mr. Pietri's initial deposit of $10,000 was returned to him.

176.     In making this investment, Mr. Pietri reviewed and relied on the offering materials for this investment.

177.     The business plan for Phase VII stated that the investment made by Mr. Pietri would be used to build a "world class" biomedical research facility with clean rooms in a sterile environment and high-tech equipment that scientists need for research efforts.

178.     The Limited Partnership Agreement for Phase VII stated that: (i) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts with banks or financial institutions in the name of the Limited Partnership, which accounts were to be controlled by the General Partner; (iii) the General Partner would not borrow from the funds of the Limited Partnership; and (iv) the

General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

179.    Nowhere did the offering materials provided to Mr. Pietri disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

180.    On or about April 22, 2016, Mr. Pietri learned for the first time of the SEC's Enforcement Action and that Phase VII in which he had invested was a "Ponzi" scheme.

181.    Mr. Pietri has been damaged in that all or a portion of the funds that he invested in Phase VII were misused, commingled, and used as collateral for margin loans.

182.    There are no material differences between these Defendants' actions and practices directed to Mr. Pietri and their actions and practices directed to the Class.

### *Tongyi Wang*

183.    On or about December 4, 2015, Mr. Wang made a refundable deposit of $10,000 to an escrow account at People's Bank to purchase a Limited Partnership unit in Phase VIII.

184.    Soon thereafter, on December 9, 2015, Mr. Wang wired $515,000 to an escrow account at People's Bank, which was the balance of the purchase price and the administrative fee for his Limited Partnership unit.

185.    In making this investment, Mr. Wang reviewed and relied on the offering materials for this investment.

186.    The Limited Partnership Agreement for Phase VIII stated that: (a) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (b) investors' funds would be deposited into accounts with banks or financial institutions in the name of the Limited Partnership, which would be controlled by the General Partner; (c) the General Partner would not borrow the funds of the Limited Partnership; and (d)

the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the finds of another person.

187.     Nowhere did the offering materials provided to Mr. Wang disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

188.     Mr. Wang has been damaged in that all or a portion of the funds that he invested in Phase VIII were misused, commingled, and used as collateral for margin loans.

189.     There are no material differences between these Defendants' actions and practices directed to Mr. Wang and their actions and practices directed to the Class.

### Jose Casseres-Pinto

190.     On or about January 25, 2013, Dr. Casseres-Pinto made a refundable deposit of $10,000 to an escrow account at People's Bank to purchase a Limited Partnership unit in Phase VII.

191.     On or about February 11, 2013, Dr. Casseres-Pinto wired $550,000 to the "Jay Peak Biomedical Research Park" account at People's Bank, for the purchase of one Limited Partnership unit in Phase VII, of which $50,000 went toward an administrative fee.

192.     In making this investment, Mr. Casseres-Pinto reviewed and relied on the offering materials for this investment.

193.     The business plan for Phase VII stated that Dr. Casseres-Pinto's investment would be used to build a "world class" biomedical manufacturing and research facility with "clean room" spaces and sophisticated equipment for scientists' research efforts.

194.     The Limited Partnership Agreement for Phase VII stated that: (a) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (b) investors' funds would be deposited into accounts with banks or financial

45

institutions in the name of the Limited Partnership, which would be controlled by the General Partner; (c) the General Partner would not borrow from the funds of the Limited Partnership; and (d) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of any other person or entity.

195.    Nowhere did the offering materials provided to Dr. Casseres-Pinto disclose that his funds would be allocated for purposes not authorized by the Limited Partnership Agreement.

196.    In April 2016, Dr. Casseres-Pinto first learned of the SEC's enforcement action and that Phase VII project in which he invested was part of a Ponzi scheme.

197.    Dr. Casseres-Pinto has been damaged in that all or a portion of the funds that he invested in Phase VII were misused, commingled, and used as collateral for margin loans.

198.    There are no material differences between these Defendants' actions and practices directed to Dr. Casseres-Pinto and their actions and practices directed to the Class.

### *James B. Shaw*

199.    On or around May 7, 2010, Mr. Shaw wired $550,000 to an escrow account at Chittenden Trust Company, which was the purchase price and the administrative fee for one Limited Partnership unit in Phase II.

200.    In making this investment, Mr. Shaw reviewed and relied on the offering materials for this investment.

201.    The business plan for Phase II stated that the investment made by Mr. Shaw would be used to build particular facilities and amenities in connection with the Phase II project.

202.    The Limited Partnership Agreement for Phase II stated that: (i) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts "with such bank or banks whose

deposits are insured by an agency of the federal government," in the name of the Limited Partnership, which accounts were to be controlled by the General Partner; (iii) the General Partner would not borrow from the funds of the Limited Partnership; and (iv) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

203.    Nowhere did the offering materials provided to Mr. Shaw disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

204.    In April 2016, Mr. Shaw learned for the first time of the SEC's Enforcement Action and that Phase II in which he had invested was a "Ponzi" scheme.

205.    Mr. Shaw has been damaged in that all or a portion of the funds that he invested in Phase II were misused, commingled, and used as collateral for margin loans.

206.    There are no material differences between these Defendants' actions and practices directed to Mr. Shaw and their actions and practices directed to the Class.

### *Johannes Eijmberts*

207.    On or about March 12, 2012, Mr. Eijmberts wired $530,000 to an escrow account at People's Bank, which was the purchase price and the administrative fee for one Limited Partnership unit in Phase VI.

208.    In making this investment, Mr. Eijmberts reviewed and relied on the offering materials for this investment.

209.    The business plan for Phase VI stated that the investment made by Mr. Eijmberts would be used to build particular facilities and amenities in connection with the Phase VI project.

210.    The Limited Partnership Agreement for Phase VI stated that: (i) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5

program; (ii) the monies would be deposited into accounts at banks or financial institutions in the name of the Limited Partnership, which accounts were to be controlled by the General Partner; (iii) the General Partner would not borrow from the funds of the Limited Partnership; and (iv) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

211.    Nowhere did the offering materials provided to Mr. Eijmberts disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

212.    In April 2016, Mr. Eijmberts learned for the first time of the SEC's Enforcement Action and that Phase VI in which he had invested was a "Ponzi" scheme.

213.    Mr. Eijmberts has been damaged in that all or a portion of the funds that he invested in Phase VI were misused, commingled, and used as collateral for margin loans.

214.    There are no material differences between these Defendants' actions and practices directed to Mr. Eijmberts and their actions and practices directed to the Class.

*Lorne Morris*

215.    On or about January 30, 2012, Mr. Morris wired a refundable deposit of $10,000 to an escrow account at People's Bank, to purchase a Limited Partnership unit in Phase VI.

216.    On or about March 8, 2012, Mr. Morris wired $525,000 to an escrow account at People's Bank, which was the balance of the purchase price and the administrative fee for one Limited Partnership unit in Phase VI.

217.    In making this investment, Mr. Morris reviewed and relied on the offering materials for this investment.

218.    The business plan for Phase VI stated that the investment made by Mr. Morris would be used to build particular facilities and amenities in connection with the Phase VI project.

48

219.     The Limited Partnership Agreement for Phase VI stated that: (i) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts at banks or financial institutions in the name of the Limited Partnership, which accounts were to be controlled by the General Partner; (iii) the General Partner would not borrow from the funds of the Limited Partnership; and (iv) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

220.     Nowhere did the offering materials provided to Mr. Morris disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

221.     In April 2016, Mr. Morris learned for the first time of the SEC's Enforcement Action and that Phase VI in which he had invested was a "Ponzi" scheme.

222.     Mr. Morris has been damaged in that all or a portion of the funds that he invested in Phase VI were misused, commingled, and used as collateral for margin loans.

223.     There are no material differences between these Defendants' actions and practices directed to Mr. Morris and their actions and practices directed to the Class.

## TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

224.     Plaintiffs and Class members did not and could not have discovered the facts constituting Defendants' violations until the SEC and Vermont Department of Financial Regulations complaints were made available to the public on April 14, 2016.

225.     Defendants concealed Quiros's wrongdoing, and Stenger's assistance therein, by carrying out the complex series of transactions through which Plaintiffs' funds were misappropriated, commingled, and misused.

226.     Plaintiffs learned of the actions of Quiros, Stenger, People's Bank, Raymond James, and Burstein — directly or indirectly — through the SEC and Vermont actions and media coverage about them.  Plaintiffs then retained counsel.

