UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 16-CV-21575-FAM

ALEXANDRE DACCACHE, CARLOS ENRIQUE
HILLER SANCHEZ, PHILIP CALDERWOOD, JOSE
ANTONIO PIETRI, JOSE R. CASSERES-PINTO,
TONGYI WANG, JAMES B. SHAW, JOHANNES
EIJMBERTS, and LORNE MORRIS, on behalf of
themselves and all others similarly situated

       Plaintiffs

v.

RAYMOND JAMES & ASSOCIATES, INC.,
PEOPLE'S UNITED FINANCIAL, INC.,
PEOPLE'S UNITED BANK, ARIEL QUIROS,
WILLIAM STENGER, and JOEL BURSTEIN,

       Defendants.

_____/

## RAYMOND JAMES & ASSOCIATES, INC.'S MOTION TO DISMISS

Financial institutions are not insurers or sureties of misconduct committed by their customers' authorized agents.  Accordingly, Raymond James & Associates, Inc. ("R.J.") seeks dismissal of this suit because it is alleged to be liable for following instructions given by agents of its customers, the Limited Partnerships that the Plaintiffs invested in.  Plaintiffs' allegations boil down to a theory that R.J. *should have known* about the alleged Ponzi scheme, but Plaintiffs' aiding and abetting, RICO, and conspiracy claims require findings that R.J. *actually knew* about and intentionally assisted the Ponzi scheme with the knowing intent to defraud Plaintiffs. Plaintiffs' allegations do not come close to supporting these claims.

As a threshold matter, Plaintiffs lack standing because any injury they suffered was derivative of injury to the Limited Partnerships as a whole.  The claims also fail because the bulk of the Limited Partnerships finished construction and opened.  The RICO claim also fails because Plaintiffs fail to show that R.J. had a conscious knowing purpose to defraud Plaintiffs, or that R.J. caused injury to Plaintiffs.  The common law and RICO conspiracy claims also fail because they fail to show that R.J. reached agreement with anyone to defraud Plaintiffs.

Each investor who purchased a Limited Partnership interest did so to acquire U.S. citizenship.  Each investment was required to create or preserve at least 10 jobs for at least two years.  Am. Compl. ¶ 51.  Thus, for each Phase/Limited Partnership invested in, construction was

expected *to take at least two years*.   Out of the seven Phases/Limited Partnerships whose money was held in R.J. accounts, "construction is complete and the facilities are operating" for Limited Partnerships I through V, construction is partially complete for Limited Partnership VI, and site preparation and other work has been done on Phase VII.  Initial Compl. ¶ 34.[1]   Considering that construction funds were still being raised for phases VI and VII as of December 2012 and beyond, that construction was expected to take *at least* two years, and that the construction was mostly completed, R.J. had no reason to believe that the construction funds were being stolen.

Plaintiffs bring this action on behalf of all Limited Partnership investors but, collectively, they do not hold interests in all of the Limited Partnerships, only Phases II, III, and VII.  Am. Compl. ¶¶ 9-17, 27, 29, 35, 37.   In addition, Plaintiff Wang was a limited partner only in a separate development project, *Q Burke, whose funds were never held at R.J.* Am. Compl. ¶¶ 14, 110.  *None of the Plaintiffs was a limited partner in Phases I, III, IV, or V*.

## BACKGROUND

In 2006, Jay Peak, Inc., a company owned by Mont Saint-Sauveur International, Inc. ("MSSI"), began selling limited partnership interests to build the Jay Peak Resort.  Am. Compl. ¶¶ 24, 26, 27.   In 2008, Quiros, through his company Q Resorts, Inc., purchased Jay Peak from MSSI.  The Jay Peak Project involved six hotels and a Biomedical Research facility.  Continuing the structure formed by MSSI, each of the seven Phases (Phases I – VII) had a separate Limited Partnership that was controlled by a General Partner.  Am. Compl. ¶¶ 2, 26-38.

Quiros and Stenger controlled the General Partners.  Am. Compl. ¶ 321(a-f).  Beginning in 2008, Jay Peak and the seven related Limited Partnership entities – through Stenger and Quiros – opened investment accounts and agreed to have the Limited Partnerships' assets collateralize margin loans at R.J.  Notwithstanding that most of the Jay Peak Project is up and running and has created countless jobs, Plaintiffs allege that the entire project was "a front for a Ponzi scheme masterminded by Defendant Ariel Quiros …."  Am. Compl. ¶ 1.

In its Motion to Dismiss the Initial Complaint (D.E. 43), R.J. pointed out that "red flags" are insufficient to establish knowledge.   R.J. also explained that Plaintiff's own allegations showed that R.J. had no dealings with any investor, had no discretion over the funds placed in its

---

[1] Plaintiff admitted these facts in his Initial Complaint but removed them from the Second Amended Complaint after reviewing R.J.'s Motion to Dismiss the Initial Complaint.   The Receiver's Complaint, which the Second Amended Complaint references, also makes this admission.  *See* Am. Compl. ¶ 6, Receiver's Complaint ¶ 34, *see infra*, page 7.

accounts, and had no actual knowledge that Stenger and Quiros were supposedly stealing the Limited Partnerships' money.  R.J. also pointed out that it played no role whatsoever in the Limited Partnerships, and that all of Plaintiff's allegations were purely conclusory.

The Amended Complaint fares no better.  Plaintiffs still claim that "[b]oth Raymond James and Burstein knew that Quiros's scheme was fraudulent, in part because the high number of transactions in the accounts of the Limited Partnerships was out of the ordinary and raised red flags . . . ." Am. Compl. ¶ 121.   Even with the new allegations – which are still conclusory – Plaintiffs fail to show any knowledge or involvement by R.J. in the alleged Ponzi scheme.

One of Plaintiffs' major complaints is that Stenger's delegation of authority to Quiros was improper, and that R.J. knew or should have known that it was improper.  Plaintiffs vaguely allege that R.J. was provided with "sufficient portions of the offering materials for all of the Limited Partnerships" to be on notice that "the investors were unaware that their capital contributions would be under the exclusive control of Quiros." Am. Compl. ¶ 251(c) and (e).  Plaintiffs do not specify what materials were supposedly provided to R.J. or recite the language that supposedly informed R.J. of this supposed prohibition.  Nor do they allege that R.J. actually read those legal documents, or why, in the face of Quiros having been given authority to manage the Limited Partnerships' money, they were even required to read through the offering materials and adhere to any supposed restrictions not found in the account opening documents.

But even if R.J. had read the offering materials, and those materials did not affirmatively state that Quiros would be managing the Limited Partnerships' money, it does not follow that the offering materials *prohibited* Quiros from managing the money.  Moreover, the reality is that, even without the delegation, Quiros *was* authorized to act for the Limited Partnership, as admitted by Plaintiff in his Initial Complaint.  *See* Initial Compl. ¶ 15. ("[T]hrough Jay Peak, Inc., Quiros controlled each of the Jay Peak general partners and limited partnerships.").

