UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:16-CV-21575-MORENO/O'SULLIVAN

ALEXANDRE DACCACHE, CARLOS
ENRIQUE HILLER SANCHEZ, PHILIP
CALDERWOOD, JOSE ANTONIO PIETRI,
JOSE R. CASSERES-PINTO, TONGYI WANG,
JAMES B. SHAW, JOHANNES EIJMBERTS,
and LORNE MORRIS, on behalf of themselves
and all others similarly situated,

       Plaintiffs,

v.

RAYMOND JAMES & ASSOCIATES, INC.,
PEOPLE'S UNITED FINANCIAL, INC.,
as successor-in-interest to Chittenden Trust Company,
PEOPLE'S UNITED BANK, ARIEL QUIROS,
WILLIAM STENGER, and JOEL BURSTEIN,

       Defendants.

_____/

PLAINTIFFS' RESPONSE TO DEFENDANT ARIEL QUIROS'S
MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

The Securities and Exchange Commission is alleging Ariel Quiros engaged in an "ongoing, massive eight-year fraudulent scheme" where he "systematically looted" and commingled investor funds in the Jay Peak and Q Burke projects, and Judge Gayles has entered a Temporary Restraining Order, Asset Freeze, and Other Emergency Relief on a finding that the SEC presented a *prima facie* case of securities law violations by Quiros.[1]   Despite the SEC

_____

[1] *SEC v. Ariel Quiros, et al.*, Case No. 16-CV-21301-GAYLES (S.D. Fla.) (Complaint for Injunctive and Other Relief [D.E. 1 ¶ 1]; Order Granting Plaintiff Securities and Exchange Commission's Motion for Temporary Restraining Order, Asset Freeze, and Other Emergency Relief [D.E. 11 at 3-4]; Amended Complaint for Injunctive and Other Relief, [D.E. 120 ¶ 1]). This Court may take judicial notice of pleadings publicly filed in related actions.  *See Cash Inn of Dade, Inc. v. Metropolitan Dade County*, 938 F.2d 1239, 1243 (11th Cir. 1991); *Hurd v. Durrand*, No. 12-20899-CIV-MORENO, 2013 WL 1192351, at *7 n.8 (S.D. Fla. Jan. 24, 2013). Judge Gayles also appointed a Receiver in the SEC Enforcement Action, who has filed a civil action against Quiros, Raymond James, and Joel Burstein. *See Goldberg v. Raymond James Financial, Inc. et al.,* No. 1:16-cv-21831-JAL (S.D. Fla.).

allegations and Judge Gayles' decision, Quiros asks this Court to dismiss claims against him brought by the very investors who have been harmed by his fraudulent scheme. Quiros's shotgun Motion to Dismiss ("Quiros Motion") raises ten purported grounds to support dismissal, but all of his arguments fail.

## FACTUAL BACKGROUND

This action is brought on behalf of a proposed class of 836 individuals who invested over $400 million in a series of related projects at the Jay Peak and Q Burke ski resorts in Vermont, as part of the EB-5 Immigrant Investor Program. (Am. Compl. ¶ 1.)[2] Congress created the EB-5 Program to enable investors to gain permanent U.S. residency by funding projects that create or preserve jobs in the United States. (*Id.*) Unbeknownst to investors, however, these projects were a front for a Ponzi scheme masterminded by Defendant Ariel Quiros, who, together with his co-Defendants Raymond James, Joel Burstein, William Stenger, and People's Bank, diverted investor funds to Raymond James accounts controlled by Quiros. (*Id.*) Quiros's son-in-law, Joel Burstein, as Miami Branch Manager and Vice President of Investments of Raymond James's South Florida Complex, established and oversaw the Raymond James accounts. (*Id.* ¶ 2.)

The scheme operated as follows: Quiros and Stenger would send potential investors offering materials for one or more of the EB-5 Projects. (Am. Compl. ¶2.) The offering materials for the projects were uniformly fraudulent in that they concealed from investors that Quiros intended to, and did, use investor funds for improper purposes including covering shortfalls in other projects and for his own personal use. (*Id.*) Upon committing to a project, investors deposited funds into project-specific escrow accounts maintained by People's Bank. (*Id.* ¶¶ 1, 2.) Once People's Bank released the funds and transferred them to Raymond James, the money was supposed to be committed to a particular EB-5 Project. (*Id.* ¶¶ 1, 2, 100.) Instead, after People's Bank released the funds, the money was commingled and misappropriated by Quiros, with the knowledge of and substantial assistance by the other Defendants. (*Id.* ¶¶ 1, 2.) Defendants misappropriated more than $200 million in EB-5 Project investor funds, and the

---

[2] The Amended Class Action Complaint [D.E. 55] shall be referred to as "Amended Complaint" and cited as "(Am. Compl.)." The Jay Peak/Q Burke Limited Partnerships shall be referred to as the "EB-5 Projects" or as the "Limited Partnerships."

assets have no net value. (*Id.* ¶¶ 1, 69.)[3]  Plaintiffs bring this class action to recover their losses resulting from the Jay Peak and Q Burke Ponzi scheme.  (*Id.* ¶ 8.)

Jay Peak is a ski resort in the Green Mountains of Vermont, which was owned and operated by Mont Saint-Sauveur International, Inc. ("MSSI") from 1978 until mid-2008.  (Am. Compl. ¶ 50.)   Quiros and Stenger began negotiating with MSSI to acquire and further develop the Jay Peak resort in 2007.  (*Id.* ¶ 51.)  During the first half of 2008, Quiros met with Burstein, then the South Florida Complex Administrative Manager at Raymond James, and Frank Amigo, Burstein's supervisor.  (*Id.* ¶ 52.)  During this meeting, Quiros, Burstein, and Amigo discussed a financial structure for the Limited Partnerships that they would create to raise funding for the EB-5 Projects.  (*Id.*)

The financial structure was never disclosed in the offering materials provided to the investors.  (Am. Compl. ¶52.)  Specifically, the offering materials omitted to disclose that each investor's funds would be transferred from escrow accounts at People's Bank or its predecessors to accounts at Raymond James, over which Quiros would have exclusive control.  (*Id.* ¶¶ 52-53.)  The offering materials likewise omitted to disclose that Quiros's control would allow him to manage and use investors' deposits and capital contributions without any regard for the terms in the applicable offering materials.  (*Id.* ¶ 53.)[4]

_____

[3] The SEC's expert in the enforcement action puts the resort's current value at $44 million, and further reduced the value of the resort to about $41.6 million to account for repairs that need to be made to certain projects at the resort.  (Am. Compl. ¶ 69.)  Jay Peak also has at least $60 million in debt.  (*Id.*)  Thus, Jay Peak has negative value.  (*Id.*)