227.     Because Plaintiffs and the Class could not have reasonably discovered the facts constituting Defendants' violations until April 14, 2016, their claims accrued on that date and any applicable statutes of limitation were tolled until that date.

## CLASS ACTION ALLEGATIONS

228.     Plaintiffs bring this lawsuit as a Class action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).

229.     The Class is defined as:

> All persons who invested in the Limited Partnerships. Excluded from this Class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

230.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

231.     The Class satisfies the requirements of Rule 23(a), as well as 23(b)(3).

232.     Numerosity.   The Class consists of more than 800 geographically dispersed individuals.  Joinder of the Class members is not practicable.  The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

233.     Ascertainability. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by the Jay Peak and Q Burke Projects. Notice of this action can thus be provided to all members of the proposed Class.

234.  <u>Typicality.</u>  Plaintiffs were investors in the Jay Peak and Q Burke Projects at the time of the wrongdoing alleged herein.  Plaintiffs' claims are typical of the claims of all Class members as all Class members are similarly affected by Defendants' wrongful conduct as complained of herein.

235.  <u>Adequacy.</u>  Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class action litigation, including litigation relating to investment fraud. Plaintiffs have no interests antagonistic to or in conflict with other members of the Class.

236.  <u>Commonality and Predominance.</u>  Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class.  The questions of law and fact common to the Class include, but are not limited to:

a.  Whether the offering materials approved for each of the Limited Partnerships were fraudulent;

b.  Whether the other Defendants knew that the offering materials for each of the Limited Partnerships were fraudulent and substantially assisted the fraud that was carried out against the investors;

c.  Whether Quiros, Raymond James, and Burstein  knew of the Jay Peak and Q Burke General Partners' breaches of fiduciary duties to the investors in the Limited Partnerships;

d.  Whether Quiros, Raymond James, and Burstein  provided substantial assistance to the General Partners or encouraged their wrongdoing;

e.  Whether Quiros, Raymond James, and Burstein  had knowledge that their conduct would assist the General Partners in breaching their fiduciary duties to the investors in the Limited Partnerships;

f.  Whether Quiros, Raymond James, and Burstein conspired to advance the General Partners' breaches of fiduciary duty, and if so, whether these Defendants committed overt acts in furtherance of their conspiracy;

g.    Whether, in the alternative, Stenger owed a duty of care to each Limited Partnership, and breached that duty causing damages to the Plaintiffs and the Class;

h.    Whether People's Bank owed a duty of care to each investor in the Limited Partnerships, and breached that duty by negligently facilitating transfers to and from the Raymond James accounts controlled by Quiros, causing damages to the Plaintiffs and the Class;

i.    Whether People's Bank owed a fiduciary duty to each investor in the Limited Partnerships, and breached that duty by facilitating transfers to and from the Raymond James accounts controlled by Quiros, causing damages to the Plaintiffs and the Class;

j.    Whether People's Bank breached the escrow arrangements with Plaintiffs and the Class, thereby causing damages to the Plaintiffs and the Class;

k.    Whether Quiros, Raymond James, and Burstein used the mails and wires or laundered money in furtherance of the Jay Peak/Q Burke scheme;

l.    Whether Quiros, Raymond James, and Burstein were employed by or associated with a RICO enterprise;

m.    Whether Plaintiffs and the Class were injured in their business or property by reason of Defendants Quiros, Raymond James, and Burstein's RICO violative activities; and

n.    Whether Quiros, Raymond James, and Burstein conspired to violate Florida RICO.

237.    The Class may be certified under Rule 23(b)(3). Questions of law or fact common to Class members predominate over any questions affecting only individual members. Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit. There will be no unusual difficulty in the management of this action as a Class action.

## COUNT I

## COMMON LAW FRAUD
### (against Quiros)

238.    Plaintiffs re-allege and incorporate paragraphs 1-237 as if fully set forth herein.

239.    Quiros participated in the preparation and dissemination of the offering materials to Plaintiffs and the Class, which offering materials were uniformly fraudulent.

240.    The offering materials were delivered to all investors before each of them invested in the Limited Partnerships.

241.    None of the offering materials disclosed to investors that their investments would be misappropriated, commingled, and misused.

242.    The offering materials were uniformly fraudulent in that these documents concealed various material facts, including, without limitation, that the sponsors considered themselves free to use, and did use, investor funds for purposes inconsistent with those described in the offering materials, including the following: (a) investors' funds would be placed under Quiros's exclusive control; (b) investors' funds would be offered up as collateral for margin loans; (c) investors' funds would not be controlled by the General Partner of the Limited Partnership that the investor had selected; (d) investors' funds would not be used for the EB-5 Project that the particular Limited Partnership had been formed to create; and (e) investors' funds would be directed to other phases and projects or to pay Quiros's personal expenses.

243.    The offering materials were uniformly fraudulent in that these documents concealed material aspects of the financial structure that was conceived of and implemented by Raymond James and Burstein for the Limited Partnerships to facilitate and conceal misuse, and commingling of investors' funds.  For example, the offering materials concealed that:  (a) substantial fees were paid to Raymond James for converting the contributions of the investors into

Treasury Bills; (b) the Treasury Bills were used by Quiros to obtain margin loans at Raymond James for which substantial interest had to be paid; (c) Quiros used the margin loans to not only commingle the assets and liabilities of the Limited Partnerships but also to pay for his own personal expenses; and (d) that hundreds of transactions were being undertaken in non-segregated pooled accounts (like JCM) such that the assets and liabilities of the Limited Partnerships were being commingled.

244.    Quiros had actual knowledge of the omissions in the offering materials, because, among other things, they drafted, reviewed or approved the offering materials before such were disseminated to the investors, and were also the architects of the Jay Peak and Q Burke Ponzi scheme. Quiros knew that the financial structure created by Raymond James and Burstein was not disclosed in the offering materials and that this financial structure was contrary to what was represented in the offering materials, which stated, among other things, that (a) capital contributions would be used only to complete the specific EB-5 Project disclosed in the offering materials for the Limited Partnership; (b) capital contributions would not be commingled; and (c) capital contributions would not be loaned, encumbered, or disposed of except for completion of the Limited Partnership's EB-5 Project.

245.    Quiros intended that investors would rely on the offering materials in investing in the Limited Partnerships.

246.    Each of the Plaintiffs reviewed and relied upon the offering materials provided to him or her to invest in one of the Limited Partnerships. The offering materials for each Limited Partnership, although containing different details with respect to the EB-5 Project to be completed, were uniformly fraudulent for the reasons stated above.

247.     Plaintiffs and the entire Class have suffered substantial injury as a result of having reviewed and relied upon the uniformly fraudulent offering materials to invest in excess of over $400 million in the Limited Partnerships.

248.     The specific misconduct that gives rise to this claim for common law fraud was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.

249.     By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT II

### AIDING AND ABETTING COMMON LAW FRAUD
### (against Raymond James and Burstein)

250.     Plaintiffs re-allege and incorporate paragraphs 1-237 as if fully set forth herein.

251.      Raymond James and Burstein had actual knowledge of the fraud that was being committed by Quiros.  The facts that indicate the actual knowledge of the fraud include, without limitation, the following:

   a.     Throughout much of the business relationship, there also existed a familial relationship between Quiros and Burstein.

   b.     From the outset of the business relationship, Raymond James and Burstein knew that the Limited Partnerships were participating in the EB-5 Program, and, therefore, at all times they also knew that investors would be unaware that their capital contributions would be spent on anything other than the EB-5 Project that the Limited Partnership was formed to create.

   c.     From the outset of the business relationship, in 2008, Raymond James and Burstein received sufficient portions of the offering materials for all of the Limited Partnerships, such as, for example, the Limited Partnership Agreement for Phase I, to understand the nature of the Jay Peak investment projects and that investors were

dependent on the proper application of their funds for the success of their investments.

d.   Beginning in 2008 and continuing until 2014, Raymond James and Burstein knew from offering materials that the investors were unaware that their capital contributions were being commingled, loaned, encumbered, or applied to any purpose other than completion of the EB-5 Project for which the Limited Partnership was formed.

e.   Beginning in 2008 and continuing until 2014, Raymond James and Burstein knew from the offering materials provided to them that the investors were unaware that their capital contributions would be under the exclusive control of Quiros.

f.   As the architects of the financial structure that Quiros used for the Limited Partnerships, Raymond James and Burstein knew that they were creating a financial structure for each Limited Partnership that was materially different from what the investors understood to be the financial structure for each Limited Partnership based on the uniform offering materials.

g.   Beginning in 2008 and continuing until 2014, Raymond James and Burstein were warned by numerous persons, including, without limitation, MSSI, controllers for the Limited Partnerships, and FINRA, that the financial structure that they conceived of and implemented for the Limited Partnerships and Quiros was deceptive in that it facilitated the misuse and commingling of the capital contributions by Plaintiffs and the Class.

h.   Beginning in 2008 and continuing throughout the business relationship, Raymond James and Burstein, by affirmative acts and omissions, concealed from others the fraud committed by Quiros.