Despite that R.J. was not involved with the creation or dissemination of the offering materials, *see, e.g.,* Am. Compl. ¶¶ 2, 91, Plaintiffs artfully attempt to make R.J. appear far more involved.  Plaintiffs, for instance, attempt to characterize R.J.'s opening of accounts to hold the Limited Partnerships' money as R.J. "devising" a "financial structure for the Limited Partnerships that they would implement to raise financing for the EB-5 Projects."  Am. Compl. ¶ 52.  Plaintiffs also question R.J.'s provision of margin loans and agreement to collateralize the loans with assets in the Limited Partnership accounts because it allowed Quiros to commingle

funds and because the offering documents allegedly said that the Partnerships could not pledge investor funds as collateral.  Again, R.J. did not prepare or provide any offering materials, is not named in the offering materials, and otherwise had nothing to do with the offering materials. Knowledge of commingling is insufficient to show actual knowledge of fraud.

Plaintiffs also allege that, once the money was in the R.J. accounts, R.J. helped hide the alleged fraud by using an intricate web of transfers among various accounts to disguise that the projects were experiencing shortfalls. Am. Compl. ¶ 4.  For this to plausibly support liability, however, Plaintiffs must allege that they were actually reviewing account information from R.J., that the information was misleading, and that R.J. had knowledge of this and an intent to deceive Plaintiffs.  Plaintiffs do not make any such allegation, because they had no dealings with or awareness of R.J.

Plaintiffs also allege that a lawyer for MSSI told R.J., in June 2008, that the assets in the MSSI Raymond James Suites Phase I account and those transferred into a Phase II account could not be used to fund the acquisition of Jay Peak and that the funds had to be used in accordance with the Limited Partnership agreements.  Am. Compl. ¶ 60.  Again, Plaintiffs do not explain why R.J. was required to monitor the use of funds against the Partnership agreements or to honor those instructions rather than the instructions given by Stenger, who had authority and delegated it to Quiros.  Furthermore, this allegation relates to only Phases I and II, but those Partnerships suffered no injury because the associated hotels are open and operating.  Initial Compl. ¶ 34.

In short, Plaintiffs fail to plead that R.J. had actual knowledge that the Jay Peak project was supposedly "a front for a Ponzi scheme . . . ."  On the contrary, the allegations that Plaintiffs deleted from their Initial Complaint –  those showing all of the work being done and the jobs being created on the Jay Peak Project –  demonstrated that R.J., along with many others, had every reason to believe that the Jay Peak Limited Partnerships were performing properly.

## ARGUMENT

### I.    Plaintiffs Lack Standing to Bring Any of their Claims.

Just as the law prevents a limited partner from being sued in his or her individual capacity for liabilities *caused by* the limited partnership, it also prevents the limited partner from suing in his or her individual capacity for injuries *suffered by* the limited partnership.  To have standing, a shareholder must demonstrate a distinct injury that did not flow from an initial injury to the company ***and*** an injury special and unique from injury suffered by other shareholders:

> [A]n action may be brought directly only if (1) there is a direct harm to the shareholder or member such that the alleged injury does not flow subsequently from an initial harm to the company *and* (2) there is a special injury to the shareholder or member that is separate and distinct from those sustained by the other shareholders or members.

*Dinuro Investments, LLC v. Camacho*, 141 So. 3d 731, 738–40 (Fla. 3d DCA 2014).[2]  *See also Harris v. Orange, S.A.*, 636 F. App'x. 476, 482-83 (11th Cir. 2015) (where primary alleged injuries flowed from diminution in the value of shares, claim is derivative).

"This rule applies with equal force in the case of partnerships." *Ball v. Field*, 1992 WL 57187, at *8 (N.D. Ill. 1992)) (citing *Klebanow v. New York Produce Exch.*, 344 F.2d 294, 297 (2d Cir. 1965)); *see also Lewis v. Seneff,* 654 F. Supp. 2d 1349, 1363 (M.D. Fla. 2009) ("Limited partners are not directly injured when they are damaged only to the extent of their proportionate interest in the partnership.") (internal citation omitted).

Plaintiffs concede that each investor became a Limited Partner in one of the seven Limited Partnerships.  *See* Am. Compl. ¶ 39 ("Phases I through VII are collectively referred to as the 'Jay Peak Limited Partnerships' and "[e]ach investor in Phases I through VII became a Limited Partner.").  Plaintiffs confirm that, after they purchased their Limited Partnership interests, they sent their money to Limited Partnership accounts at People's Bank.  *See* Am. Compl. ¶ 102 (when "an investor wired money to People's Bank, the confirmation identified the beneficiary…as the specific limited partnership to which the investor had contributed funds….").

Plaintiffs also concede that when Stenger transferred the Limited Partnerships' money from People's Bank to R.J., the money was held in Limited Partnership accounts at R.J.  *See, e.g.,* Am. Compl. ¶ 90 (referring to "the [R.J.] accounts for the Limited Partnerships."); ¶ 94 (referring to "the monies invested in the Limited Partnerships").

Plaintiffs further claim that, once the Limited Partnerships' money was in the R.J. accounts, Quiros misappropriated the Limited Partnerships' money to (1) finance his purchase of the Jay Peak resort, (2) back a personal line of credit to pay his income taxes, (3) purchase a luxury condominium, (4) pay taxes of a company he owns, and (5) pay off margin loans that he established without authority.  Am. Compl. ¶ 3; *see also* Am. Compl. ¶ 62 (alleging that Quiros

---

[2] Vermont law is no different. *See Bovee v. Lyndonville Sav. Bank & Trust Co.*, 811 A.2d 143, 145-46 (Vt. 2002) ("To have standing to sue individually, the shareholder must allege an injury separate and distinct from other shareholders….").

used "$12.4 million from Phase I and $9.5 million from Phase II to fund the vast majority of his purchase of Jay Peak, Inc."); ¶ 88 ("Quiros transferred $4.2 million from the Phase VII account to pay corporate taxes … even though Phase VII was in no way responsible for these tax liabilities."); ¶ 89 ("Quiros took funds from the Phase VII account at Raymond James… to pay off Margin Loan IV.")  Thus, if R.J. is somehow liable for allowing money to be misappropriated from its accounts, it was the Limited Partnerships' money, not the money of individual investors.