[4] Quiros challenges Plaintiffs' allegations that the offering memoranda for the various Limited Partnerships are "uniformly fraudulent" (Quiros Mot. at 4), and has filed a Request for Judicial Notice attaching 42 exhibits that consist of offering materials for each Limited Partnership. Quiros, however, fails to point out a single material difference in the offering documents for each phase.  His inability to do so confirms that the documents are uniform and standardized.  In fact, when Quiros quotes from various sections of the Limited Partnership Agreements, he refers to the quoted agreements as "representative" documents. (Quiros Mot. at 12-14.)  Further, because Plaintiffs allege fraudulent omissions, any differences among the offering documents, such as a description of the specific nature of the project or specific use of funds (to build a hotel, vacation cottages, a medical center or a biotechnology facility) are irrelevant.  Plaintiffs allege that none of the documents disclose that Quiros intended to fund his purchase of the Jay Peak and Q Burke resorts with investor funds, to commingle investor funds among bank and brokerage accounts, to use funds from one phase to pay margin loans taken out by another phase, or to purchase personal items such as a luxury apartment at Trump Place in New York City.  Despite requesting

The Amended Complaint further describes how Quiros, along with Raymond James's employees Burstein and Amigo, made plans to finance the purchase of Jay Peak, Inc. from MSSI using a margin loan. (Am. Compl. ¶ 54.) Under this scheme, investor funds would first be used to purchase Treasury bills. (*Id.*) Raymond James would lend money to Quiros using Treasury bills, bought with investor money, as collateral for the margin loan. (*Id.*) Quiros could then borrow up to 90% of the value of the Treasury bills in the accounts of the Limited Partnerships at Raymond James. (*Id.*) Investors were never told their money would be collateral for the loan. (*Id.*)

Once MSSI and Q Resorts finalized the Jay Peak, Inc. stock transfer agreement on June 13, 2008, in furtherance of the agreement and scheme, Quiros opened brokerage accounts at Raymond James for each of the Limited Partnerships, made unauthorized transfers of funds between these accounts, improperly margined the accounts, and otherwise commingled and misused the Limited Partnership Funds. (Am. Compl. ¶¶ 54-58, 62-67, 73-90.) The monies in the MSSI accounts for Phases I and II were escrowed investor funds that could not be used by Quiros to purchase Jay Peak, Inc., as confirmed in a letter sent by MSSI representatives to Raymond James and Burstein. (*Id.* ¶¶ 60, 61.)

The standardized offering materials for the EB-5 Projects — including the offering memoranda, subscription documents, business plans, and Limited Partnership Agreements — were designed to conceal Defendants' fraudulent scheme and lull investors into believing that their investments were protected. (Am. Compl. ¶ 91.) The offering materials given to every investor described the particular project in which they were investing, the purpose for which their investment would be used, and touted the likely success of the project. (*Id.*). The offering materials uniformly failed to disclose Quiros's intended and actual use of investor funds. (*Id.*).

None of the offering materials disclosed that the monies invested in the Limited Partnerships were being and would be misused and commingled by Quiros, with Stenger's assistance. (*Id.* ¶ 94.) Further, there was no disclosure that Quiros considered himself free to, or that Quiros and Stenger did, transfer investor funds to accounts controlled by Quiros at Raymond James, or that Raymond James would and did establish these accounts to facilitate the misuse and commingling of investor funds. (*Id.*) Nor was there any disclosure that an investment in one

_____

the Court to take judicial notice of 42 exhibits comprising 2,343 pages, Quiros fails to point to a single page that contains such disclosures, because no such disclosures were made.

Limited Partnership could be used for an EB-5 Project undertaken by another Limited Partnership or for Quiros's personal financial gain. (*Id.*)

The Amended Complaint includes a claim against Quiros for common law fraud, based on the uniformly fraudulent offering materials that induced Plaintiffs and the Class to invest in the Limited Partnerships. (Am. Compl. ¶¶ 238-49.) The Amended Complaint also includes a claim against Quiros for aiding and abetting the breach of fiduciary duty by the General Partners of the Limited Partnerships, who owed a direct fiduciary duty to the Limited Partners in light of the contractual agreement in the Limited Partnership Agreements providing that they would not "borrow from the Partnership or commingle Partnership funds with the funds of any Person" without the consent of the Limited Partners. (*Id.* ¶¶ 260-66.)

The Amended Complaint further alleges that Quiros conspired with Raymond James, Burstein, and People's Bank in perpetrating their unlawful, unfair, and fraudulent scheme on Plaintiffs and the Class. (*Id.* ¶¶ 250-52.) Specifically, Quiros made an agreement in the first half of 2008 with each of Raymond James, Burstein, and People's Bank to induce Plaintiffs and the Class into investing millions of dollars into the Limited Partnerships and to commit fraud and fiduciary breaches. (*Id.* ¶ 284.) The Amended Complaint alleges overt acts in furtherance of the conspiracy by Quiros, including:

- "Quiros used the uniformly fraudulent offering materials to induce Plaintiffs and the Class into investing money in the Limited Partnerships with the substantial aid and assistance of the other Defendants."
- "Quiros misused investors' funds to purchase the Jay Peak and Q Burke resorts."
- "Quiros misused and misappropriated investors' funds by using them as collateral for loans, to pay off margin loans, and by misappropriating them for personal expenses."

(*Id.* ¶ 285.)

Finally, Plaintiffs allege that Quiros, along with Raymond James and Burstein, violated the Florida Racketeer Influenced and Corrupt Organization Act ("RICO") and conspired to violate RICO by creating an illegal Ponzi scheme (the "Enterprise") that was organized for the purpose of inducing investors to invest monies in the Limited Partnerships by uniformly fraudulent offering materials and to misappropriate the monies once invested. (*Id.* ¶ 318.) The members of the Enterprise had a common purpose: to deceive EB-5 investors into believing that their funds were being used for the purposes described in the offering materials in order to

increase the amount of funds invested into the Limited Partnerships, to permit Q Resorts and Q Burke LLC to acquire Jay Peak and Burke Mountain, and to increase and maximize their profits by misappropriating funds that they knew belonged to investors.  (*Id.* ¶ 322.)   Plaintiffs alleged specific predicate acts of criminal activity including Mail Fraud — 18 U.S.C. § 1341; Wire Fraud — 18 U.S.C. § 1343; Money Laundering — 18 U.S.C. §§ 1956 and 1957; and Organized Fraud — § 817.034(4)(a), Fla. Stat.  (*Id.* ¶¶ 325-329, 343-370).

Plaintiffs and the Class relied to their detriment on the RICO Defendants' misrepresentations and omissions of material fact made in furtherance of the scheme.  (Am. Compl. ¶ 365.)   Defendants' acts of criminal racketeering activity were so permeated by fraud that reliance is established; had the RICO Defendants disclosed the true nature of their scheme, or the purposes for which investors' funds would be used, Plaintiffs and the Class would not have invested over $400 million in the Limited Partnerships.  (*Id.* ¶¶ 376-368.)

## STANDARD OF REVIEW

When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true.  *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.,* 795 F.2d 948, 954 (11th Cir. 1986); *Larach v. Standard Chartered Bank Int'l (Americas) Ltd.,* 724 F. Supp. 2d 1228, 1232 (S.D. Fla. 2010).  A complaint need only contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.").  Claims based on fraud must satisfy Federal Rule of Civil Procedure 9(b), which requires that the circumstances constituting fraud be stated with particularly.  As this Court has noted, however, "Rule 9(b) must be read in conjunction with the liberal notice pleading standard of Fed. R. Civ. P. 8, which states that a pleading setting forth a claim for relief need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co*., No. 06-61055-CIV-MORENO, 2007 WL 2826603, at *5 (S.D. Fla. Sept. 25, 2007).