252.   Over the course of the six-year business relationship, Raymond James and Burstein rendered substantial assistance to Quiros in his commission of a fraud against the investors by, among other things, the following specific acts:

a.   Even though Raymond James and Burstein knew about Quiros's fraud and that the Limited Partnership funds in the Raymond James accounts were the proceeds of the fraud, Raymond James and Burstein provided the financial structure needed to enable the fraud. More specifically, according to Quiros, in recorded testimony to the SEC, Raymond James and Burstein provided him with "great support" throughout the business relationship, by designing the financial structure of the Limited Partnerships, something he could not have done on his own, and then implementing the financial structure throughout a six-year period by participating in thousands of financial transactions that permitted Quiros to misuse, commingle, and steal Limited Partnership funds.

b.     Raymond James and Burstein permitted Quiros, individually, to take control of the funds of each of the Limited Partnerships on deposit in the Raymond James accounts, even though Raymond James and Burstein knew that Quiros did not have the right to exercise such control.

c.     Raymond James and Burstein permitted Quiros to misuse capital contributions to acquire an ownership interest in not only Jay Peak, Inc. but also Q Burke.

d,     At the bidding of Quiros, Raymond James and Burstein concealed the commingling and misuse of the funds of the Limited Partnerships from the controllers of the Limited Partnerships.

e.     Raymond James and Burstein set up margin loans that enabled Quiros to commingle assets and liabilities of the Limited Partnerships and to misuse or steal capital contributions for his own personal expenses.  When FINRA instructed Raymond James and Burstein to put an end to the margin loans, these Defendants persisted in maintaining the margin loans for many more months, after which they closed the margin loans without making any effort to undo the misuse and commingling of funds committed by Quiros.

f.     Raymond James and Burstein created non-segregated pooled accounts, such as the account for JCM, which facilitated the commingling of the funds of the Limited Partnerships and the misuse or commingling of the funds by Quiros, and were disciplined by FINRA for ignoring red flags for the account through which Raymond James and Burstein facilitated hundreds of transactions that permitted Quiros to misappropriate investor funds and put the proceeds beyond the reach of investors.

253.    The specific misconduct that gives rise to this claim for aiding and abetting common law fraud was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.

254.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT III

## AIDING AND ABETTING COMMON LAW FRAUD
### (against People's Bank)

255.    Plaintiffs re-allege and incorporate paragraphs 1-237 as if fully set forth herein.

256.    People's Bank had actual knowledge of the fraud that was being committed by

Quiros.  The facts that indicate the actual knowledge of the fraud include, without limitation, the

following:

a.    Throughout much of the ten-year business relationship from 2006-2015, Stenger was in frequent contact with People's Bank employees, as Quiros's agent and on his behalf.

b.    Throughout the relationship, People's Bank knew that each of the Limited Partnerships was participating in the EB-5 Program, and, therefore, at all times they also knew that the investors would be unaware that their capital contributions would be spent on anything other than the EB-5 Project that the Limited Partnership was formed to create.

c.    Throughout the relationship, People's Bank received certain offering materials from Stenger, including, without limitation, escrow and subscription agreements signed by each investor, which offering materials made clear that People's Bank was acting as an escrow agent for each of the Limited Partnerships.

d.    During 2008, People's Bank knew from offering materials that investors were unaware that their capital contributions were being commingled or disposed of for any reason other than completion of the EB-5 Project for which the Limited Partnership was formed.

e.    Beginning in 2008, People's Bank learned that the offering materials for each of the Limited Partnerships were deceptive in that these documents did not disclose that the capital contributions were being commingled.

f.    During 2008, People's Bank learned that the offering materials for each Limited Partnership were deceptive in that these documents did not disclose that the capital contributions escrowed with People's Bank were being used for purposes unrelated to the completion of the EB-5 Project for which the Limited Partnership was formed.

g.    During 2008, People's Bank learned that the offering materials for Phases I, II and III were deceptive in that these documents did not disclose that the monies were

58

being released from escrow for transfer to a brokerage firm instead of a bank or federally-insured bank.

257.    Over the course of the business relationship of many years between Quiros, through his agent Stenger, and People's Bank, People's Bank rendered substantial assistance to Quiros in his commission of a fraud against the investors by, among other things, the following specific acts:

a.    People's Bank lent an air of legitimacy to the fraud in that People's Bank told investors that their investments were being held in escrow and would only be applied towards completion of the EB-5 Project in which they invested.

b.    People's Bank released monies escrowed for investors in accounts designated for particular Limited Partnerships to accounts at Raymond James designated for the same or different Limited Partnerships that were controlled by Quiros. People's Bank executed these transfers knowing that investors' subscription agreements did not allow for the transfer of investor funds to brokerage accounts controlled by Quiros, and knowing that the escrowed funds should not be transferred to funds designated for Limited Partnerships other than the ones selected by individual investors. For many years, by participating in hundreds of transactions of this type, People's Bank assisted in the misuse and commingling of the capital contributions that Quiros had obtained by fraud against the investors.

c.    For many years, even though People's Bank was an escrow agent with fiduciary duties to the investors, it never made any attempt to alert any of the investors to the fraud committed by Quiros.

258.    The specific misconduct that gives rise to this claim for aiding and abetting common law fraud was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.

259.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment against People's Bank for compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT IV

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (against Quiros)

260.    Plaintiffs re-allege and incorporate paragraphs 1-237 above as if fully set forth herein.

261.    Each of the General Partners owed fiduciary duties to the investors in the Limited Partnerships.  These fiduciary duties apply by operation of law and the terms of the written Limited Partnership Agreements for each of the Limited Partnerships.  In each of the Limited Partnership Agreements, the General Partner specifically promised investors of that Limited Partnership that it would not "borrow from the Partnership or commingle Partnership funds with the funds of any Person."

262.    Each of the General Partners breached the fiduciary duties that they directly owed to the Limited Partners by commingling, misappropriating, and misusing the monies of Plaintiffs and the Class.

263.    Stenger permitted Quiros to exercise exclusive control over the General Partners of Phases I-VI.  Quiros is also one of the managing members of the General Partners of Phases VII and VIII.  Quiros substantially assisted in the breaches of fiduciary duty by each of the General Partners with knowledge that the General Partners were breaching fiduciary duties owed to Plaintiffs and the proposed Class of investors.

264.    As a result of the breaches of fiduciary duties directly owed to the investors by the General Partners, Plaintiffs and the Class suffered damages.

265.    The specific misconduct that gives rise to this claim for aiding and abetting fiduciary breach was intentional, malicious, deliberate, outrageous and reprehensible, and/or so

60

reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.

266.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

**COUNT V**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(against Raymond James and Burstein)**

267.    Plaintiffs re-allege and incorporate paragraphs 1-237 above as if fully set forth herein.

268.    Each of the General Partners owed fiduciary duties to the investors in the respective Limited Partnerships.  The fiduciary duties apply by operation of law and the terms of the Limited Partnership Agreements for each of the Limited Partnerships.  In each Limited Partnership Agreement, the General Partner promised the investors of that Limited Partnership that it would not "borrow from the Partnership or commingle Partnership funds with the funds of any Person."

269.    Each of the General Partners breached the fiduciary duties directly owed to the Limited Partners by commingling, misappropriating, and misusing the monies of Plaintiffs and the Class.

270.    Raymond James and Burstein substantially assisted in the General Partners' breaches of fiduciary duty with knowledge that the General Partners were breaching fiduciary duties owed to the Plaintiffs and the proposed Class of investors.

271.    As a result of the breaches of fiduciary duties directly owed to the investors, Plaintiffs and the Class suffered damages.

272.     The specific misconduct that gives rise to this claim for aiding and abetting fiduciary breach was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.

273.     By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT VI

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (against People's Bank)

274.     Plaintiffs re-allege and incorporate paragraphs 1-237 above as if fully set forth herein.

275.     Each of the General Partners owed fiduciary duties to the investors in the respective Limited Partnerships.  The fiduciary duties apply by operation of law and the terms of the Limited Partnership Agreements for each of the Limited Partnerships.   In each Limited Partnership Agreement, the General Partner promised the investors of that Limited Partnership that it would not "borrow from the Partnership or commingle Partnership funds with the funds of any Person."