That the alleged injury was to the Limited Partnerships as a whole is further confirmed by the fact that any rights that Plaintiffs claim were violated were rights they had by virtue of being Limited Partners and rights that allegedly stemmed from the Limited Partnership agreements. *See, e.g.,* Am. Compl. ¶ 77 ("Quiros's establishment of the margin loans violated the terms of the written Limited Partnership Agreement applicable to each Limited Partnership."); ¶ 97 ("Each Limited Partnership Agreement prevented the General Partner, without consent of the Limited Partners in each Limited Partnership, from: (1) borrowing from or commingling funds; (2) acquiring any property with investor funds that does not belong to the Limited Partnership, other than as specifically authorized in the agreement; or (3) mortgaging, conveying or encumbering Limited Partnership property that was not real property.")  Thus, any injury allegedly suffered by Plaintiffs by Quiros's alleged misappropriation of the Limited Partnerships' money flowed from an injury to the Limited Partnerships and from Plaintiffs' derivative rights as Limited Partners.

The case law is clear that claims of authorized agents absconding with an entity's money are claims belonging to the entity, not the individuals who invested in the entity:

> This claim … alleges that the … managers and directors of the entities … abscond[ed] with funds invested in IDT and Brandaid.  This claim is indistinguishable from the myriad claims of self-dealing and mismanagement that courts have held may only be brought as derivative claims. . . .  The loss of value to these Plaintiffs' investment in IDT and Brandaid is indistinguishable from the loss to all other investors who were similarly harmed when funds were transferred from the corporate account to personal accounts of the defendants.

*Medkser v. Feingold*, 307 F. App'x. 262, 265 (11th Cir. 2008); *see also Cowin*, 741 at 416  (self-dealing and diversion of assets are "fundamentally claims belonging to the corporation …").

The Receiver appointed for the Partnerships has already brought the same claims – aiding and abetting Quiros, RICO, and common law and RICO conspiracy claims – against R.J. in *Michael I. Goldberg, as Receiver v. Raymond James Financial, Inc.,* Case No. 16-CV-21831-

JAL.  *See* Am. Compl. ¶ 6.  Allowing Plaintiffs in this case to sue on the same claims and for the same conduct would interfere with the Receiver's case and subject R.J. to double liability.

## II.      R.J. Was Entitled to Follow Quiros's Instructions.

It is settled law that "[t]he public have a right to rely upon an agent's apparent authority…."  *Indus. Ins. Co. of N. J. v. First Nat. Bank of Miami*, 57 So. 2d 23, 26 (Fla. 1952) (quoting *Aetna Ins. Co. v. Holmes*, 59 Fla. 116, 116, 52 So. 801 (1910)).  "Apparent or ostensible authority arises where a principal allows or causes others to believe the agent possesses such authority, as where the principal … by his actions or words holds the agent out as possessing it."  *Singer v. Star*, 510 So. 2d 637, 640 (Fla. 4th DCA 1987).

These fundamental agency doctrines protect a financial institution that relies upon the instructions of its customers' authorized agents.  *See, e.g., O'Halloran v. First Union National Bank of Florida,* 350 F.3d 1197, 1205 (11th Cir. 2003) ("[A] bank … has the right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds….").  Plaintiffs' Amended Complaint makes clear that Quiros had authority to act for the Limited Partnerships.  It concedes that (1) "[e]ach of the General Partners is controlled … by Defendants Quiros and Stenger," Am. Compl. ¶ 321, (2) Stenger is the President of the General Partner of the Phase I and II Limited Partnerships, Am. Compl. ¶ 321(a), and (3) Stenger is the "director and only principal" of the General Partners of the Phase III, IV, V, VI and VII Limited Partnerships.  Am. Compl. ¶ 321(b-f).  Quiros, along with Stenger, is also the managing member of the General Partner of Phase VII.  Am. Compl. ¶¶ 38, 321(f).

Plaintiffs further allege that "Stenger, as the sole principal of the General Partners … ceded control of the funds to Quiros" and had control over the accounts and approved the transfer of the funds to an account at R.J. over which only Quiros had control.  Am. Compl. ¶¶ 59, 74, 75.  Considering that the Limited Partnerships sent the money to the R.J. accounts with knowledge that Quiros alone had authority over the accounts, R.J. had every reason to believe that Quiros had the authority.

## III.      The Phases I through V Limited Partnerships Suffered No Losses.

As discussed above, Plaintiff Daccache admitted in his initial Complaint that construction for the first five phases (the Phase I through V Limited Partnerships) was completed and the Projects were operating.  Initial Compl. ¶ 34.   R.J. pointed to these facts in its initial Motion to Dismiss, and Plaintiffs removed those allegations from their Amended Complaint.   But the

Plaintiffs who invested in any of the Phase I through V Limited Partnerships – Plaintiffs Daccache (Phase III), Calderwood (Phase II), Shaw (Phase II) – cannot escape these facts, and their claims must be dismissed because they suffered no injury.  *See Fernandez v. School Bd. of Miami-Dade County*, 2016 WL 4417632 n. 1, __ F. Supp. 3d __ (S.D. Fla. Aug. 19, 2016) (finding that facts alleged by plaintiffs in their first amended complaint that demonstrated applicability of defenses to claims but removed by plaintiffs in their amended complaint would not be ignored by court in ruling on motion to dismiss second amended complaint).

## IV.   Plaintiffs Fail to Plead Plausible Claims for Aiding and Abetting Fraud[3] (Count II) and Aiding and Abetting  a Breach of Fiduciary Duty (Count V).

"In order to establish a claim for aiding and abetting, the plaintiff must establish that the aider and abettor had knowledge of the underlying breach of fiduciary duty or fraud, and that the aider and abettor substantially assisted or encouraged commission of the breach or fraud." *Lamm v. State St. Bank & Trust Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012).

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  In addition, "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct …." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).

### A.  Plaintiffs Fail to Plead Facts Showing Actual Knowledge by R.J.

The underlying breaches that R.J. are alleged to have aided and abetted are the same for the fraud and fiduciary duty claims – the misappropriation of the Limited Partnership money through a Ponzi scheme masterminded by Quiros.  Am. Compl. ¶ 251 (referring to fraud by Quiros); ¶ 268 (referring to the breach of fiduciary duty that the General Partners committed by commingling, misappropriating, and misusing the Limited Partnerships' money).  To support aider and abettor liability against R.J., Plaintiffs must allege facts showing that R.J. had *actual knowledge* that Quiros was operating a Ponzi scheme and was stealing the Limited Partnerships' money.  "Conclusory statements that a defendant 'actually knew' [are] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest that the defendant 'should have known' that something was amiss." *Lamm*, 889 F. Supp. 2d at 1332.  (citing

---

[3] It is unclear whether Florida even recognizes a cause of action for aiding and abetting fraud. *Lamm v. State St. Bank & Trust*, 749 F.3d 938, 950 (11th Cir. 2014).