I.      **PLAINTIFFS HAVE ALLEGED A PONZI SCHEME**

Quiros makes the stand-alone argument that the Jay Peak/Q Burke scheme described in the Amended Complaint is not a "typical Ponzi-scheme," (Quiros Motion at 7.) as if the label of the fraudulent scheme is critical.  Quiros posits that the EB-5 Projects at issue here were "real and substantive, not 'phony,'" (*Id.*) ignoring the allegations that he robbed the project.

Many courts have recognized that a Ponzi scheme may exist where a business begins as legitimate but becomes fraudulent when the business is faced with losses, which are then funded with money from new investors.  *See United States v. Kimmel*, 644 F. App'x 231, 232 (4th Cir. 2016) (business venture of buying and selling used cars "began as a legitimate business but became a fraudulent Ponzi scheme when the financial crisis halted used car purchases and the company began using new investor money to make interest payments to earlier investors"); *United States v. Morawski*, 754 F.3d 440, 441-42 (7th Cir. 2014) (Posner, J.) (company that invested in and purchased real estate "became a Ponzi scheme" after general financial crash in 2008 halted real estate sales).  Further, courts have recognized the concept of "partial" Ponzi schemes in which some investor money is used for legitimate purposes and some is used to repay earlier investors.  *See U.S. v. Beckman*, 787 F. 3d 466, 502 n.3 (8th Cir. 2015) (in a "partial" Ponzi scheme, some investor money is used for legitimate purposes, but other investor money is used to pay off earlier investors or to benefit the Ponzi scheme operators); *SEC v. Small Bus. Capital Corp.*, No. 5:12-CV-03237 EJD, 2013 WL 2146605 (N.D. Cal. May 15, 2013) (SEC alleged defendants "engaged in a 'Ponzi-like scheme' where returns to investors were ***partially*** funded with money from new investors.").  (Emphasis added).

In this case, Plaintiffs allege a complex series of financial transactions where Quiros improperly used investor money from Phases I and II of the EB-5 Project to finance his purchase of Jay Peak, Inc., creating a shortfall of funds in those phases.  (Am. Compl. ¶¶ 53-71.)  Then, investor funds from later phases were used to pay margin loans secured by the investor funds in the earlier phases.  (*Id.* ¶¶ 72-90).  This fraudulent activity created a shortfall in the later phases and thus constituted a Ponzi scheme.  (*Id.* ¶¶ 1 - 4, 89.)  That Quiros used some money to build projects only helped mask his fraud.

## II.     PLAINTIFFS' CLAIMS ARE DIRECT, NOT DERIVATIVE

Quiros next argues that Plaintiffs lack standing to bring derivative claims under either Florida or Vermont law, which Quiros admits are not materially different.  However, Plaintiffs' claims against Quiros are direct, not derivative, for the same reasons Plaintiffs argued in response to the Motions to Dismiss filed by Raymond James and Burstein on September 19, 2016.  [D.E. 108, 109].  Plaintiffs incorporate that argument, which is summarized below.

Quiros argues that Plaintiffs' claims are derivative because they seek to recover losses suffered by the Limited Partnerships.  That overlooks the fundamental allegations that Plaintiffs were directly injured due to Quiros's fraudulent omissions that induced them to purchase their Limited Partnership interests, and that Plaintiffs lost their investments in the Limited Partnerships as a result of their reliance on these fraudulent omissions.  Fraud-based claims are direct claims.  *See, e.g., Medkser v. Feingold*, 307 F. App'x 262 (11th Cir. 2008) (claims involving direct injuries sustained based on their own reliance on fraudulent statements and misrepresentations made to them are direct); *In re Smith Barney Transfer Agent Litig.,* 765 F. Supp. 2d 391, 399 (S.D.N.Y. 2011) (plaintiffs' claim that they were fraudulently induced to purchase shares in funds based on material misrepresentations is a direct claim); *Newman v. Family Mgmt. Corp.,* 748 F. Supp. 2d 299, 316 (S.D.N.Y. 2010), *aff'd,* 530 F. App'x 21 (2d Cir. 2013) (common law fraud and negligent misrepresentation claims alleging inducement to invest in the fund are direct claims); *Askenazy v. KPMG LLP*, 988 N.E.2d 463, 466-69 (Mass. App. Ct. 2013) (inducement-based claims are direct claims).  The same rationale applies to claims based on fraudulent omissions.  *See Albert v. Alex Brown Mgmt. Serv., Inc.,* Nos. Civ. A 762-N, *et al.*, 2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005) ("[g]enerally, non-disclosure claims are direct claims").

Further, Plaintiffs have alleged direct claims for civil conspiracy, Florida RICO, and conspiracy to violate Florida RICO.  These claims similarly arise from Quiros's fraudulent omissions which induced them to invest in the Limited Partnerships at issue.  *See Beck v. Prupis*, 162 F.3d 1090, 1096 n.10 (11th Cir. 1998) (claim for civil RICO conspiracy based on allegations that defendants' actions fraudulently induced plaintiff to make investments was a direct claim where plaintiff alleged injury proximately caused by defendants' acts of racketeering that targeted him rather than corporation), *aff'd,* 529 U.S. 494 (2000); *see also Maiz v. Virani*, 253 F.3d 641, 655-56 (11th Cir. 2001).

8

Plaintiffs' remaining claim against Quiros for aiding and abetting a breach of fiduciary duty is also a direct claim, for three reasons.  First, Plaintiffs' claim rests on allegations that the General Partners commingled and misused Plaintiffs' funds, activities which were not disclosed in the offering materials. Because Plaintiffs' aiding and abetting claim is based on Defendants' failure to disclose material facts regarding Plaintiffs' investment, it is therefore direct.  *See Official Comm. of Unsecured Creditors of BankUnited Fin. Corp. v. FDIC*, No. 1-20305-CIV, 2011 WL 10653884 at \*7 (S.D. Fla. 2011) (Moreno, J.) (claims for breach of fiduciary duty based on a failure to disclose, which caused direct injury to plaintiff, are direct, not derivative); *see also In re R.E. Loans LLC v. Noble*, 519 B.R. 499 (Bankr. N.D. Tex. 2014) (claims for aiding and abetting breach of fiduciary duty that are based on misrepresentation or omissions of material facts made to plaintiffs, which wrongfully induced them to enter into an exchange offering, are direct claims); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385 (S.D.N.Y. 2005) (breach of fiduciary duty claim based on alleged misrepresentations that caused plaintiffs to invest or retain their investment was direct claim).