276.     Each of the General Partners breached the fiduciary duties directly owed to the Limited Partners by commingling, misappropriating, and misusing the monies of Plaintiffs and the Class.

277.     People's Bank substantially assisted in the General Partners' breaches of fiduciary duty with knowledge that the General Partners were breaching fiduciary duties owed to Plaintiffs and the Class.

278.     As a result of the breaches of fiduciary duties directly owed to the investors, Plaintiffs and the Class suffered damages.

279.     The specific misconduct that gives rise to this claim for aiding and abetting fiduciary breach was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.  In addition, senior management of People's Bank engaged in such conduct, or knowingly condoned, ratified or consented to such conduct.

280.     By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT VII

### CIVIL CONSPIRACY
### (against Quiros, Burstein, Raymond James, and People's Bank)

281.     Plaintiffs re-allege and incorporate paragraphs 1-237 above as if fully set forth herein.

282.     At all relevant times, each of Quiros, Raymond James, Burstein, and People's Bank was a principal, agent, alter ego, joint venturer, partner, or affiliate of these other defendants, and in doing the acts alleged herein, was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship.  Each of Quiros, Raymond James, Burstein, and People's Bank had actual or constructive knowledge of the acts of each of the others, and ratified, approved, joined in, acquiesced, or authorized the wrongful acts of the co-Defendant, and/or retained the benefits of said wrongful acts.

283.     Quiros, Raymond James, Burstein, and People's Bank, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the others, and others, in perpetrating their unlawful, unfair or fraudulent scheme on Plaintiffs and the Class.  In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other wrongdoings complained of, each of Quiros, Raymond James, Burstein, and People's Bank acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing herein alleged.

284.     An agreement was made in the first half of 2008 by Quiros with each of Raymond James, Burstein, and People's Bank to induce Plaintiffs and the Class into investing millions of dollars into the Limited Partnerships and to commit the fraud and fiduciary breaches described above.

285.     Defendants Quiros, Raymond James, Burstein, and People's Bank committed overt acts in furtherance of their conspiracy as alleged above, including: (a) Quiros used the uniformly fraudulent offering materials to induce Plaintiffs and the Class into investing money in the Limited Partnerships with the substantial aid and assistance of the other Defendants; (b) Quiros misused investors' funds to purchase the Jay Peak and Q Burke resorts; (c) Quiros misused and misappropriated investors' funds by using them as collateral for loans, to pay off margin loans, and by misappropriating them for personal expenses; (d) Raymond James and Burstein provided financial and other services essential to Quiros's use of investor funds to purchase Jay Peak, knowing such use was unauthorized; (f) People's Bank released investors' funds to Raymond James despite knowing that said transfers violated investors' subscription agreements and escrow obligations owed by People's Bank to the investors;  and (g) Raymond James and Burstein

provided Quiros with margin loans collateralized by Plaintiffs' and investors' funds for Quiros to misappropriate and misuse.

286.     As a direct and proximate consequence of Defendants' conduct as described in the foregoing, Plaintiffs and the Class have lost money that they invested in the Limited Partnerships, have been denied the use of their money, and have been damaged thereby in an amount to be determined at trial.

287.     The specific misconduct that gives rise to this claim for civil conspiracy was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.  In addition, in the case of the entity Defendants, senior management of the entities engaged in such conduct, or knowingly condoned, ratified or consented to such conduct.

288.     By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT VIII

## NEGLIGENCE
## (against Stenger)

289.     Plaintiffs re-allege and incorporate paragraphs 1-237 above as if fully set forth herein.

290.     By virtue of his role as either the president, director, or managing member of the General Partners, Stenger owed a duty of care to the Limited Partnerships and each investor in those Limited Partnerships.

291.     Due to the relationship between Plaintiffs and the Class and Stenger, Stenger had a duty to exercise reasonable skill and ordinary diligence in handling the investor funds entrusted to the General Partners.

292.     Stenger breached his duty to the Limited Partnerships and each investor in those Limited Partnerships by allowing Quiros to commingle, misappropriate, and misuse Plaintiffs and the Class's funds.

293.     As a result of the breach of his duty, Plaintiffs and the Class have suffered damages.

294.     By reason of the foregoing, Plaintiffs sand the Class are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT IX

## NEGLIGENCE
## (against People's Bank)

295.     Plaintiffs re-allege and incorporate paragraphs 1-107, 109-123, 125-237 above as if fully set forth herein.

296.     This Count is pled in the alternative to Counts III, VI, VII, and X.

297.     In connection with their investments in the Limited Partnerships, Plaintiffs and each member of the Class entered into an Escrow Agreement with People's Bank and transferred funds into an escrow account at People's Bank in the name of the Limited Partnership in which he or she had invested.

298.     Due to the escrow relationship between Plaintiffs and members of the Class and People's Bank, People's Bank had a duty to exercise reasonable skill and ordinary diligence in disbursing the investor funds entrusted to it.

299.    By releasing escrowed funds to improper accounts and non-bank financial institutions and into accounts that were not under the control of the Jay Peak and Q Burke General Partners, People's Bank breached its duties to Plaintiffs and the Class.

300.    As a result of this breach of duty, Plaintiffs and the Class have suffered damages.

301.    By reason of the foregoing, Plaintiffs sand the Class are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT X

## BREACH OF FIDUCIARY DUTY
### (against People's Bank)

302.    Plaintiffs re-allege and incorporates paragraphs 1-237 above as if fully set forth herein.

303.    As part of investing in the Limited Partnerships, each investor sent his or her funds into an escrow account at People's Bank that was named for the Limited Partnership in which he or she had invested.  People's Bank thus owed escrow obligations to Plaintiffs and each member of the Class.

304.    Due to the escrow relationship between Plaintiffs and members of the Class and People's Bank, People's Bank owed a fiduciary duty to Plaintiffs and the Class.  This fiduciary duty includes, at a minimum, an obligation to exercise reasonable skill and ordinary diligence in following the escrow instructions, disbursing the investor funds entrusted to it, and responding appropriately to suspicious activity occurring in connection with the escrowed funds.

305.    By releasing escrowed funds to improper accounts and non-bank financial institutions and into accounts that were not under the control of the General Partners, and by failing

to notify Plaintiffs and the Class of suspicious activity occurring in connection with the escrowed funds, People's Bank breached its fiduciary duties to Plaintiffs and the Class.

306.    As a result of these breaches of fiduciary duty, Plaintiffs and the Class have suffered damages.

307.    The specific misconduct that gives rise to this claim for fiduciary breach was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.   In addition, senior management of People's Bank engaged in such conduct, or knowingly condoned, ratified or consented to such conduct.

308.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT XI

## BREACH OF CONTRACT
### (against People's Bank)

309.    Plaintiffs re-allege and incorporate paragraphs 1-237 above as if fully set forth herein.

310.    In connection with their investments in the Limited Partnerships, each Plaintiff and each member of the Class entered into an Escrow Agreement with People's Bank.

311.    Pursuant to these Escrow Agreements, each investor in a Limited Partnership sent his or her funds into an escrow account at People's Bank in the name of the Limited Partnership.

312.     The Escrow Agreements provided that upon release of the escrowed funds, these funds would be committed to the specific Limited Partnership project for which the funds were placed in escrow.

313.     People's Bank breached its escrow obligations by releasing the escrowed funds for improper use to accounts not controlled by the Limited Partnership for which the funds were placed in escrow.

314.     As a result of the breach of the Escrow Agreements, Plaintiffs and the Class have suffered damages.

315.     By reason of the foregoing, Plaintiffs sand the Class are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT XII

### Florida Racketeer Influenced and Corrupt Organizations Act ("RICO") (against Quiros, Raymond James, and Burstein)

316.     Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-237.

317.     Plaintiffs, on behalf of themselves and the Class, assert claims against certain Defendants, Quiros, Raymond James, and Burstein (the "RICO Defendants"), for violations of Florida' RICO statute, Fla. Stat. § 772.103 *et seq.*

### The Enterprise

318.     From in or about the first half of 2008 until April 2016, all or some of the Limited Partnerships, the General Partners, Q Resorts, Q Burke, JCM, GSI, and NECS constituted an illegal Ponzi scheme (the "Enterprise") that was organized for the purpose of inducing investors

to invest monies in the Limited Partnerships by uniformly fraudulent offering materials and to misappropriate the monies once invested.