*Platinum Estates, Inc. v. TD Bank, N.A.,* No. 11–60670–CIV, 2012 WL 760791, at *3 (S.D. Fla. Mar. 8, 2012)).  Nor can the allegations showing actual knowledge be based on mere supposition or belief.  *See, e.g., Hines v. FiServ, Inc.*, No. 808-CV-2569-T-30AEP, 2010 WL 1249838, at *4 (M.D. Fla. Mar. 25, 2010) ("Plaintiffs are directed to specifically state whether it is claiming that FiServ had actual knowledge.  If Plaintiffs make that claim without adequate investigation, of course, they are subject to Rule 11 sanctions.").

Here, Plaintiffs fail to allege facts showing that R.J. had actual knowledge.  Plaintiffs instead sprinkle the phrase "knowing assistance" throughout the Amended Complaint to describe R.J.'s actions, Am. Compl. ¶ 2, 62, 71, 81, 85, but those purely conclusory allegations must be disregarded.  *See Am. Dental Ass'n*, 605 F.3d at 1294 (noting that, under *Iqbal*, bare allegations are not entitled to a presumption of truth and should be ignored under *Twombly*) (citing *Twombly*, 550 U.S. at 557, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

Plaintiffs also point to the fact that Burstein was then the son-in-law of Quiros.  Am. Compl. ¶ 251 (a).  This, too, is nothing more than implausible innuendo that R.J. *should have known*.  As discussed above, Plaintiffs also claim that R.J. was provided with "sufficient portions of the offering materials … to understand the nature of the Jay Peak investment projects," and that the offering materials demonstrated that (1) "the investors were unaware that their capital contributions were being commingled….," and (2) "that the investors were unaware that their capital contributions would be under the exclusive control of Quiros."  Am. Compl. ¶ 251(c-e).  As also discussed above, Plaintiffs fail to actually identify what specific materials or documents were provided to R.J. and what those documents said.  But, as also mentioned above, even if the offering materials did not expressly affirmatively state that Quiros would be managing the Limited Partnerships' money, that is a far cry from the offering materials actually prohibiting Stenger from delegating the authority to manage the money to Quiros.

Moreover, assuming that R.J. was required to and actually did read the offering materials, Plaintiff Daccache conceded in his Initial Complaint that those materials would have informed R.J. that Jay Peak, Inc. – which was owned by Quiros – was entitled to receive $3.7 million of the funds raised from the investors in the Phase III Limited Partnership "for its own use." Initial Compl. ¶ 142.  And that was just from *one* of the Limited Partnerships.  Moreover, as Quiros pointed out in his Motion to Dismiss the Initial Complaint, the Limited Partnership Agreements afford the General Partners broad discretion in running the construction of the projects, including

9

executing agreements and conveying partnership property, and expressly authorize transactions with affiliates of the General Partners. *See* D.E. 34 at 4-6. Thus, if R.J. actually had the knowledge of the offering materials that Plaintiffs claim it should have had, that knowledge would only weaken Plaintiffs' allegations that there was something suspicious about funds being commingled or "diverted" to Jay Peak or other affiliates.

Moreover, even if all of the voluminous offering materials and Limited Partnership agreements were provided to R.J., Plaintiffs fail to allege that anyone at R.J. actually read or understood them, or was even required to read or understand them.[4]  In other words, this, too, amounts to nothing more than an allegation that R.J. *should have known*, which is insufficient to establish *actual knowledge*. *See, e.g., In re Palm Beach Fin. Partners, L.P.*, 488 B.R. 758, 773 (Bankr. S.D. Fla. 2013) ("The Plaintiff asserts that M & I knew of the manner in which the Petters purchase financing transactions were conducted and of the 'representations, recitals and responsibilities' contained in the DAMA. Neither of these allegations indicate that anyone at M & I had actual knowledge of Petters' fraud.  Instead, they merely suggest that M & I should have known of Petters' fraud had they been paying closer attention….").

In *Lawrence v. Bank of America*, 455 F. App'x. 904 (11th Cir. 2012), the Eleventh Circuit confirmed a financial institution is not required to investigate its customer's transactions:

> [W]e agree…that Plaintiffs' allegations fall short of *Twombly's* requirements. Plaintiffs alleged that Bank of America authorized numerous deposits, withdrawals, and wire transfers involving large amounts of money and … received substantial commissions. Although Plaintiffs alleged the transactions were atypical and therefore Bank of America *should have known* of the Ponzi

---

[4] Plaintiffs reference FINRA and "Know Your Customer" regulations, but fail to allege that these regulations required R.J. to read the offering materials or Limited Partnership Agreements.  Even assuming that it was R.J.'s policy to carefully review all of that material, the failure would not support *actual knowledge. See, e.g., El Camino Res., LTD. v. Huntington Nat. Bank*, 722 F. Supp. 2d 875, 923 (W.D. Mich. 2010), *aff'd*, 712 F.3d 917 (6th Cir. 2013) ("[C]ourts have routinely rejected the notion that a bank's failure to execute a duty to investigate, whether that duty is alleged to arise from federal regulation or from the bank's own internal policies, somehow satisfies the actual knowledge standard."); *Chance World Trading E.C. v. Heritage Bank of Commerce,* 438 F. Supp. 2d 1081, 1086 (N.D. Cal. 2005), *aff'd*, 263 F. App'x. 630 (9th Cir. 2008) (bank's failure to comply with "internal policies … cannot constitute knowledge that Ms. Yadav-Ranjan was engaged in any fraudulent activity.").  On the contrary, "[know your customer] rules … are intended to protect the banks and the general public from harm.  They were not created to protect borrowers from harm done by co-borrowers.  These rules therefore cannot form the basis for a negligence claim in this case." *Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269, 282 (S.D. Fla. 2010).

scheme, such allegations are insufficient under Florida law to trigger liability. Florida law does not require banking institutions to investigate transactions…To be liable, the bank would have had to have *actual knowledge* of Diamond's fraudulent activities. These allegations simply fail to make that "plausible."

*Lawrence,* 455 F. App'x. at 907 (emphasis added).

In *Lamm v. State Street Bank*, the Eleventh Circuit affirmed dismissal with prejudice of similar claims and rejected the notion that a financial institution is to be "an extra pair of eyes" over an account as to which it exercises no discretion. Citing cases from many other courts, the Eleventh Circuit held that there was no duty to monitor irregular transactions and, therefore, red flags do not permit an inference of actual knowledge. *Lamm*, 749 F.3d at 947-51.

Following *Lawrence* and *Lamm*, the Eleventh Circuit rejected similar aiding and abetting claims in *Perlman v. Wells Fargo Bank*, 559 F. App'x. 988, 993-94 (11th Cir. 2014). In that case, a Ponzi schemer named George Theodule opened four accounts at Wells Fargo for a company named Creative Capital, representing them as relating to "investment business" and "securities/commodities business" activity. 559 F. App'x. at 991. Over the next few weeks, 36 "feeder accounts" were opened, and from those feeder accounts, $2.2 million was transferred to the Creative Capital accounts. *Id.* at 991.