Second, the aiding and abetting breach of fiduciary duty claim rests on duties owed directly to the Plaintiffs pursuant to the Limited Partnership Agreements.  As alleged in the Amended Complaint, Plaintiffs are parties to the Limited Partnership Agreements which expressly provide that the General Partners may not "borrow from the Partnership or commingle Partnership funds with the funds of any Person" without the consent of the Limited Partner. Where a separate duty granted by contract or statute is owed by a defendant to a plaintiff shareholder or member, a claim brought to enforce that duty is direct, not derivative.  *See Elandia Int'l Inc. v. Koy*, No. 09-20588-Civ, 2010 WL 2179770 (S.D. Fla. Feb. 22, 2010); *Dinuro Invs., LLC v. Camacho,* 141 So. 3d 731 (Fla. 3d DCA 2014); *Harrington v. Batchelor*, 781 So. 2d 1133 (Fla. 3d DCA 2001).

Third, this Court has recognized the "Ponzi" scheme exception to the general rule governing derivative actions.  In *Walco Investments, Inc. v. Thenen*, 947 F. Supp. 491 (S.D. Fla. 1996) (Moreno, J.), this Court found that where plaintiffs were individual investors in various funding entities, which in turn invested in certain corporations that operated as a Ponzi scheme, they could not show a direct injury because any injury was suffered by the funding entity in which plaintiffs invested.  The reasoning in *Walco* is particularly appropriate here because in the Receiver's action against Quiros, Raymond James, and Burstein, Raymond James argues that the

Receiver's claims should be dismissed because the Limited Partnerships were *in pari delicto* with Raymond James. *See Goldberg v. Raymond James Financial, Inc., et al.*, Case No. 16-cv-21831-JAL (S.D. Fla.) [D.E. 45]. Accordingly, to the extent that Quiros argues that Plaintiffs' claims are derivative and properly brought only by the Limited Partnerships, this argument fails under *Walco* in light of Plaintiffs' allegation that the Limited Partnerships were "a front for a Ponzi scheme" masterminded by Quiros and perpetrated by Quiros, Raymond James, Burstein and others. (Am. Compl. ¶ 1.)

### III.   PLAINTIFFS HAVE ALLEGED INVESTMENT INJURY FOR ALL PHASES

Quiros contends that Phases I through V of the Limited Partnerships were operating, as if this conclusively establishes that the Plaintiffs who invested in those phases suffered no injury. The mere fact that some of the phases were completed and operating, however, does not establish that Plaintiffs suffered no injury as a matter of law.

First, Plaintiffs allege that the Jay Peak assets have no net value, and that there are no funds available for investors *in any phase*. (Am. Compl. ¶ 69.) As set forth in the Amended Complaint, the SEC's expert in the enforcement action estimated the resort's current value as $44 million, and further reduced the value of the resort to approximately $41.6 million to account for repairs that need to be made to certain projects at the resort. (*Id.*) Jay Peak also has at least $60 million in debt. (*Id.*) Thus, Jay Peak has negative value, with no funds available for investors in any phase. (*Id.*) Second, each Plaintiff alleges that he has been damaged in that all or a portion of the funds each invested "were misused, commingled, and used as collateral for margin loans." (*Id.* ¶¶ 150, 161, 171, 181, 188, 197, 205, 213, 222.) Interest on the margin loans alone was more than $2 million. (*Id.* ¶ 123.) Third, Plaintiffs and the Class accordingly allege damages in each claim against Quiros. (*Id.* ¶¶ 247, 264, 286, 369, 370, 384, 385.)

### IV.   PLAINTIFFS HAVE STANDING TO BRING CLAIMS FOR INVESTORS IN ALL OF THE LIMITED PARTNERSHIPS WHERE THE FUNDS WERE COMMINGLED

Quiros argues next that the Plaintiffs do not have standing to bring claims related to Phases I, IV or V, because no Plaintiff invested in those phases, citing cases which hold that a plaintiff who purchased one product lacks standing to sue for damages based on the use of a different product. *See, e.g., Toback v. GNC Holdings, Inc.*, 13-80526-CIV, 2013 WL 5206103 (S.D. Fla. Sept. 13, 2013) (purchaser of specific health product lacked standing to raise claims

for other products by same manufacturer); *Garcia v. Kashi Co.,* 43 F. Supp. 3d 1359 (S.D. Fla. 2014) (purchasers of food products could not bring claims for products they did not purchase). However, these are cases which relate to the purchase of entirely separate products.  They are inapplicable here, where the central allegations are that funds of the investors ***in all phases*** were commingled.  As alleged in the Amended Complaint, funds from Phases I and II were improperly used by Quiros to purchase Jay Peak, Inc., which owned the property on which all of the Jay Peak projects were to be built.  (Am. Compl. ¶¶ 53-71).  Quiros then pledged investor funds from Phases I and II to take out Margin Loans I and II, which he later consolidated into Margin Loan III.  (*Id.* ¶¶ 72-82).   Quiros used more than $105 million of investor funds from phases I - V to pay down Margin Loan III, as well as funds from the Q Resorts account.  (*Id.* ¶¶ 82, 84).  He then opened margin Loan IV, pledging investor funds from Phases V and VI as collateral for this margin loan, which he paid with investor funds from Phases V, VI and VII. (*Id.* ¶¶ 85-89).  The payoff of Margin Loan IV was a major cause of the shortfall in Phase VII. (*Id.* ¶ 89).  Quiros also commingled investor funds among various phases in accounts held at People's Bank.  (*Id.* ¶ 83).

In light of Quiros's extensive commingling of funds, it cannot be said, particularly at the pleading stage, that Plaintiffs lack standing to sue for claims relating to all phases of the fraudulent scheme. *See Randolph v. Smucker Co.*, No. 13-80581-CIV, 2014 WL 1018007 (S.D. Fla. March 13, 2014) (class certification stage is the appropriate time to address plaintiff's standing to assert claims relative to particular products); *see also SEC v. Byers,* 637 F. Supp. 2d 166 (S.D.N.Y. 2009) (due to defendants' commingling of funds among various limited liability corporations which owned specific real estate assets, court declined to apply tracing analysis to claims of investors in each corporate entity and approved *pro rata* distribution of assets from all investments).