319.     Each of the RICO Defendants was employed by or associated with the Enterprise.

a.      Quiros was in charge of Jay Peak, Inc., Q Resorts, Q Burke, JCM, GSI, and NECS, entities through which Quiros misappropriated the investors' monies.  Quiros, along with Stenger, was in charge of the General Partners for Phases VII and VIII.

b.      Stenger was in charge of the General Partners for Phases I-VI, and he, along with Quiros, was in charge of the General Partners for Phases VII and VIII.

c.      Raymond James and Burstein were the architects of the financial structure for the Enterprise.  In the first half of 2008, these Defendants conceived of the illicit financial structure that would best serve the RICO Defendants in accomplishing the Enterprise's purpose; they also implemented and managed the illicit financial structure from the first half of 2008 until 2014, and during this time frame they concealed the financial structure from regulatory authorities and employees and agents of Jay Peak, Inc. and the Limited Partnerships.

320.     Each of the RICO Defendants conducted or participated, directly or indirectly, in the Enterprise through a pattern of criminal activity, consisting of numerous and repeated uses of the interstate mails and wire communications, and acts of money laundering, all with the purpose of executing a scheme to defraud.

321.     Each of the General Partners is controlled (directly or indirectly) by Defendants Quiros and Stenger. Specifically, the Limited Partnerships and associated General Partners are as follows:

a.      Phase I is the entity through which the RICO Defendants raised $17.5 million from 35 separate investors. Phase II is the entity through which the RICO Defendants raised $75 million from 65 separate investors. Jay Peak Management, Inc. is the general partner of Phase I and Phase II. Jay Peak Management, Inc. is a wholly owned subsidiary of Jay Peak, and its president is Stenger.

b.      Phase III is the entity through which the RICO Defendants raised $32.5 million from 65 separate investors. Jay Peak GP Services, Inc. is the general partner of Phase III. Stenger is Jay Peak GP Services, Inc.'s director and only principal.

c.     Phase IV is the entity through which the RICO Defendants raised $45 million from 90 separate investors. Jay Peak GP Services Golf, Inc. is the general partner of Phase IV. Stenger is Jay Peak GP Services Golf, Inc.'s director and only principal.

d.     Phase V is the entity through which the RICO Defendants raised $45 million from 90 separate investors. Jay Peak GP Services Lodge, Inc. is the general partner of Phase V. Stenger is Jay Peak GP Services Lodge, Inc.'s director and only principal.

e.     Phase VI is the entity through which the RICO Defendants raised $67 million from 134 separate investors. Jay Peak GP Services Stateside, Inc. is the general partner of Phase VI. Stenger is Jay Peak GP Services Stateside, Inc.'s director and only principal.

f.     Biomedical Project is the entity through which the RICO Defendants raised $83 million from 166 separate investors. AnC BIO Vermont GP Services, LLC is the general partner of Biomedical Project. Quiros and Stenger are AnC BIO Vermont GP Services, LLC's managing members.

g.     Q Burke LP is the entity through which the RICO Defendants raised over $53 million from 106 separate investors.  Burke GP is the general partner of Q Burke LP.  Quiros and Stenger are the owners and sole members of Q Burke GP.

322.    The members of the Enterprise had a common purpose: to deceive EB-5 investors into believing that their funds were being used for the purposes described in the offering materials to increase the amount of funds invested into the Limited Partnerships; permit Q Resorts, and Q Burke LLC to acquire Jay Peak and Burke Mountain; and increase and maximize their profits by illegally diverting for unauthorized and improper purposes funds that they knew belonged to investors.

323.    The RICO Defendants agreed to engage in a pattern of racketeering activity using, among other things, a Raymond James branch and office located in South Florida, to further the objectives of the Enterprise.

324.     The Enterprise functioned over a period of years and had a continuing, on-going structure, functioning as a continuous unit that maintained an ascertainable structure with established duties separate, distinct, and apart from the pattern of criminal activity described herein.

325.     The RICO Defendants conducted and participated, directly and indirectly, in the Enterprise through a pattern of criminal activity within the meaning of Florida Statute § 772.103(3), including violation of federal mail and wire fraud statutes and money laundering statutes, in violation of 18 U.S.C. §§ 1341, 1343, 1956 and 1957; and violation of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a). Acts of mail and wire fraud and money laundering are subject to indictment or information as a criminal offense pursuant to 18 U.S.C. § 1961(1)(B), and are accordingly specifically delineated as "criminal activity" pursuant to Florida Statute § 772.102(1)(b). Violation of the Florida Communications Fraud Act is specifically delineated as "criminal activity" pursuant to Florida Statute § 772.102(1)(a)(22).

326.     These incidents of criminal activity had the same or similar intents, results, accomplices, participants, victims, or methods of commission, or otherwise were interrelated by distinguishing characteristics and were not isolated incidents.

327.     The RICO Defendants each directed, controlled, operated, and managed the Enterprise's affairs including, among other things, by agreeing to perform the following services, among others, which facilitated the activities of the Enterprise and its members:

a.     The RICO Defendants devised the above-described scheme to defraud investors and divert their invested funds using the Limited Partnerships for the personal gain of the RICO Defendants;

b.     Quiros knowingly wired money out of accounts holding investors' funds for unauthorized purposes and for Quiros's own personal gain;

c.    Burstein met with Quiros and provided him with access to Raymond James' services and the means to implement his fraudulent scheme;

d.    Raymond James and Burstein assisted in the diversion and misuse of investors' funds, knowing that these funds belonged to investors, by providing financial and other services essential to the operation of the scheme;

e.    Raymond James provided margin loans to Quiros which were collateralized with assets belonging to the investors;

f.    Raymond James and Burstein facilitated an intricate web of transfers among various accounts at Raymond James to disguise the fact that the majority of the eight projects were either over budget or experiencing shortfalls;

g.    Quiros also improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) he set up in the name of the Limited Partnerships at Raymond James;

h.    Quiros reviewed the contents of the Phase I-VI offering materials, was familiar with them, and understood he had to abide by them. He also approved the use of proceeds document in Phases III-VI;

i.    Quiros, as a principal of the General Partners for Phases VII and VIII, reviewed and approved the contents of these projects' offering materials, including the Limited Partnership Agreement and the use of proceeds document; and

j.    The RICO Defendants devised a plan to collateralize investors' funds for loans to Quiros.

328.    The success of the Enterprise would not have been achieved but for the active, willing participation of Raymond James and its Coral Gables office located in South Florida. The acts of Raymond James in Florida provided the Enterprise with a platform through which the Enterprise could manipulate the funds it solicited from Plaintiffs and the Class through withdrawal or transfer for the purposes of converting the funds for the unlawful uses of the Enterprise.

329.    The success of the Enterprise's fraudulent investment scheme made it possible for the RICO Defendants to enjoy substantial illegal financial benefits, through illicit payments and transaction fees.

**Defendants' Pattern of Racketeering Activity through the Enterprise**

330.   To effectuate the illegal objectives of the Enterprise and in furtherance of the scheme to defraud, the RICO Defendants committed numerous overt acts affecting more than 830 investors in violation of the federal mail and wire fraud and money laundering statutes, as well as the Florida Communications Fraud Act.

331.   These predicate acts constitute a pattern of criminal racketeering activity because (1) at least two of the acts had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents; (2) as described throughout this Complaint, this series of related acts extended over a substantial, but closed, period of time (from June 16, 2008 to April 2016); and (3) the last of such related acts occurred within 5 years after a prior incident of criminal activity.

332.   Alternatively, as described throughout this Amended Complaint, the RICO Defendants' scheme began in or around the first half of 2008 and the RICO Defendants engaged in a pattern of related and continuous predicate acts that amounted to, or threatened the likelihood of, continued criminal activity projecting into the future.

333.   The predicate acts discussed herein are the Enterprise's regular way of conducting business. The nature of such predicate acts themselves implies a threat of continued criminal activity.

334.   The RICO Defendants' scheme began in or around December 2006 and would have continued into the future, but for the temporary restraining order and asset freeze entered in the SEC action.

335.   The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the Enterprise and the common purpose, including, without limitation, to defraud

Plaintiffs and the investor Class by increasing and maximizing the RICO Defendants' profits by illegally diverting funds that the RICO Defendants knew belonged to investors for improper and unauthorized purposes.