Within six weeks, Wells Fargo noted in internal documents suspicious transfers in one of the "feeder" accounts but continued to allow them based on a business plan that contained numerous obvious inconsistencies. *Perlman*, 559 F. App'x. at 991. Over the next few months, more than $10 million was deposited and withdrawn, with substantial portions being disbursed directly to Theodule and his wife. *Id.* Over the course of his 5-month relationship with Wells Fargo, the principal transferred more than $38 million through the accounts. *Id.* Even on these facts, the Eleventh Circuit affirmed the trial court's dismissal, holding that while the allegations might show that Wells Fargo *should have known* about the Ponzi scheme, they failed to establish that Wells Fargo had actual knowledge of the Ponzi scheme because red flags and other oddities, including numerous transfers through different accounts and commingling, are insufficient:

Perlman alleges … Theodule's opening of various accounts, numerous transfers amongst the accounts within short time periods, thousands of deposits of even dollar amounts, large cash deposits and withdrawals, the absence of any investment activity, and Wells Fargo's lifting of the freeze on the Wealth Builders account without further investigation. These allegations fall short of raising a plausible inference that Wells Fargo actually knew that Theodule was engaging in fraudulent activity. At most they list facts that could arouse suspicions, and are

11

<u>not sufficient to trigger any obligation by Wells Fargo to investigate.  While these</u> <u>"red flags" may have put the bank on notice that some impropriety may have been</u> <u>taking place, those alleged facts do not create a strong inference of actual</u> <u>knowledge</u>....

*Id.* at 993-94 (11th Cir. 2014) (emphasis added, citations and quotation marks omitted).[5]

Finally, in *O'Halloran v. First Union National Bank of Florida*, the Eleventh Circuit noted that a bank must be able to assume that those with legal authority over the accounts do not misuse the money they control, and made clear that, when a financial institution follows the instructions of those with authority over the accounts, it cannot be liable for any wrongdoing subsequently committed by those with authority, and dismissal of the claims is appropriate:

> [A] bank can only really complete transactions with natural persons and has the right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds….  The bank is responsible only for making sure that the employee, at the time of the withdrawal, has the authority to make withdrawals on behalf of the accountholder entity.
>
> .        .        .
>
> Here, however, we find that the complaint … clearly alleges that Payne was … fully authorized by Greater Ministries to act on its behalf, and we agree with First Union that these allegations foreclose the possibility of the trustee prevailing on any of his theories….  First Union is not responsible for Payne's diverting funds to his own purposes … and dismissal of this claim was appropriate.

*O'Halloran,* 350 F.3d at 1205 (emphasis added.)

Plaintiffs rest on a theory that R.J. should have been on notice of possible improprieties because of the number of fund transfers, the use of multiple accounts, the use of margin, and the commingling of funds, including the use of funds to acquire Jay Peak.  Am. Compl. ¶ 121.  At best, this is an allegation of "red flags," but "red flags," including the commingling of funds and numerous or large transfers, are not enough to establish aider and abettor liability against a

---

[5] *See also Freeman v. JP Morgan Chase Bank, N.A.,* 137 F. Supp. 3d 1284, 1296-97 (M.D. Fla. 2015) ("The Court agrees with the Bank that this is a case involving mere allegations of atypical transactions similar to those addressed in *Lawrence*.  Freeman's evidence amounts to little more than unusual banking activity, such as the Bank's customer providing misleading information when opening his accounts and a wire-transfer of a large sum of money to a  location determined to be 'high risk.'  This evidence standing alone does not raise an inference of actual knowledge under Florida law.")  Notably, the Eleventh Circuit also held in *Perlman* that, based on the plaintiff's proposed amended complaint, which alleged that the bank's Vice President, among other things, suspected unlawful activity and contacted law enforcement because the unusual activity "raised the hair on the back of your neck," the plaintiff should be given leave to amend.  *Perlman*, 559 F. App'x. at 995-96.  There are no such allegations here.

financial institution.  *See Wiand*, 938 F. Supp. 2d at 1248 ("Commingling of funds, even where the bank knows that the customer holds the funds in a fiduciary or trust capacity, is not necessarily prohibited and is insufficient to allege knowledge of an underlying fraud.") (citing *Atlanta & St. A.B. Ry. Co. v. Barnes*, 95 F.2d 273, 275 (5th Cir. 1938) ("The bank may and should assume the customer's honesty and correct conduct of his business.  *That a trustee, with the bank's knowledge, deposits trust money in his individual account it [sic] not always nor ipso facto a conversion of it.*")). (Emphasis added).

Here, just as in *O'Halloran*, Plaintiffs concede that Stenger, who had actual authority over the Limited Partnership money, delegated that authority to Quiros.  As in *Lamm*, R.J. had no discretion to invest the funds, and R.J. was entitled to assume that Quiros was not stealing funds unless it had *actual knowledge* that he was.  Considering that numerous hotels, a water park, an ice rink, a golf clubhouse, an activities center, a bar and restaurant, cottages, a chapel, townhouses, a parking garage, and a café were built and opened, (Initial Compl. ¶ 34), it is hard to see how the Plaintiffs can support actual knowledge by R.J., especially because the Court is free to infer from the factual allegations in the complaint "obvious alternative explanations which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental.*, 605 F.3d at 1290 (internal quotation marks omitted).

**B.  Plaintiffs Fail to Plead Substantial Assistance by R.J.**

To plead substantial assistance, the allegations must demonstrate that the defendant "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [underlying violation] to occur." *BCJJ, LLC v. LeFevre,* No. 09–CV–551, 2012 WL 3071404, at *34 (M.D. Fla. July 27, 2012).  If the defendant is a financial institution, the requirement cannot be satisfied merely by permitting a wrongdoer to "create accounts, transfer funds among accounts, and make withdrawals from accounts."  *Freeman v. JP Morgan Chase Bank, N.A.*, 137 F. Supp. 3d 1284, 1298-99 (M.D. Fla. 2015) (because the bank did not conceal its customer's fraud, it could not have substantially assisted the fraud); *Lamm v. State St. Bank & Trust Co.*, 889 F. Supp. 2d 1321, 1333 (S.D. Fla. 2012) ("[T]he substantial assistance prong cannot be established where, as here, State Street had no duty to disclose the alleged irregularities in the transactions."); *Groom v. Bank of Am.*, No. 8:08-CV-2S67-JDW-EAJ, 2012 WL 50250, at *4 (M.D. Fla. Jan. 9, 2012) ("Plaintiffs' assertion that the Defendant banks 'made it possible for Pearlman and his cohorts to deposit vast sums of money' is likewise insufficient.  This is, at

most, a conclusory allegation that the banks permitted a customer to engage in suspicious transactions, which fails to establish substantial assistance.").