## V.   PLAINTIFFS' CLAIMS AGAINST QUIROS DO NOT ARISE FROM THE BREACH OF ANY CONTRACT

Quiros asserts that each claim against him must be dismissed because Plaintiffs have alleged no injury or damage other than economic losses arising from contractual claims against applicable limited partnerships. This is an economic loss rule argument. The Florida Supreme Court left no doubt in *Tiara*, however, that the economic loss rule is limited to products liability cases.  *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399, 400 (Fla. 2013).  In an effort to avoid *Tiara*'s unequivocal holding, Quiros attempts to re-characterize Plaintiffs' causes

of action as "simple claims for contractual breach," relying on the proposition that tort claims must be independent from a breach of contract claim.[5]

Quiros is not a party to any contract with any Plaintiff, and no cause of action brought by Plaintiffs alleges the breach by Quiros of any contract.  Instead, Plaintiffs bring distinct claims against Quiros for common law fraud, aiding and abetting breach of fiduciary duty, civil conspiracy, Florida RICO statute violations and conspiracy to violate the Florida RICO statute. None of these claims are contractually-based. *See, e.g., Daedalus Capital LLC v. Vinecombe*, No. 8:12-CV-2533-T-35TBM, 2014 WL 11412836, at *6 (M.D. Fla. Aug. 22, 2014), *report and recommendation adopted,* No. 8:12-CV-2533-T-35TBM, 2014 WL 11412837 (M.D. Fla. Sept. 12, 2014) (claim for fraudulent inducement constitutes a tort independent from any breach of contract because as Florida courts have recognized, whether a defendant was truthful during the formation of the contract is unrelated to the events giving rise to any claim for breach of that contract); *Tiara Condo. Ass'n, Inc. v. Marsh, USA, Inc.*, 991 F. Supp. 2d 1271, 1279 (S.D. Fla. 2014) (on remand after certified question answered by Florida Supreme Court, finding negligence and breach of fiduciary duty claims are not contractually grounded "and therefore, inevitably fall outside the reach of the 'independent tort rule'").  Further, Quiros cannot argue that the statutory RICO causes of action arise from a breach of contract.  The Amended Complaint alleges that Quiros orchestrated a massive Ponzi scheme that allowed him to misappropriate millions of dollars, not that he breached a contract. Accordingly, the Court should reject Quiros's outdated economic loss rule argument.

## VI.    PLAINTIFFS HAVE PLED FRAUD WITH PARTICULARITY

### A.    Plaintiffs Have Alleged Misrepresentations by Quiros

Quiros's invocation of Rule 9(b) does not justify dismissing the claims against him. Although Rule 9(b) requires fraud to be pled with particularity, the application of the rule does not abrogate the concept of notice pleading.  *Durham v. Bus. Mgmt. Assoc.*, 847 F.2d 1505, 1511 (11th Cir. 1988).  "Rule 9(b) must be read in conjunction with the liberal notice pleading

---

[5] Notably, Quiros relies on two decisions that pre-date *Tiara* and are thus not controlling.  *See Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co*., 208 F. Supp. 2d 1310 (S.D. Fla. 2002); *McCutcheon v. Kidder, Peabody & Co*., 938 F. Supp. 820 (S.D. Fla. 1996).  Decisions post-*Tiara* reject this argument.  *E.g.*, *Samana, Inc. v. Lucena*, 156 F. Supp. 3d 1373, 1373-74 (S.D. Fla. 2016); *Cableview Cmmc'ns Jacksonville, Inc. v. Time Warner Cable S.E.*, LLC, No. 3:13-cv-306-J-34JRK, 2016 WL 128561, at *11 & n. 18 (M.D. Fla. Jan. 11, 2016).

standard of Fed. R. Civ. P. 8, which states that a pleading setting forth a claim for relief need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Special Purpose Accounts Receivable Coop. Corp. v. Prime One Capital Co., LLC*, No. 06-61005-CIV-MORENO, 2007 WL 2826603 at *14 (S.D. Fla. Sept. 25, 2007). "Furthermore, 'if the alleged fraud occurred over an extended period of time and the acts were numerous, the specificity requirements are applied less stringently.'" *Id.* "This relaxed requirement is used where strict application of Rule 9(b) could result in substantial unfairness to private litigants who could not possibly have detailed knowledge of all the circumstances surrounding the alleged fraud." *Id.*

"Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule." *Durham,* 847 F.2d at 1511. Thus, the circumstances of the fraud must be pled with enough specificity to put defendants on notice as to the nature of the claim, and must be based on a reasonable belief that a wrong has been committed. *Sturge v. Bilbeisi*, No. 90-2976-CIV-MORENO, 1992 U.S. Dist. LEXIS 17365, *42 (S.D. Fla. Sept. 10, 1992). Rule 9(b) only requires that the circumstances constituting fraud be identified so that the defendant can prepare an adequate answer from the allegations. *Id.* at *42 n.15 (citations omitted). Here, Plaintiffs have alleged that the fraud occurred when they were presented with the offering materials. (Am. Compl. ¶¶ 91-100.) This allegation is more than sufficient, particularly since Plaintiffs have also alleged when each of them invested in the respective Limited Partnership. (Am. Compl. ¶¶ 141, 152, 163, 173, 183, 190, 199, 207, 215.)

Quiros argues that the Amended Complaint does not allege that he had **"any** involvement in preparing, issuing, or disseminating any of the offering documents, nor do Plaintiffs allege that [Quiros] reviewed the offering documents before they were issued." (Quiros Motion at 12, emphasis in original.) This assertion is belied by specific allegations of the Amended Complaint, including that:

- "Quiros and Stenger would send potential investors offering materials for one or more of the Jay Peak and Q Burke projects …." (Am. Compl. ¶ 2.)

- "Quiros and Stenger produced and adopted standardized offering materials for the EB-5 Projects — including an offering memorandum, subscription documents, business plan, and Limited Partnership Agreement – which were designed to conceal their fraudulent

scheme and lull investors into believing that their investments were legitimate." (*Id.* ¶ 91.)

- "Quiros participated in the preparation and dissemination of the offering materials to Plaintiffs and the Class, which offering materials were uniformly fraudulent." (*Id.* ¶ 239.)

These allegations of the Amended Complaint specify Quiros's individual role in creating, reviewing, approving, and distributing the investor disclosures for the Limited Partnerships.[6]

This Court's decision in *Continent Aircraft Trust v. Diamond Aircraft Industries*, No. 11-61663-CIV-MORENO, 2013 WL 2285539, at *15-16 (S.D. Fla. May 23, 2013), supports that Quiros's liability for fraud may be based on his dissemination of the fraudulent offering materials.  In that case, the defendant's agent sent an email to the plaintiff attaching several documents outlining warranty terms of aircraft engines – terms that plaintiff claims defendant's agent knew or should have known would not be honored by the corporation that manufactured the engines, because the company was facing bankruptcy.  The defendant argued that its representations did not amount to a fraud, but were merely a dissemination of the terms of the third party warranty.  This Court disagreed, and held that because plaintiff alleged that defendant's agent knew or should have known that the third party corporation could not honor the warranty, the act of sending out the email with the attached warranty documents could sufficiently state a claim for misrepresentation.