336. The predicate acts are related and are not isolated events.

337. The predicate acts all had the purpose of diverting and misappropriating funds that Plaintiffs and the Class had invested with the RICO Defendants. The predicate acts were committed or caused to be committed by the RICO Defendants, and were interrelated in that they involved using funds belonging to Plaintiffs and the Class. Further, Defendants' misappropriation repeatedly involved diversion of funds for (a) the RICO Defendants' personal benefit and (b) to conceal the misuse of other funds pursuant to the scheme.

### *Quiros*

338. Quiros used each of the Limited Partnerships to raise money and then divert millions of dollars for his own use. To raise capital for each of the Limited Partnerships, the General Partners and Quiros made a series of misleading statements and omissions to prospective investors in the offering materials.

339. Upon raising funds for the Limited Partnerships, Quiros knowingly wired money out of the Limited Partnerships' investor accounts at People's Bank and Raymond James for unauthorized purposes and for Quiros's personal gain. Quiros, alone and through his agent, Stenger, also routinely authorized the transfer of investors' funds out of the Limited Partnerships' escrow accounts at People's Bank in violation of the offering materials.

340. Further, Quiros improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) he and Raymond James set up in the name of the Limited Partnerships at Raymond James in Florida.

*Raymond James (Florida)*

341.    Raymond James conducted and/or participated, directly or indirectly, in the Enterprise in Florida by developing a mechanism by which Quiros and Stenger could misappropriate funds without detection — specifically by opening investment and margin accounts on behalf of each of the Limited Partnerships to facilitate the transfer of funds between and among the Limited Partnerships as well as to Quiros, Stenger, and entities under their control.

342.    Further, among other things, Raymond James,

- Assisted in the diversion and misuse of investors' funds, knowing that these funds belonged to investors;

- Provided margin loans to Quiros;

- Collateralized the margin loans with assets belonging to the investors; and

- Facilitated an intricate web of transfers among various accounts at Raymond James in Florida to disguise the fact that the majority of the EB-5 Projects were either over budget or experiencing shortfalls.

### **Specific RICO Predicate Acts of the RICO Enterprise**

343.    The following specific overt acts of criminal activity are merely examples of the numerous predicate acts committed by Quiros, Raymond James, and Burstein:

### **Mail Fraud — 18 U.S.C. § 1341**

### Offering Materials

344.    Quiros violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme by means of false pretenses, misrepresentations, promises, and omissions.

345.    Quiros's use of the mails includes, but is not limited to, the transmission, delivery, or shipment of the following fraudulent documents by the RICO Defendants or third parties acting at Quiros's behest, such as administrative assistants of Jay Peak, Inc. or the Q Burke General

Partner, which documents were foreseeably mailed or caused to be mailed as a result of the RICO Defendants' illegal scheme:

- Private Placement Memoranda;

- Limited Partnership Agreements;

- Sales and marketing materials; and

- Other documents that misrepresented and concealed the true nature of the Limited Partnerships.

346.    On information and belief, Quiros or his agents, for the purpose of executing the illegal scheme, sent or received or caused to be sent or received by mail or by private or interstate carrier, documents by mail or private carrier affecting interstate commerce, including the items described above.

## Wire Fraud — 18 U.S.C. § 1343

### Offering Materials and Other Communications with Investors

347.    Quiros violated 18 U.S.C. § 1343 by, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by wire in interstate or foreign commerce, writings for the purpose of executing such scheme or artifice.

348.    Quiros's use of wire transmissions includes, but is not limited to, the transmission of the following fraudulent documents by the RICO Defendants or third parties, acting at the behest of the RICO Defendants, such as, for example, accountants and administrative assistants of Jay Peak, Inc. or the Q Burke General Partner, that were foreseeably caused to be sent as a result of the RICO Defendants' illegal scheme:

- Private Placement Memoranda;

- Limited Partnership Agreements;

- Limited Partner updates and correspondence;

- Emails;

- Financial Statements;

- K-1 tax returns;

- Sales and marketing materials; and

- Other documents that misrepresented and concealed the true nature of the Limited Partnerships.

349.    On information and belief, Quiros or his agents, for the purpose of executing the illegal scheme, sent or received or caused to be sent or received by mail or by private or interstate carrier, documents by mail or private carrier affecting interstate commerce, including the items described above.

### Wire Fraud — 18 U.S.C. § 1343

<u>Financial Transactions</u>

350.    As part of and in furtherance of the fraudulent scheme, beginning in or about June 2008 and continuing through April 2014, the RICO Defendants knowingly and with intent to obtain money and property from others by means of materially false and fraudulent pretenses, representations, and promises, knowing that such pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme, transmitted and caused to be transmitted certain wire communications in interstate and foreign commerce, as set forth below:

| AMOUNT | DATE | WIRE COMMUNICATION |
|--------|------|--------------------|
| $11 million | June 16 and 17, 2008 | Interstate wire transfers sent from People's Bank to Raymond James in Florida. |
| $1 million | June 20, 2008 | Interstate wire transfer sent from People's Bank to Raymond James in Florida. |

| $13.5 million | June 23, 2008 | Interstate wire transfer sent from Raymond James in Florida to People's Bank. |
|---|---|---|
| $5 million | June to October 2008 | Interstate wire transfers sent from Raymond James in Florida to People's Bank. |
| $600,000 | July 1, 2008 | Interstate wire transfer sent from People's Bank to Raymond James in Florida. |
| $1 million | September 4, 2008 | Interstate wire transfer sent from People's Bank to Raymond James in Florida. |
| $3 million | September 15, 2008 | Interstate wire transfer sent from People's Bank to Raymond James in Florida. |
| $1.5 million | September 22, 2008 | Interstate wire transfer sent from People's Bank to Raymond James in Florida. |
| $18.2 million | March 5, 2014 | Interstate wire transfer sent from People's Bank to Raymond James in Florida. |
|  | June 2008 to 2016 | Additional interstate wire transfers of funds to be established through discovery. |

351.   Absent the fraud orchestrated by Quiros and assisted by Raymond James and others, Plaintiffs and the investor Class would not have invested the funds that were the subject of the wire transfers listed above.

352.   By engaging in the foregoing scheme involving the solicitation of investor funds under the guise of EB-5 investments, Quiros, Raymond James, and others intentionally participated in a scheme, using the wires, to defraud Plaintiffs and the Class of money by means of material misrepresentations and omissions. Plaintiffs and the Class reasonably relied on misrepresentations made by Quiros and others in furtherance of the fraudulent scheme. Plaintiffs and the Class suffered injury as a result of the fraud in the amount of money the RICO Defendants misappropriated from Plaintiffs and the Class.

353.     Through the foregoing conduct, Quiros, Raymond James, and others, having devised, and intending to devise, a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce writings, signs and signals for the purpose of executing such scheme and artifice to defraud, in violation of 18 U.S.C. § 1343.

### Money Laundering — 18 U.S.C. §§ 1956 and 1957

354.     Further, as part of the fraudulent Jay Peak/Q Burke scheme, the RICO Defendants engaged in, and otherwise caused, numerous financial transactions and transfers through financial institutions in the United States, which transactions violated 18 U.S.C. Sections 1956 and 1957 (money laundering).  Such conduct is chargeable by indictment under Florida criminal law under § 896.101, Fla. Stat. (2013).

355.     The RICO Defendants participated in acts of money laundering, namely financial transactions, in furtherance of their scheme to misappropriate investor funds in violation of 18 U.S.C. § 1956(a)(1)(A), and to conceal their unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B).