Plaintiffs allege that R.J. should be held liable for setting up Quiros's bank structure, permitting margin loans, and executing the transfers directed by Quiros.  This is insufficient to constitute "substantial assistance" by R.J.  Plaintiffs' claim that R.J. helped conceal Quiros's alleged theft by using a misleading web of transfers to hide the dissipation of money is not plausible because Plaintiffs admit that they did not even have access to any R.J. account information and did not even know about the existence of R.J.  Plaintiffs have failed to allege facts sufficient to show "substantial assistance" by R.J.

## V.  Plaintiffs Fail to Sufficiently Plead a Claim for Civil Conspiracy (Count VII).

In the absence of allegations of an actual agreement to do an unlawful act, a civil conspiracy claim must be dismissed.  *See Russo v. Fink*, 87 So. 3d 815, 819 (Fla. 4th DCA 2012) ("[T]he complaint merely states that 'Leonard Fink and Marilyn Fink conspired in concert with full knowledge of each other's action[s]'.... Because [the complaint] never alleged that there was an agreement, it has failed to allege sufficient facts with respect to the conspiracy count.")

Conspiracy claims must also be pleaded with enough specificity to notify a defendant about the time, place, and persons involved in making the conspiratorial agreement, and to show that an actual agreement was reached.  *See Twombly*, 550 U.S. at 565 n. 10 (noting that a defendant responding to conspiracy claims "would have little idea where to begin" where the pleadings "mentioned no specific time, place, or person involved in the alleged conspiracies."); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("A complaint may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy.")

Moreover, where the conspiracy alleged involves fraud, the pleadings must also satisfy Rule 9(b)'s heightened pleading requirements.  *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064–65 (11th Cir. 2007) ("[A]s the district court noted, where a conspiracy claim alleges that two or more parties agreed to commit fraud, the plaintiff must also plead this act with specificity."); *see also Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) ("Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made … and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same ….").

Here, Plaintiffs generally allege a conspiracy among Quiros, R.J., Burstein, and People's

Bank to fraudulently induce Plaintiffs into investing millions of dollars, Am. Compl. ¶¶ 283, 284, but fail to specifically allege the existence of any conspiratorial agreement.  In conclusory fashion, Plaintiffs allege only that "[a]n agreement was made in the first half of 2008 by Quiros with each of Raymond James, Burstein, and People's Bank to induce Plaintiffs and the Class into investing millions of dollars into the Limited Partnerships and to commit the fraud…" *Id.* ¶ 284. By alleging "the first half of 2008" as the time of the making of the alleged conspiratorial agreement, Plaintiffs have failed to sufficiently allege when the agreement was made.  Nor do Plaintiffs allege the place where any supposed agreement was made, or whether the supposed agreement was made with the alleged co-conspirators at the same time or place.

Moreover, based on the artful allegation that Quiros made an agreement "with each of" R.J., Burstein, and People's Bank, it is not even clear whether there was one agreement among all of the alleged co-conspirators, or multiple different agreements with each alleged co-conspirator.  Nor has Plaintiff alleged sufficient facts to make it plausible that any agreement was actually reached with anyone.  *See Albra v. City of Fort Lauderdale*, 232 F. App'x. 885, 890–91 (11th Cir. 2007) ("The plaintiff … must show some evidence of agreement between the defendants.  To allege a conspiracy, a plaintiff must make 'particularized allegations' that are more than vague or conclusory.")  Plaintiffs' allegations are nothing but conclusory, and the conspiracy count must accordingly be dismissed.

## VI.    Plaintiffs Have Failed to Sufficiently Plead a Substantive RICO Claim (Count XII).

After R.J. filed its initial Motion to Dismiss, Plaintiffs dropped their Federal RICO claim and added a Florida RICO claim.  The claim fares no better because the same standards apply, and Plaintiffs' allegations are just as conclusory.  *See Rogers v. Nacchio*, 241 F. App'x. 602, 607 (11th Cir. 2007) ("Because § 772.103 is patterned after the federal RICO statute, the Florida courts have looked to decisions interpreting the federal statute in interpreting § 772.103.").[6]

Just like a Federal RICO claim, a Florida RICO claim predicated on fraud must satisfy Rule 9(b)'s heightened pleading requirements.  *See Rogers*, 241 F. App'x. at 608 (applying Rule 9(b) to Florida RICO claim and affirming trial court's dismissal of Florida RICO claim for plaintiff's failure to plead specific facts to support the claim).  As discussed more fully below, to

---

[6] *See also O'Malley v. St. Thomas University, Inc.*, 599 So. 2d 999, 1000 (Fla. 3d DCA 1992) ("Since Florida RICO is patterned after federal RICO, … federal decisions should be accorded great weight").

state a substantive RICO claim based on fraud, Plaintiffs must plead – *with heightened particularity*[7] – sufficient facts to demonstrate a plausible case that the defendant: (1) participated in the RICO enterprise's affairs (2) with a conscious knowing intent to defraud (i.e., scienter) (3) through deception (i.e., "racketeering activity"), and (4) the deception directly injured the plaintiff. These elements must be alleged "*with respect to each defendant's participation in the fraud.*" *Am. Dental Ass'n*, 605 F.3d at 1291 (emphasis added).

**A. Plaintiffs Fail to Plausibly Allege Facts Showing That R.J. Acted with a Conscious Knowing Intent to Defraud (i.e., Scienter)**.

In RICO claims based on fraud, the allegations must demonstrate "a conscious knowing intent to defraud" (i.e., scienter) by the defendant. *See Pelletier v. Zweifel*, 921 F.2d 1465, 1498-99 (11th Cir. 1991) ("Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property…. [T]he defendant must have "*had a 'conscious knowing intent to defraud.*'") (emphasis added); *see also Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1354 (11th Cir. 2008) ("The predicate acts … – mail and wire fraud … – each require proof of scienter.").

Allegations demonstrating a "conscious knowing intent to defraud" *cannot be conclusory*. *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 949 (11th Cir. 1997) ("Panama's conclusory allegation that the BCCI defendants acted 'in concert with the First American defendants' … is insufficient to establish the requisite intent. A RICO plaintiff's allegations of scienter cannot be 'merely conclusory and unsupported by any factual allegations.'") (quoting *O'Malley v. O'Neill*, 887 F.2d 1557, 1560 (11th Cir. 1989)).