Moreover, because Plaintiffs' claim rests upon material *omissions*, Quiros's argument that Plaintiffs have not alleged particular misrepresentations misses the mark.   (Quiros Mot. at 12-13.)   By definition, the actionable omissions of Quiros do not appear in the misleading documents he helped prepare and disseminate.  "Florida law recognizes that fraud can occur by

---

[6] Quiros erroneously relies on *Arnold v. McFall*, 839 F. Supp. 2d 1281 (S.D. Fla. 2011), *Eagletech Communications, Inc. v. Bryn Mawr Investment Group, Inc.*, 79 So. 3d 855 (Fla. 4th DCA 2012), and *Serefex Corp. v. Hickman Holdings, LP*, 695 F. Supp. 2d 1331 (M.D. Fla. 2010), but these cases either support denial of a motion to dismiss where, as here, a defendant allegedly made actionable misstatements, or address group pleading (*i.e.,* lumping together allegations concerning a large number of defendants).  *See Arnold*, 839 F. Supp. 2d at 1287, 1289 (fraud claim asserted by one of the plaintiffs did not fail for lack of specificity as to the source of a false statement where the plaintiff identified a specific defendant as the sender of an email containing those statements); *Eagletech*, 79 So. 3d at 861 (fraud claim lacked requisite specificity because it "lumped twenty-nine defendants together and failed to identify which defendant made which statement"); *Serefex*, 695 F. Supp. 2d at 1342 (dismissing where the plaintiff "lumped together all defendants").

omission ….." *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. 4th DCA 2003). Plaintiffs allege that Quiros's failure to disclose his conduct rendered the offering documents incomplete and, consequently, misleading:

> The offering materials were uniformly fraudulent in that these documents *concealed* . . . that the sponsors considered themselves free to use, and did use, investor funds for purposes inconsistent with those described in the offering materials, including the following: (a) investors' funds would be placed under Quiros's exclusive control; (b) investors' funds would be offered up as collateral for margin loans; (c) investors' funds would not be controlled by the General Partner of the Limited Partnership that the investor had selected; (d) investors' funds would not be used for the EB-5 Project that the particular Limited Partnership had been formed to create; and (e) investors' funds would be directed to other phases and projects or to pay Quiros's personal expenses.

(Am. Compl. ¶ 242; emphasis added.) Plaintiffs specifically allege that Quiros used $12.4 million of Phase I investor money and $9.5 million of Phase II investor money to buy Jay Peak, Inc., where nothing in the applicable use of proceeds documents indicated Quiros would or might use investor funds for that purpose. (*Id.* ¶ 68.) Nor was there anything in the disclosures about Quiros's pledge of investor funds as collateral for high-risk margin loans: "Neither Quiros nor Stenger ever told any investors that the Limited Partnerships in which they were investing could use or were using their money in this fashion." (*Id.* ¶ 77.)[7] Quiros does not, and cannot, dispute that the fact of such risky usage of investment funds would be material to a reasonable investor. (*Id.* ¶¶ 242-43). Thus, the Amended Complaint details Quiros's wrongful conduct and failure to disclose it in the materials he created, reviewed, approved, and distributed to potential investors.

## B. The Partnership Offering Documents Do Not Exculpate Quiros From Fraud

Quiros's reliance on certain sections of the offering documents is unfounded. None of the sections cited by Quiros discloses to investors Quiros's intention to commingle and misuse partnership funds. As Quiros himself admits, the offering documents for each phase contain specific sections governing the use of investor funds. (Quiros Mot. at 4-5.) Quiros does not cite to any provisions of the offering documents that permitted Quiros to purchase Jay Peak, Inc. with funds from Phases I and II, or to repay margin loans from prior phases with funds from later phase investors. In fact, one of the sections cited by Quiros protects the General Partner from

---

[7] While Quiros contends that Plaintiffs fail to quote from the offering documents to set forth the statements they believe are false, he cites a case involving an affirmative misrepresentation, not an omission. *See First Union Brokerage v. Milos*, 717 F. Supp. 1519, 1521 (S.D. Fla. 1989). It is impossible to quote an omission.

15

responsibility "for any acts performed in good faith."  (*Id.* at 14 (citing Section 5.05, Liability to Partnership and Limited Partner).)   The conduct alleged in the Amended Complaint falls far short of good faith actions, nor does it fall within any "conflict of interest" transactions disclosed in the Limited Partnership Agreements.[8]

> ### C.   Plaintiffs Have Alleged Reliance and Transaction Causation

Plaintiffs have specifically pled reliance and causation in the fraud claim against Quiros. (Am. Compl. ¶¶ 245-47.)   The sole case cited by Quiros for his argument to the contrary is *Rogers v. Cisco Sys.*, 268 F. Supp. 2d 1305, 1314 (N.D. Fla. 2003).  That case, however, dealt with the failure to plead reliance in connection with a "holding claim" — a claim premised on misstatements that cause investors to retain their securities—not a claim for fraudulent inducement to purchase a security.  *Id.* at 1313 ("The court concludes the Plaintiffs have not sufficiently pled their reliance in order to state a holding claim . . . .")

## VII.   PLAINTIFFS HAVE PLED A CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

Plaintiffs have pled a claim for aiding and abetting breach of fiduciary duty against Quiros, for the reasons set forth in their response to the Motions to Dismiss filed by Raymond James and Burstein on September 19, 2016.  [D.E. 108, 109].  Those arguments are expressly incorporated herein.  Moreover, Quiros's "ignorance defense," that the Amended Complaint fails to allege that he had knowledge of the purported fiduciary duties at issue because he never went to college, let alone business or law school, is specious.  It does not take a college degree, business degree, or law degree to comprehend that Quiros's misuse of investor funds to purchase Jay Peak, Inc., his commingling of investor funds among the various phases, and his misuse of investor funds for personal expenses including the purchase of a luxury condominium, constitutes a breach of duty.

## VIII.   PLAINTIFFS HAVE PLED A CLAIM FOR CONSPIRACY

Quiros's assertion that Plaintiffs have failed to allege an ***actual agreement*** among the Defendants to commit fraud and breach fiduciary duties, also fails for the reasons set forth by Plaintiffs in response to Raymond James's and Burstein's Motions to Dismiss.   Plaintiffs specifically allege that:  "An agreement was made in the first half of 2008 by Quiros with each of

---

[8] The fact that the offering materials disclosed the possibility of transactions between the Limited Partnerships and affiliates of Quiros in no way disclosed that Quiros would commingle investor funds or misuse investor funds to pay for his personal expenses.

Raymond James, Burstein, and People's Bank to induce Plaintiffs and the Class into investing millions of dollars into the Limited Partnerships and to commit the fraud and fiduciary breaches described above."   (Am. Compl. ¶ 284.)

While Quiros contends that these allegations are only conclusory, and vague as to time, place, or manner, courts have recognized that the very nature of a conspiracy permits such a claim to be pleaded and proven by circumstantial evidence.  *See United States v. Arias-Izquierdo*, 449 F.3d 1168, 1182 (11th Cir. 2006) ("Because the crime of conspiracy is 'predominantly mental in composition,' it is frequently necessary to resort to circumstantial evidence to prove its elements.").   For this reason, courts have denied motions to dismiss conspiracy claims even where the complaint only circumstantially pleads an agreement. *See Koch v. Royal Wine Merchants, Ltd.,* 907 F. Supp. 2d 1332, 1346-47 (S.D. Fla. 2012) ("In the instant case, Plaintiff has alleged a number of facts that circumstantially indicate an agreement between Royal and Rodenstock."); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 690 F. Supp. 2d 1296, 1311-12 (S.D. Fla. 2010) (finding plaintiffs allegations sufficient to state a claim for conspiracy liability, and noting that the existence of the conspiracy agreement does not have to be proven by direct evidence, but instead can be inferred from "the conduct of the alleged participants or from circumstantial evidence of the scheme").