356.     The RICO Defendants knowingly and with the intent of promoting the misappropriation of investor funds and to conceal and disguise the nature, source, and ownership of the misappropriated investor funds, engaged in the following financial transactions:

| AMOUNT | DATE | LAUNDERING TRANSACTION |
|---|---|---|
| $7.6 million | June 23, 2008 | Transfer of $7.6 million from Phase I partnership account at Raymond James in Florida to account at Raymond James in Florida in the name of Q Resorts (controlled by Quiros) |
| $6 million | June 23, 2008 | Transfer of $6 million from Phase II partnership account at Raymond James in Florida to account at Raymond James in Florida in the name of Q Resorts (controlled by Quiros) |

| | | |
|---|---|---|
| $13.6 million | June 23, 2008 | Transfer of funds from partnership account at Raymond James in Florida to Quiros entity account at Raymond James in Florida. |
| $11 million | June 25, 2008 | Purchase of $11 million in U.S. Treasury Bills in Phase I partnership account at Raymond James in Florida, using margin loan, to hide the $7.6 million transfer on June 23, 2008. |
| $7.6 million | June 25, 2008 | Borrowing $7.6 million from Raymond James in Florida on margin to finance purchase of U.S. Treasury Bills. |
| $7 million | June 25, 2008 | Purchase of $7 million in U.S. Treasury Bills in Phase II partnership account at Raymond James in Florida, using margin loan, to hide the $6 million transfer on June 23, 2008. |
| $6 million | June 25, 2008 | Borrowing $6 million from Raymond James in Florida on margin to finance purchase of U.S. Treasury Bills. |
| | June to October 2008 | Purchase of U.S. Treasury Bills using margin loan to hide transfer of investor funds out of partnership account at Raymond James in Florida. |
| $4.7 million | September to October 2008 | Wire transfers of $4.7 million from Phase II account at Raymond James to Phase I account at Raymond James |
| $11.2 million | June 2008 to April 2011 | Transfers from Phase II account at Raymond James to Q Resorts account at Raymond James in Florida. |
| $1.5 million | 2008 | Purchase of $1.5 million in U.S. Treasury Bills in Phase I partnership account at Raymond James in Florida, using margin loan, to hide the |
| $105 million | 2008 to 2011 | $105 million in investor funds from Phases I-V used to repay margin loans from Raymond James in Florida. |
| $3 million | October 2010 to January 2011 | Wire transfers of $3 million from Phase II account at funds from Raymond James to Phase III account at Raymond James in Florida. |
| $32.5 million | December 2010 to August 2011 | Transfers from Phase III account at Raymond James to repay Margin Loan III in Florida. |
| $62,000 | February 23, 2011 | Transfer from People's Bank Phase I account to People's Bank Phase II account. |
| $49,000 | October 3, 2011 | Transfer from People's Bank Phase III account to People's Bank Phase I account. |

| $4.5 million | January 2011 to February 2013 | Transfers of funds from Phase III account at Raymond James to Q Resorts account |
|---|---|---|
| $34.3 million | December 2011 to April 2013 | Transfers of funds from Phase IV account at People's Bank to JCM account at Raymond James |
| $22.4 million | February 24, 2012 | Transfer of $22.4 million of investor funds (Phase VI and Phase V) from Quiros entity account at Raymond James in Florida to repay |
| $7.01 million | May 16, 2012 | Wire transfer of $7.01 million from Margin Loan IV to Coltaf Trust for purchase of Q Burke Resort |
| $6.5 million | February 2012 to March 2014 | Use of $6.5 million in investor funds (Phase V and Phase VI) to repay margin loan at Raymond James in Florida. |
| $3 million | April 9, 2013 | Transfer of $3 million of investor funds from Phase VII account at Raymond James to Phase VII account at People's Bank |
| $3 million | April 12, 2013 | Transfer of $3 million of investor funds from Phase VII account at People's Bank to GSI account at Raymond James |
| $3 million | May 30, 2013 | Wire transfer of $2.2 million from GSI account at Raymond James to Mr. and Mrs. Quiros's Raymond James account |
| $7.8 million | March 2013 to July 2014 | Transfers of approximately $7.8 million from Phase VII account at People's Bank to NECS account at People's Bank |
| $47 million | March 2013 to October 2014 | Transfers of $47 million from Phase VII account at Raymond James to JCM account at Raymond James |
| $4.2 million | April to October 2013 | Transfers of $6 million from JCM account at Raymond James to the IRS and the State of Vermont for tax liabilities |
| $5.5 million | August 2013 to July 2014 | Transfers totaling approximately $5.5 million from NECS account at People's Bank to Quiros' accounts |
| $18.2 million | March 4, 2014 | Transfer of $18.2 million in investor funds from Phase VII account at People's Bank to JCM account at Raymond James |
| $18.2 million | March 5, 2014 | Transfer of approximately $19 million from JCM account at Raymond James to Margin Loan IV |

| $10.7 million | April 2015 | Wire transfer of $10.7 million of Phase VII funds from Raymond James in Florida to Citibank to repay Quiros's personal line of credit. |
|---|---|---|
| | June 2008 to 2016 | Additional money laundering transfers of funds to be established through discovery. |

357.  The foregoing scheme, as set forth in detail herein, and each act committed in furtherance thereof, constitutes money laundering within the meaning of 18 U.S.C. §§ 1956 and 1957 in that:

a.  The RICO Defendants, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions which in fact involved proceeds of a specified unlawful activity, namely mail and wire fraud (18 U.S.C. §§ 1341 & 1343), knowing that the transactions were designed in whole or in part to promote the carrying on of the foregoing specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i);

b.  The RICO Defendants, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions which in fact involved proceeds of a specified unlawful activity, namely mail and wire fraud (18 U.S.C. §§ 1341 & 1343), knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the foregoing specific unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

c.  The RICO Defendants, in an offense that took place in the United States, knowingly engaged or attempted to engage in monetary transactions in criminally deprived property of a value greater than $10,000, that was derived from specified unlawful activity, namely mail and wire fraud (18 U.S.C. §§ 1341 & 1343), in violation of 18 U.S.C. § 1957.

**Organized Fraud — § 817.034(4)(a), Fla. Stat.**

358.  The RICO Defendants' conduct described herein constituted an organized scheme to defraud, in that each engaged in a systematic, ongoing course of conduct with intent to defraud one or more persons, or with intent to obtain property from one or more persons by false or

fraudulent pretenses, representations, or promises or willful misrepresentations of a future act in violation of § 817.034(4)(a), Fla. Stat.

359. Specifically, Quiros, alone or through his agent, Stenger, provided materials to investors by use of the interstate mails and wires, and all of the RICO Defendants wired investor funds among various accounts, and to pay Quiros's personal expenses.

360. As part of and in furtherance of the organized scheme to defraud, Quiros and his agent, Stenger, made material omissions and misrepresentations to Plaintiffs and Class members with the intent to deceive them. For example, offering materials disseminated to each of the Plaintiffs for the Limited Partnership in which they invested, included a Limited Partnership Agreement. The Limited Partnership Agreements provide that the General Partners of the respective Limited Partnerships are prohibited, absent consent of the Limited Partners, from: (1) borrowing from or commingling investor funds; (2) acquiring any property with investor funds that does not belong to the Limited Partnership, other than as specifically authorized in the agreement; or (3) mortgaging, conveying or encumbering Limited Partnership property that is not real property. None of the offering materials provided to the Class Representatives disclosed that the investors' funds would be diverted for purposes not authorized by the applicable Limited Partnership Agreement. Quiros and his agents or employees sent offering materials to Plaintiffs stating that investors would realize a guaranteed 4% minimum return, with a projected 6% average return. The offering materials did not disclose that the investors' likelihood of achieving the projected return would be affected by the improper commingling and misuse of their investment funds.

361. Marketing materials distributed to investors at Quiros's direction, through his agent Stenger, represented that investors' funds would be used to purchase real estate and other projects

such as hotels, suites, and a biomedical research facility, when in fact, their funds would be used for unauthorized and illegitimate purposes.

362.   Quiros, through Stenger, also caused to be distributed to investors "use of proceeds" disclosures detailing how funds invested in the Limited Partnerships would be used, including representations that the funds would be devoted to specified land acquisition, site preparation, and construction purposes specific to that Limited Partnership.  The document also listed the management contribution in each offering and misrepresented how Jay Peak would spend that money.

363.   Quiros had a duty to correct their misrepresentations and the mistaken impressions that arose from their omissions of material fact. Their misrepresentations and omissions were material, as they helped the RICO Defendants advance their scheme and conceal their fraud, and were designed to lull Plaintiffs and Class members into believing that their investments were legitimate.

364.   Plaintiffs and the Class were targets of the RICO Defendants' scheme to defraud potential EB-5 investors because the Enterprise and/or its members targeted such foreign investors using the promise of investment returns and citizenship to market their fraud.

365.   Plaintiffs and the Class saw, were aware of, and relied to their detriment on the RICO Defendants' misrepresentations and omissions of material fact made in furtherance of the RICO Defendants' scheme.

366.   Such misrepresentations and omissions would have been relied upon by a reasonable person.

367.   In addition to the fact that Plaintiffs and the Class saw, were aware of, and relied to their detriment on the RICO Defendants' misrepresentations and omissions of material fact made

in furtherance of the RICO Defendants' scheme, Defendants' acts of criminal racketeering activity were so permeated by fraud that reliance is established, as no reasonable investor — including Plaintiffs and the Class — would knowingly invest in a fraud.