Plaintiffs allege only that R.J. set up a banking structure allowed by Stenger, executed the transfers that Quiros requested, and ignored supposed red flags. None of these create any inference that R.J. had any conscious knowing intent to defraud, especially in light of the facts that (i) the accounts were authorized by Stenger on behalf of the Limited Partnerships, (ii) the projects were being built and operated, and (iii) R.J. was not involved in any of the allegedly misleading offering materials that Stenger and Quiros provided to investors. Because Plaintiffs fail to plausibly allege a conscious knowing intent by R.J. to assist Stenger and Quiros in stealing

---

[7] *See Am. Dental*, 605 F.3d at 1291 ("Because plaintiffs' section 1962(c) claim is based on … acts of mail and wire fraud, their substantive RICO allegations must comply … with … Fed.R.Civ.P. 9(b)'s heightened pleading standard….")

money, the RICO claim cannot survive.

**B. Plaintiffs Fail to Plausibly Allege Facts Demonstrating Deception (Racketeering Activity) by R.J.**

The crux of a RICO claim predicated on fraud is an intent to defraud by deception. *Am. Dental Ass'n.*, 605 F.3d at 1291-92 ("We have held that a plaintiff must allege that some kind of deceptive conduct occurred in order to plead a RICO violation predicated on mail fraud.") (citing *Am. United Life Ins. Co. v. Martinez,* 480 F.3d 1043, 1065 (11th Cir. 2007) (affirming dismissal of RICO claim where complaint failed to allege any affirmative misrepresentations)).

Plaintiffs attempt to allege that R.J. "facilitated an intricate web of transfers among various accounts at R.J. to disguise the fact that most of the eight projects were either over budget or experiencing shortfalls." (Am. Compl. ¶ 327(f).) The fatal flaw, is that, as discussed, R.J. never provided false or misleading financial account information to any investors or ever undertook to do so. Nor is there any allegation that R.J. expected any investor to receive account information from R.J. Thus, the allegations do not even satisfy Rule 8(a), let alone Rule 9(b). *See Am. Dental*, 605 F.3d at 1291-92 ("[N]or do they allege the manner in which they were misled by the documents, as they are required to do under Rule 9(b).").

**C. Plaintiffs Fail to Plausibly Allege That the Members of the Alleged RICO Enterprise Shared a Common Purpose.**

An essential element of a RICO enterprise is that its alleged members shared a common purpose. *Boyle v. United States*, 556 U.S. 938, 948 (2009) ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose."). Plaintiffs allege that Quiros, R.J., and Burstein were part of a RICO enterprise whose common purpose was to deceive investors into believing that their funds were being used for the purposes described in the offering materials. Am. Compl. ¶ 322. Plaintiffs' allegations fail to give rise to a plausible inference that Quiros, R.J., and Burstein shared such a common purpose.

The Eleventh Circuit recently issued an opinion addressing this very issue in an analogous case, *Ray v. Spirit Airlines, Inc.*, 2016 WL 4578347, __ F.3d __ (11th Cir. Sep. 2, 2016). In *Ray*, Spirit Airlines customers alleged that Spirit misled them into buying tickets because Spirit used an internet platform that portrayed its "Passenger Usage Fee" as a government-imposed fee when, in fact, it was a portion of a fee charged by Spirit. *Id.* at *1. The plaintiffs alleged that Spirit was part of a RICO enterprise with software vendors and consultants

who helped create the internet platform, and that all of the members of the enterprise shared the common purpose of defrauding Spirit customers by tricking them into thinking that they were paying a government-imposed fee when they were paying a fee to Spirit.  *Id.* at *3.

In deciding whether the pleading plausibly alleged a shared common purpose, the Court began by rejecting the purely conclusory allegation of a "shared common purpose" and searched for factual allegations that actually gave rise to a plausible inference that the members shared a common purpose to defraud Spirit customers.  *Ray*, 2016 WL 4578347 at *8.  The Court found that the plaintiffs failed to adequately plead a common purpose because:

> Nowhere in the complaint do the plaintiffs allege facts giving rise to a plausible inference that the various technology vendors and consultants … were in any way involved in the actual decisions of how to portray the Passenger Usage Fee, knew the true nature of the fee, or worked intentionally to misrepresent the fee. Thus, passing over the complaint's wholly conclusory claims, there is no plausible allegation that these vendors knowingly cooperated with Spirit in a scheme that involved misrepresenting the Passenger Usage Fee….

*Id.* at *8-9.

Just as in *Ray*, Plaintiffs' Amended Complaint fails to allege any facts giving rise to a plausible inference that R.J. and Burstein were involved in how to portray the Jay Peak Project to investors through the offering materials, which only Stenger and Quiros are alleged to have been involved with.  Nor are there any allegations that R.J. and Burstein were reviewing the offering materials being sent to investors or were aware that they were supposedly false, or that R.J. and Burstein worked intentionally to misrepresent the Jay Peak project to investors.  Just as in *Ray*, Plaintiffs have failed to allege facts sufficient to plausibly show that R.J. and Burstein shared a common purpose with Quiros to mislead investors through the offering materials.

**D.  Plaintiffs Fail to Plausibly Allege a Direct Injury.**

A RICO plaintiff must also allege facts showing that the defendant's racketeering conduct directly led to (was the proximate cause of) the plaintiff's claimed injury.   *See Ray*, 2016 WL 4578347 at *5 ("[P]leading a civil RICO claim requires that plaintiffs plead facts sufficient to give rise to a reasonable inference that the claimed racketeering activity—here, the misrepresentation of the Passenger Usage Fee through mail and wire fraud—was the but-for and proximate cause of the plaintiffs' injuries.")  To satisfy the proximate causation requirement in a fraud case, a plaintiff must plead facts – with specificity – showing that its injury was caused by some reliance on the defendant's misrepresentations.   The Eleventh Circuit confirmed this

requirement in *Ray*, where the plaintiffs alleged that merely purchasing a ticket and paying the unlawful passenger fee, by itself, amounted to reliance on Spirit's fraudulent conduct. *Id.* The Court rejected that argument:

> [The] second amended complaint …does not allege a direct link—or, indeed, any link at all—between Spirit's presentation of its Passenger Usage Fee and the plaintiffs' decision to purchase tickets on Spirit's website. It pleads causation only at the highest order of abstraction and supports the claim only with conclusory assertions…. In short,…[t]he plaintiffs have pled nothing even remotely suggesting that they—or anyone else for that matter—would have acted at all differently had Spirit been clearer in its presentation and description of the Passenger Usage Fee.

*Ray*, 2016 WL 4578347 at *6. Similar to the claims in *Ray*, Plaintiffs here complain that the offering materials sent by Stenger and Quiros to prospective investors were fraudulent because they did not specifically identify that Quiros would manage the money; that the Limited Partnerships' money would be held in R.J. accounts; that the money would be used to purchase Treasuries; or that the money would be used as collateral for loans that R.J. extended for the development of the Jay Peak Project. Plaintiffs fail to allege any facts making it plausible that the investors would not have invested the money necessary to obtain their green cards had they known about this information. Moreover, as mentioned, Plaintiffs did not even know of R.J.'s existence, as they had no interaction with R.J. and R.J. was never mentioned in any of the offering documents that Quiros and Stenger sent to prospective investors.