## IX.   PLAINTIFFS STATE CLAIMS FOR FLORIDA RICO AND RICO CONSPIRACY

To state a claim under the Florida RICO Act, Plaintiffs must allege facts showing (1) conduct or participation in an enterprise through (2) a pattern of criminal activity. *See Arthur v. JP Morgan Chase Bank, NA*, 569 F. App'x 669, 679–80 (11th Cir. 2014) (citing Fla. Stat. § 772.103); *see also Horace-Manasse v. Wells Fargo Bank, N.A.*, 521 F. App'x 782, 784 (11th Cir. 2013).  Each of these elements has been met here.[9]

---

[9] Quiros suggests that the heightened pleading standard of Rule 9(b) applies to the entirety of Plaintiffs' RICO allegations. However, Rule 9(b) does not apply to the pleading of any elements except for predicate acts sounding in fraud.  *See Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008).   Thus, although Plaintiffs' allegations relating to the mail and wire fraud predicate acts are subject to Rule 9(b), the remaining RICO allegations are subject only to the "short and plain statement" requirement of Rule 8.   In particular, to the extent the allegations relate to the money laundering predicates, they are subject only to Rule 8.  *See id.* at 1355–56 ("We now hold that RICO predicate acts not sounding in fraud need not necessarily be pleaded with the particularity required by Fed. R. Civ. P. 9(b)");

Quiros takes the position that Plaintiffs' allegations of his various forms of fraud are not pled with sufficient specificity, and so the allegations of money laundering that are premised on this same fraud are likewise necessarily insufficient.  These arguments ignore the allegations of the Amended Complaint, the law, and common sense.

Quiros knew in 2008 that his use of investor funds was restricted (Am Compl. ¶¶ 52–55, 60–68), having been specifically warned by MSSI that investor funds "may not be used in any manner, including as collateral or a guarantee, to fund the purchase of the Jay Peak Resort." (*Id.* ¶ 61.)  He and Burstein concealed from MSSI that they were disregarding this explicit warning, and used investor funds anyway to buy Jay Peak, Inc.  He then set up margin loans with Raymond James to commingle and further misappropriate investor funds from the Limited Partnerships' accounts at Raymond James, doing whatever he wanted with those funds, including paying himself and paying off both a $23 million margin loan and a $19 million margin loan to Raymond James. (*Id.*  ¶¶ 2–4, 62–68, 71–98, 109–13, 319, 327, 338–40.)    Quiros even misappropriated $2.2 million of investor money to buy a luxury condominium at Trump Place in New York City.  (*Id.* ¶ 87.)

Quiros also directed, controlled, operated, and managed the Enterprise's affairs.   As alleged in the Amended Complaint:

- "Quiros knowingly wired money out of accounts holding investors' funds for unauthorized purposes and for Quiros's own personal gains."

- "Quiros reviewed the contents of the Phase I-VI offering materials, was familiar with them, and understood he had to abide by them. He also approved the use of proceeds document in Phases III-VI."

- "Quiros, as a principal of the General Partners for Phases VII and VIII, reviewed and approved the contents of these projects' offering materials, including the Limited Partnership Agreement and the use of proceeds document."

- "Quiros used each of the Limited Partnerships to raise money and then divert millions of dollars for his own use. To raise capital for each of the Limited Partnerships, the General Partners and Quiros made a series of misleading statements and omissions to prospective investors in the offering materials."

- "Upon raising funds for the Limited Partnerships, Quiros knowingly wired money out of the Limited Partnerships' investor accounts at People's Bank and Raymond James for unauthorized purposes and for Quiros's personal gain. Quiros . . . also

*see also Bryan v. Countrywide Home Loans*, 2008 WL 4790660, at *4 (M.D. Fla. Oct. 27, 2008) (applying *Renta*'s holding to money laundering allegations underlying a civil RICO claim).

routinely authorized the transfer of investors' funds out of the Limited
Partnerships' escrow accounts at People's Bank in violation of the offering
materials."

- "Further, Quiros improperly used additional investor funds to pay down and pay
off margin loans (including paying nearly $2.5 million in margin interest) he and
Raymond James set up in the name of the Limited Partnerships at Raymond
James in Florida."

(Am. Compl. ¶¶ 327, 338–42.)  The details of Quiros's fraudulent purchase of Jay Peak, Inc., as
well as the various money wires and transfers — ***including the date, transferor, transferee, and
amount of transfer*** — are all alleged with specificity.  (*Id.* ¶¶ 52–66, 107, 343–70.)[10]

Quiros deceived MSSI and omitted material facts from others, including Plaintiffs and
the Class.  Plaintiffs have more than sufficiently alleged Quiros's participation in a pattern of
racketeering activity that directly injured Plaintiffs and the Class in violation of Florida RICO.
*See Maiz v. Virani*, 253 F.3d 641, 674 (11th Cir. 2001) (affirming judgment where, as a result of
money laundering by RICO defendants after plaintiffs' initial investment, "funds that should
have remained available to the [plaintiffs] for the benefit of their investors were diverted to and
secretly retained by the Defendants"); *see also Corcel Corp., Inc. v. Ferguson Enters., Inc.*, 551
F. App'x 571, 576 (11th Cir. 2014) ("a plaintiff need not show that the injurious conduct was the
sole cause of the injury asserted."); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004)
("It does not strain credulity to conclude that each plaintiff, in entering into contracts with the
defendants, relied upon the defendants' representations [of legitimacy] and assumed they would
be paid the amount they were due."); *Sierra Equity Grp. v. White Oak Equity Partners, LLC*, 650
F. Supp. 2d 1213 (S.D. Fla. 2009) ("Under the circumstances of this case, involving primarily a

---

[10] To the extent Quiros suggests that Plaintiffs are required to allege that they relied on a
misrepresentation by him made in furtherance of his fraudulent scheme, he is wrong — and his
primary authority for that proposition, *Palmas Y Bambu, S.A. v. E.I Dupont Nemours & Co.*, 881
So. 2d 565 (Fla. Dist. Ct. App. 2004), is no longer good law.  *Palmas* relied on *Pelletier v.
Zweifel*, 921 F.2d 1465 (11th Cir. 1991), which held that actual reliance is required in RICO
cases based on mail or wire fraud.  In *Sikes v. Teleline*, Inc., 281 F.3d 1350 (11th Cir. 2002), the
Eleventh Circuit echoed that ruling.  But in *Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S.
639 (2008), the Supreme Court held that actual reliance is not required in RICO cases based on
mail or wire fraud and expressly abrogated *Sikes*.   The Eleventh Circuit recently adopted
*Bridge's* holding in *Ray v. Spirit Airlines, Inc.*, __ F.3d __, 2016 WL 4578347, at *6 (11th Cir.
2016) (a plaintiff can prevail on a RICO claim by showing "reliance on the fraud by someone,"
even if it was not the plaintiff who personally relied on the fraud); *see also Langford v. Rite Aid
of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000).  So, *Sikes*, *Pelletier* and *Palmas* are no longer
good law.

failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.").