368.    Plaintiffs and the Class would not have invested in the Limited Partnerships had the RICO Defendants disclosed the true nature of their scheme, or the purposes for which investors' funds would be used.

369.    Plaintiffs and the Class suffered injury as a result of their investment in the Limited Partnerships, investments which they would not have made but for the RICO Defendants' scheme to defraud. Specifically, Plaintiffs and the Class invested over $400,000,000 in the Limited Partnerships. The RICO Defendants' misuse and embezzlement of funds, including the fraud and money laundering emanating from Florida, as set forth above, caused Plaintiffs and the Class to suffer damages in the form of the loss of their investments, which were transferred to the RICO Defendants or the entities they controlled as a direct and proximate result of the criminal activity described herein.

370.    The RICO Defendants' RICO violations were the actual cause of Plaintiffs and the Class's damages, which would not have occurred without the RICO Defendants' conduct. In addition, the RICO Defendants' acts and violations were the direct, natural, and proximate cause of damage to Plaintiffs and the Class, including but not limited to, the loss of Plaintiffs and the Class's funds.  The RICO Defendants profited from their RICO-violative acts and used some proceeds to further the Enterprise.

## Violations of the Florida RICO Statute

371.    The RICO Defendants willfully and knowingly conducted or participated, directly or indirectly, in the Enterprise through a pattern of criminal activity within the meaning of Florida Statute § 772.103(3).

372.    For the purpose of executing the scheme to defraud, the RICO Defendants conducted and participated in the Enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications, numerous acts of money laundering, and organized fraud in violation of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a).

373.    Because the scheme was not disclosed, and as a result of the RICO Defendants' conduct and participation in the racketeering activity in violation of section 772.103 as alleged herein, Plaintiffs and the Class could take no action to avoid the misuse and embezzlement of their funds.

374.    The RICO Defendants' scheme to defraud, misuse and embezzlement of funds caused Plaintiffs and the Class to suffer damages in the form of the loss of their investments, which were transferred to Defendants or the entities they controlled as a direct and proximate result of the criminal activity described herein.

375.    The RICO Defendants are jointly and severally liable for their own acts and those of the other participants of the Enterprise as well as the entities controlled by members of the Enterprise. As a result of the RICO Defendants' acts, Plaintiffs and the Class invested over $400 million in the Enterprise's Ponzi scheme.

## COUNT XIII

### Conspiracy to Violate
### Florida's Civil Racketeer Influenced and Corrupt Organizations Act
### (against Quiros, Raymond James, and Burstein)

376.     Plaintiffs re-allege and incorporate paragraphs 1-237 above and the RICO allegations in Count XII as if fully set forth herein.

377.     At all relevant times, each of the RICO Defendants was a principal, agent, alter ego, joint venturer, partner, or affiliate of the other Defendant, and in doing the acts alleged herein, was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship.  Each RICO Defendant had actual or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced, or authorized the wrongful acts of the co-Defendant, and/or retained the benefits of said wrongful acts.

378.     The RICO Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants, and others, in perpetrating their unlawful, unfair or fraudulent scheme on Plaintiffs and the Class.  In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other wrongdoings complained of, each of the RICO Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing herein alleged.

379.     Defendant Quiros agreed with each of Raymond James and Burstein, beginning no later than the first half of 2008, to violate Florida Civil RICO as alleged herein by accomplishing a common and unlawful plan, namely to engage in a pattern of racketeering activity.

380.     The objects of the conspiracy included, without limitation, the misappropriation of funds from Plaintiffs and the Class by means of a scheme to defraud.  By these misappropriations,

88

the RICO Defendants gained personal benefits, obtained funds directly from the conversion of Plaintiffs and the Class's funds for their own use, and fraudulently profited through their fraudulent scheme.

381.    Each of the RICO Defendants knowingly and willfully joined in and became a member of such conspiracy.

382.    At the time each of the RICO Defendants joined such conspiracy, they did so with the specific intent either to personally engage in at least two incidents of racketeering conduct, or they specifically intended to otherwise participate in the affairs of the Enterprise with the knowledge and intent that other members of the conspiracy would engage in at least two incidents of racketeering conduct, as part of a "pattern of racketeering conduct."

383.    The RICO Defendants' agreement to join a conspiracy to engage in a pattern of racketeering activity can be reasonably inferred from their close professional relationship, their mutual financial gain resulting from their pattern of racketeering activity, their use of bank accounts and property, their use of the Raymond James accounts in Florida, and the dependency of the fraudulent acts of each on the fraudulent acts of the others. The RICO Defendants' agreement was manifested by the number and similarity of the racketeering offenses committed by them as discussed herein.

384.    By reason of the RICO Defendants' conspiracy to violate Florida Civil RICO in violation of Fla. Stat. § 772.103, Plaintiffs and the Class suffered injury in that they invested in the Limited Partnerships, investments which they would not have made but for Defendants' scheme to defraud. Specifically, Plaintiffs and the Class invested over $400 million in the Limited Partnerships. The RICO Defendants' misuse and embezzlement of funds caused Plaintiffs and the

Class to suffer damages in the form of the loss of their investments as a direct and proximate result of the RICO Defendants' commission of the foregoing predicate acts.

385.    The RICO Defendants' RICO violations were the actual cause of Plaintiffs and the Class's damages, which would not have occurred without the RICO Defendants' conduct. In addition, Defendants' acts and violations were the direct, natural, and proximate cause of damage to Plaintiffs and the Class, including but not limited to, the loss of Plaintiffs and the Class's funds.

386.    The RICO Defendants are jointly and severally liable for the acts of one another and for the acts of the members of the Enterprise, as their acts were pursuant to a single conspiracy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class;

(2)    Awarding Plaintiffs and the Class compensatory damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(3)    Awarding Plaintiffs and the Class punitive damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law

(4)    Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(5)     Awarding compensatory and treble damages, and attorneys' fees and costs under the Florida RICO statute; and

(6)     Awarding such other and further relief the Court deems just, proper and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 9th day of August, 2016.

/s/ Harley S. Tropin, Esq.

| | |
|---|---|
| Harley S. Tropin, Esq.<br>Florida Bar No. 241253<br>hst@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>Florida Bar No. 965723<br>tr@kttlaw.com<br>Dyanne E. Feinberg<br>Florida Bar No. 371548<br>def@kttlaw.com<br>Rachel Sullivan, Esq.<br>Florida Bar No. 815640<br>rs@kttlaw.com<br>Maia Aron, Esq.<br>Florida Bar No. 17188<br>ma@kttlaw.com<br>Tal J. Lifshitz, Esq.<br>Florida Bar No. 99519<br>tjl@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br><br>*Counsel for Plaintiffs* | Paul Aiello<br>Florida Bar No. 0909033<br>paiello@bennettaiello.com<br>Michael P. Bennett<br>Florida Bar No. 0775304<br>mbennett@bennettaiello.com<br>Jeremy R. Kreines<br>Florida Bar No. 101119<br>jkreines@bennettaiello.com<br>**BENNETT AIELLO**<br>The Ingraham Building, Eighth Floor<br>25 Southeast Second Avenue<br>Miami, Florida 33131<br>Telephone:     (305) 358-9011<br>Facsimile:      (305) 358-9012<br><br>*Counsel for Plaintiffs* |
| Daniel C. Girard (*Pro Hac Pending*)<br>dcg@girardgibbs.com<br>Adam E. Polk (*Pro Hac Pending*)<br>aep@girardgibbs.com<br>**GIRARD GIBBS LLP**<br>601 California Street, 14th Floor<br>San Francisco, California 94108<br>Telephone: 415.981.4800<br><br>*Counsel for Plaintiffs* | Kathleen M. Donovan-Maher (*Pro Hac Pending*)<br>kdonovanmaher@bermandevalerio.com<br>Steven Buttacavoli (*Pro Hac Pending*)<br>sbuttacavoli@bermanvalerio.com<br>Mark A. Delaney (*Pro Hac Pending*)<br>mdelaney@bermanvalerio.com<br>Nathaniel L. Orenstein (*Pro Hac Pending*)<br>norenstein@bermanvalerio.com<br>**BERMAN DEVALERIO**<br>One Liberty Square<br>Boston, Massachusetts 02109<br>Telephone:  (617) 542-8300<br>Facsimile:  (617) 542-1194<br><br>*Counsel for Plaintiffs* |

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on this 9th day of August, 2016 and served by the same means on all counsel of record.

By: _/s/ Harley S. Tropin, Esq._