In addition, Plaintiffs cannot show that R.J. was the proximate cause of injury to the Limited Partnerships because Quiros's alleged theft of the funds following the transfers was an intervening cause that broke the chain of causation. *See O'Halloran,* 350 F.3d at 1205 (observing that "a bank … has the right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds."). For all of these reasons, Plaintiffs fail to plausibly allege a direct injury caused by R.J.

**VII.   Plaintiffs Fail to Plead a Claim for RICO Conspiracy (Count XIII).**

Plaintiffs fail to allege facts to plausibly suggest the existence of the most basic aspect of a RICO conspiracy based on a fraudulent scheme to steal money – an *actual agreement* between

R.J. and Quiros to steal the money.[8]  *See Solomon*, 574 F. Supp. 2d at 1291 ("The essence of a RICO conspiracy claim is that *each defendant* has *agreed* to participate in the conduct of an enterprise's illegal activities.") (emphasis added); *In re Managed Care Litig.*, 430 F. Supp. 2d at 1345 ("[P]roof of the agreement is at the heart of a conspiracy claim.")

Here, Plaintiffs offer only the flawed assertion that an agreement by R.J. with Quiros to defraud the investors can be "reasonably inferred from their close professional relationship, their mutual financial gain resulting from their pattern of racketeering activity, their use of bank accounts and property, their use of the R.J. accounts in Florida, and the dependency of the fraudulent acts of each on the fraudulent acts of the others.  The RICO Defendants' agreement was manifested by the number and similarity of the racketeering offenses committed herein."  Am. Compl. ¶ 383.  These are precisely the types of conclusory allegations that have been found to be inadequate because they fail to "elaborate[e] about *when or how* [the defendants] formed the agreement to violate RICO and [do] not allege *who* made the agreement, *when* the agreement was made, or *how* the Defendants made the agreement."  *Solomon*, 574 F. Supp. 2d at 1292 (emphasis added).  Establishing a financial structure and carrying out traditional financial transactions does not constitute a conspiratorial agreement to do something wrong.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed.

Dated: September 19, 2016.

---

[8] The heightened pleading standard also applies to RICO conspiracies. *See Am. Dental*, 605 F.3d at 1293-96 (allegations that "[e]ach Defendant and member of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy, agreed to commit acts of fraud …" and actually committed such acts are the "formulaic recitations" of conspiracy that the Court in *Twombly* and *Iqbal* held insufficient); *Solomon,* 574 F. Supp. 2d  at 1292 (dismissing RICO conspiracy claim because the allegations only identified the entities "without elaborating about when or how those entities formed the agreement to violate RICO,…who made the agreement, when the agreement was made, or how the Defendants made the agreement.").

Respectfully submitted,

s/ Stanley H. Wakshlag
Stanley H. Wakshlag
E-mail: swakshlag@knpa.com
Deborah S. Corbishley
E-mail: dcorbishley@knpa.com
Ryan Zagare
E-mail: rzagare@knpa.com
Janelle M. Ans
E-mail: jans@knpa.com
Kenny Nachwalter, P.A.
Four Seasons Tower
Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Telephone:     (305) 373-1000
Facsimile:     (305) 372-1861
*Counsel for Defendant, Raymond James*
*& Associates, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this on September 19, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in the manner stated in the service list attached.

<div style="margin-left:40%">

s/ Stanley H. Wakshlag
Stanley H. Wakshlag

</div>

**SERVICE LIST**
**US District Court, Southern District of Florida**
**Case No. 16-CV-21575-FAM**
*Alexandre Daccache, et al. v. Raymond James & Associates, Inc.., et al.*

Harley S. Tropin
hst@kttlaw.com
Thomas A. Tucker Ronzetti
tr@kttlaw.com
Tal J. Lifshitz
tjl@kttlaw.com
Dyanne Elyce Feinberg
def@kttlaw.com
Maia Aron
ma@kttlaw.com
Rachel Sullivan
rs@kttlaw.com
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd., 9th floor
Miami, FL 33134
*Counsel for Plaintiffs*
**VIA CM/ECF**

Daniel C. Girard *(pro hac vice)*
dcg@girardgibbs.com
amv@girardgibbs.com
Adam E. Polk *(pro hac vice)*
aep@girardgibbs.com
Girard Gibbs LLP
601 California Street, 14th Floor
San Francisco, California 94108
*Co-Counsel for Plaintiffs*
**VIA CM/ECF**

Kathleen M. Donovan-Maher *(pro hac vice)*
kdonovanmaher@bermandevalerio.com
Nathaniel L. Orenstein *(pro hac vice)*
norenstein@bermandevalerio.com
Steven J. Buttacavoli *(pro hac vice)*
sbuttacavoli@bermandevalerio.com
Berman DeVarlerio
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
*Co-Counsel for Plaintiffs*
**VIA CM/ECF**

James D. Sallah
jds@sallahlaw.com
Jeffrey L. Cox
jlc@sallahlaw.com
Joshua A. Katz
jak@sallahlaw.com
Sallah Astarita & Cox, LLC
One Boca Place
2255 Glades Road
Suite 300 E
Boca Raton, FL 33431
*Counsel for Defendant Joel Burstein*
**VIA CM/ECF**

Scott B. Cosgrove
scosgrove@leoncosgrove.com
James R. Bryan
jbryan@leoncosgrove.com
León Cosgrove, LLC
255 Alhambra Circle, Suite 800
Coral Gables, FL 33134
*Counsel for Defendant Ariel Quiros*
**VIA CM/ECF**

David B. Gordon *(pro hac vice)*
dbg@msk.com
Travis Meserve *(pro hac vice)*
txm@msk.com
Mitchell Silberberg & Knupp LLP
12 East 49th Street
30th Floor, New York, NY 10017
*Counsel for Defendant Ariel Quiros*
**VIA CM/ECF**

John S. Durrant *(pro hac vice)*
jsd@msk.com
Mitchell Silberberg & Knupp LLP
11377 West Olympic Blvd.
Los Angeles, CA 90064-1683
*Counsel for Defendant Ariel Quiros*
**VIA CM/ECF**

William Stenger
1276 Bluff Road
Newport, VT 05855
billstenger123@gmail.com

Jonathan E. Minsker
Jminsker@kasowitz.com
Maria H. Ruiz
mruiz@kasowitz.com
Kasowitz Benson Torres & Friedman LLP
1441 Brickell Avenue
Suite 1420
Miami, FL 33131
*Counsel for Defendants People's United*
*Financial, Inc. and People's United Bank, N.A.*
**VIA CM/ECF**