Quiros further argues that the RICO Conspiracy count should be dismissed because the underlying elements of a RICO violation have not been sufficiently pled and because the elements of a conspiratorial agreement have not been alleged. These arguments have been addressed above and should be rejected for the same reasons. (Am. Compl. ¶¶ 376–86.)

### X.   THE STATUTE OF LIMITATIONS DOES NOT BAR ANY CLAIMS

Finally, Quiros argues that the statute of limitations bars claims for aiding and abetting breach of fiduciary duty and civil conspiracy. Quiros further argues that the delayed discovery doctrine does not apply. Quiros's argument, however, ignores the exception to the statute of limitations defense for continuing torts. *See Seaboard Air Line R.R. v. Holt*, 92 So. 2d 169 (1956). Whether the continuing tort doctrine applies is a question of fact to be determined by the jury. *See Halkey-Roberts Corp. v. Mackal*, 641 So. 2d 445, 447 (Fla. 2d DCA 1994); *Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1357 (M.D. Fla. 2003). Under the continuing tort doctrine, "the limitations period runs to the date the tortious conduct ceases." *Spadaro v. City of Miramar*, 855 F. Supp. 2d 1317, 1330 (S.D. Fla. 2012); *Millender v. State DOT*, 774 So. 2d 767, 769 (Fla. 1st DCA 2000) ("the statute of limitations, in a continuing tort action, runs from the time of the last tortious act").

The continuing tort doctrine applies to the aiding and abetting breach of fiduciary duty and civil conspiracy claims. Plaintiffs allege that Quiros engaged in commingling of investor funds, and paid margin loans for earlier phases with funds from later phase investors, as late as March 2014.  (Am. Compl. ¶ 89). The tortious conduct can be traced to as late as April 2015 when funds were transferred from Raymond James to pay off a personal line of credit Quiros had with Citibank. (*Id.*  ¶ 356).  Under the continuing tort doctrine, on the face of the Amended Complaint, the statute of limitations did not begin to run until at least April 2015. Under these circumstances, it would be premature to dismiss Plaintiffs' claims for aiding and abetting breach of fiduciary duty and civil conspiracy based on an affirmative defense of statute of limitations.

### <u>CONCLUSION</u>

Quiros masterminded a massive fraudulent scheme that is amply alleged in the Amended Complaint. Quiros's Motion to Dismiss should be denied.

Respectfully submitted,

Paul Aiello, Esq.
Florida Bar No. 0909033
paiello@bennettaiello.com
Michael P. Bennett, Esq.
Florida Bar No. 0775304
mbennett@bennettaiello.com
Jeremy R. Kreines, Esq.
Florida Bar No. 101119
jkreines@bennettaiello.com
**BENNETT AIELLO**
The Ingraham Building, Eighth Floor
25 Southeast Second Avenue
Miami, Florida 33131
Telephone:     (305) 358-9011
Facsimile:     (305) 358-9012

*Counsel for Plaintiffs*

/s/Thomas A. Tucker Ronzetti
Thomas A. Tucker Ronzetti, Esq.
Florida Bar No. 965723
tr@kttlaw.com
Harley S. Tropin, Esq.
Florida Bar No. 241253
hst@kttlaw.com
Dyanne E. Feinberg
Florida Bar No. 371548
def@kttlaw.com
Rachel Sullivan, Esq.
Florida Bar No. 815640
rs@kttlaw.com
Maia Aron, Esq.
Florida Bar No. 17188
ma@kttlaw.com
Tal J. Lifshitz, Esq.
Florida Bar No. 99519
tjl@kttlaw.com
**KOZYAK TROPIN &**
**THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Telephone:  (305) 372-1800
Facsimile:   (305) 372-3508

*Counsel for Plaintiffs*

Daniel C. Girard, Esq.
dcg@girardgibbs.com
Adam E. Polk, Esq.
aep@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: 415.981.4800

*Counsel for Plaintiffs*

Kathleen M. Donovan-Maher, Esq.
kdonovanmaher@bermandevalerio.com
Steven Buttacavoli, Esq.
sbuttacavoli@bermandevalerio.com
Mark A. Delaney, Esq.
mdelaney@bermandevalerio.com
Nathaniel L. Orenstein, Esq.
norenstein@bermandevalerio.com
**BERMAN DEVALERIO**
One Liberty Square
Boston, Massachusetts 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on

October 17, 2016, on all counsel of record via the manner stated in the service list below.

By: /s/*Thomas A. Tucker Ronzetti*

**SERVICE LIST**

| | |
|---|---|
| **Via CM/ECF** | **Via CM/ECF** |
| **Counsel for Raymond James & Associates, Inc.**<br>Stanley H. Wakshlag, Esq.<br>Swakshlag@knpa.com<br>Deborah Sampieri Corbishley, Esq.<br>Dcorbishley@kennynachwalter.com<br>Janelle M. Ans, Esq.<br>Jherrera@knpa.com<br>Ryan C. Zagare, Esq.<br>Rzagare@knpa.com<br>Kenny Nachwalter, P.A.<br>Four Seasons Tower, Suite 1100<br>1441 Brickell Avenue<br>Miami, FL 33131 | **Counsel for Joel Burstein**<br>James D. Sallah, Esq.<br>jds@sallahlaw.com<br>Jeffrey L. Cox, Esq.<br>jlc@sallahlaw.com<br>Joshua A. Katz, Esq.<br>Jak@sallahlaw.com<br>Sallah Astarita & Cox, LLC<br>One Boca Place<br>2255 Glades Road<br>Suite 300 E<br>Boca Raton, FL 33431 |
| **Via CM/ECF**<br><br>**Counsel for Ariel Quiros**<br>David B. Gordon, Esq.<br>dbg@msk.com<br>Travis Meserve, Esq.<br>txm@msk.com<br>12 East 49th Street, 30th Floor<br>New York, NY 10017<br>Mitchell Silberberg & Knupp LLP<br><br>John S. Durrant, Esq.<br>jsd@msk.com<br>11377 West Olympic Boulevard<br>Los Angeles, CA 90064-1683<br>Mitchell Silberberg & Knupp LLP<br><br>Scott B. Cosgrove<br>scosgrove@leoncosgrove.com<br>James R. Bryan<br>jbryan@leoncosgrove.com<br>León Cosgrove, LLC<br>255 Alhambra Circle, Suite 800<br>Coral Gables, Florida 33133 | **Via U.S. Mail**<br><br>**William Stenger,** *pro se*<br>William Stenger<br>1276 Bluff Road<br>Newport, Vermont 05855-9544<br><br>**Via CM/ECF**<br><br>**Counsel for People's United Financial, Inc. and People's United Bank, N.A**<br><br>Jonathan E. Minsker, Esq.<br>jminsker@kasowitz.com<br>Maria H. Ruiz, Esq.<br>MRuiz@kasowitz.com<br>James J. Stricker, Esq.<br>Jstricker@kasowitz.com<br>Kasowitz, Benson, Torres & Friedman LLP<br>Four Seasons Tower<br>1441 Brickell Avenue, Suite 1420<br>Miami, Florida 33131 |

1093354