UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 16-21575-CIV-MORENO**

ALEXANDRE DACCACHE, on behalf of
himself and all others similarly situated,

       Plaintiffs,

vs.

ARIEL QUIROS; PEOPLE'S UNITED
FINANCIAL, INC.; and PEOPLE'S UNITED
BANK,

       Defendants.

_____/

## ORDER DISMISSING AMENDED COMPLAINT AGAINST QUIROS, PEOPLE'S UNITED FINANCIAL, INC., AND PEOPLE'S UNITED BANK

The Court dismisses the Amended Complaint against the remaining Defendants: Ariel Quiros, People's United Financial, Inc., and People's United Bank and grants Defendants' Motions to Dismiss **(D.E. 111 and 114)**. The Court finds that Plaintiffs lack standing to sue Defendant Quiros, because Plaintiffs' claims are derivative under Florida law, as they have not sufficiently alleged an injury separate and distinct from other investors. Additionally, the Court lacks personal jurisdiction over the Peoples' Defendants because Plaintiffs failed to meet their burden in rebutting the Defendants' affidavits, but even if they had, exercising personal jurisdiction over them would not comport with the Due Process Clause. Accordingly, the Motions to Dismiss are granted.

I.    **Background**

    A.    **The Amended Complaint**

On August 9, 2016, Plaintiffs filed an Amended Complaint against Defendants Raymond James & Associates, Inc.,[1] People's United Financial, Inc., People's United Bank, Ariel Quiros, William Stenger,[2] and Joel Burstein.[3] The Defendants that remain are Ariel Quiros, People's United Bank, N.A., and People's United Financial, Inc. The Amended Complaint includes causes of action for: common law fraud against Quiros (Count I); aiding and abetting common law fraud against People's Bank (Count III); aiding and abetting breach of fiduciary duty against Quiros (Count IV); aiding and abetting breach of fiduciary duty against People's Bank (Count VI); civil conspiracy against Quiros and People's Bank (Count VII); negligence against People's Bank (Count IX); breach of fiduciary duty against People's Bank (Count X); breach of contract against People's Bank (Count XI); Florida's Racketeer Influenced and Corrupt Organizations Act against Quiros (Count XII); conspiracy to violate Florida's Civil Racketeer Influenced and Corrupt Organizations Act against Quiros (Count XIII). The Peoples' Defendants and Quiros move to dismiss the Amended Complaint. For the following reasons, the Court dismisses the Amended Complaint.

### B.    Facts

#### 1.    Parties

Plaintiffs are all natural persons, over the age of twenty-one, who allegedly sustained damage as a result of their investments in this Ponzi scheme. Defendant Raymond James & Associates, Inc. is a corporation organized in Florida, with its principal place of business in St. Petersburg, Florida. Defendant People's United Financial, Inc., is a financial services company. People's United Financial, Inc. acquired the Chittenden Corporation, the bank holding company

---

[1] Defendant Raymond James & Associates, Inc. was dismissed pursuant to a settlement agreement on September 6, 2017.
[2] Defendant Stenger defaulted on June 23, 2016, despite later filing an answer to the Amended Complaint on December 19, 2016.
[3] Defendant Joel Burstein was dismissed pursuant to a settlement agreement on September 6, 2017.

for the Chittenden Trust Company, which at the time of the acquisition, acted as the escrow agent for the investor funds for the EB-5 projects.

Defendant People's United Bank is a federally chartered savings bank headquartered in Bridgeport, Connecticut, and is a subsidiary of People's United Financial, Inc. Plaintiffs submit that in July 2008, the Board of Directors of People's United Financial, Inc. and the Board of Directors of People's United Bank approved a plan to consolidate the acquired Chittenden entities into People's United Bank. Defendant Quiros is a natural person residing in Florida. Defendant Stenger is the Director, President, and CEO of Jay Peak, Inc, and resides in Vermont. Finally, Defendant Burstein resides in Florida and is the Miami Branch Manager and Vice President of Investments for the Raymond James South Florida Complex.

### 2. Non-Parties

Jay Peak, Inc. is a Vermont corporation that operates the Jay Peak Resort in Jay, Vermont, the location of the first six alleged EB-5 projects for which Quiros and Stenger raised money. Q Resorts is a Delaware corporation that is a 100% owner of Jay Peak, Inc., and Plaintiffs submit that Quiros is the sole owner, officer, and director of Q Resorts. Q Resorts acquired the stock of Jay Peak, Inc. from a Canadian company, Mont Saint-Sauveur International, Inc.

Jay Peak Hotel Suites L.P. ("Phase I") is a Vermont limited partnership. Between December 2006 and May 2008, Phase I raised $17.5 million from 35 investors through the EB-5 program to build a hotel. Phase I then offered and sold securities in the form of limited partnership interests beginning in December 2006, when Jay Peak, Inc. was still owned by Mont Saint-Sauveur. Jay Peak Hotel Suites Phase II L.P. ("Phase II") is a Vermont limited partnership. Between March 2008 and January 2011, Phase II raised $75 million from 150 investors through

an EB-5 offering of limited partnership interests to build a hotel, indoor water park, ice rink, and golf club house.

Jay Peak Penthouse Suites L.P. ("Phase III") is a Vermont limited partnership. Between July 2010 and October 2012, Phase III raised $32.5 million from 65 investors through an EB-5 offering of limited partnership interests to build a 55-unit hotel and an activities center. Jay Peak Golf and Mountain Suites L.P. ("Phase IV") is a Vermont limited partnership. Between December 2010 and November 2011, Phase IV raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build golf cottage duplexes, a wedding chapel, and other facilities.

Jay Peak Lodge and Townhouses L.P. ("Phase V") is a Vermont limited partnership. Between May 2011 and November 2012, Phase V raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build 30 vacation rental townhouses, 90 vacation rental cottages, a café, and a parking garage. Jay Peak Hotel Suites Stateside L.P. ("Phase VI") is a Vermont limited partnership. Between October 2011 and December 2012, Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests to build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center. Jay Peak Biomedical Research Park L.P. ("Phase VII") is a Vermont limited partnership. Between November 2012 and April 2016, Phase VII raised approximately $83 million from 166 investors through an EB-5 offering of limited partnership interests to construct a biomedical research facility.

Q Burke Mountain Resort, LLC owns Burke 2000, LLC, which in turn owns Burke Mountain Operating Company. Plaintiffs' submit that Quiros owns 100% of Q Burke Mountain Resort, LLC. Q Burke Mountain Resort Hotel and Conference Center, L.P. ("Phase VIII") is a

Vermont limited partnership. Between June 2013 and April 2016, Phase VIII raised approximately $53 million from 106 investors through an EB-5 offering of limited partnership interests to build a 112-room hotel, a conference center, and outdoor pool.

Stenger is the director and only principal of various other entities that act as the general partners of the limited partnerships in Phases I-VI. Quiros and Stenger are managing members of AnC Bio Vermont GP Services, LLC, a Vermont limited liability company that acts as the general partner for Phase VII.

### 3. The Alleged Ponzi Scheme

Plaintiffs' claims stem from their investments in a series of related projects at the Jay Peak and Q Burke ski resorts in Vermont. Plaintiffs allege that Jay Peak was owned and operated by Mont Saint-Sauveur International, Inc. from 1978 until mid-2008. Quiros and Stenger allegedly negotiated with Mont Saint-Sauveur to acquire and further develop Jay Peak in 2007. Quiros and Stenger then raised funds to develop Jay Peak through the EB-5 Immigrant Investor Program—a program created by federal law that provides prospective immigrants the opportunity to become permanent U.S. residents by investing in U.S. enterprises. Plaintiffs allege that in 2008, Quiros, Burstein, and Amigo (Burstein's supervisor), met to discuss a financial structure for the limited partnerships they planned to implement to raise capital for the EB-5 projects. As a result, Plaintiffs submit that Raymond James agreed that investor funds would be transferred from escrow accounts at People's Bank to accounts at Raymond James, over which Quiros would have exclusive authority.

Plaintiffs allege that the Ponzi scheme occurred as follows: Burstein, Quiros, and Amigo made plans to finance the purchase of Jay Peak using a margin loan. Investor funds would be used to purchase Treasury bills and Raymond James would then lend money to Quiros using the

investor money as collateral, without notifying the investors that their money was serving as collateral. The Treasury bills purchased with investor funds became collateral for a margin loan, and the loan permitted Quiros to borrow up to 90% of the value of the Treasury bills in the limited partnership accounts at Raymond James.

In preparation for the closing of Jay Peak Inc., Quiros asked Saint-Sauveur to open brokerage accounts at Raymond James in the names of Phases I and II. Saint-Sauveur agreed, and Stenger opened Saint-Sauveur's accounts at Raymond James for Phases I and II. People's Bank then made two transfers of $11 million and $7 million in escrowed investor funds to Saint-Sauveur's Phase I and II accounts at Raymond James. Thereafter, Quiros opened two accounts at Raymond James under his control for Phases I and II. Before Quiros tendered the purchase price to Saint-Sauveur, Saint-Sauveur transferred $11 million in its Phase I and $7 million in its Phase II accounts at Raymond James to Quiros's Phase I and II accounts. By Plaintiffs' account, Quiros was in control of investor money for Phases I and II that was otherwise supposed to be in Stenger's control.

Prior to transferring the funds for Phases I and II, Saint-Sauveur wrote a letter to Burstein, copying Quiros, confirming that the funds in the Raymond James Phase I account were investor funds and cautioning about the permissible use of the funds. The letter stated, *inter alia*, that "[y]ou confirmed that these funds will not be used in any manner, including as collateral or a guarantee, to finance [Q Resorts' purchase of] the Jay Peak Resort."

Plaintiffs allege that despite knowing the investor money could not be used to purchase Jay Peak, Inc., Quiros—with the assistance of Stenger, Burstein, and Raymond James—through Q Resorts, used $21.9 million of investor funds ($12.4 million from Phase I and $9.5 million from Phase II) to fund the vast majority of the purchase of Jay Peak, Inc. Quiros then transferred

$7.6 million of Phase I investor funds and $6 million of Phase II investor funds from the Raymond James Accounts to a third account that he opened at Raymond James in the name of Q Resorts. The same day, Quiros wired $13.544 million from the Q Resorts account to the law firm representing Saint-Sauveur as partial payment for the stock purchase. Over the next several months, Quiros made additional payments to the same law firm totaling $8.4 million. Plaintiffs allege that all of these payments were made improperly using investor funds, and maintain that Stenger facilitated many of these payments by transferring additional money from People's Bank to Quiros's Q Resorts account at Raymond James. When the transfers were complete, Quiros wired the money to the law firm representing Saint-Sauveur.

Plaintiffs submit that nothing in the limited partnership agreements permitted Quiros to use the investor funds to buy Jay Peak, Inc. In fact, a section in the Phase I and II agreements prevented the general partner from borrowing or commingling investor funds and from permitting Quiros and Q Resorts to purchase Jay Peak, Inc., without investor consent. Plaintiffs further allege that Quiros's misuse of investor funds permeated through each of the EB-5 projects at issue.

When Quiros opened the Phase I and II accounts, he signed a credit agreement with Raymond James that allowed both accounts to hold margin balances—the accounts could borrow money and hold negative cash balances that would be paid back to Raymond James with interest. Quiros pledged the funds in the Phase I and II accounts as collateral for any margin loans the accounts incurred, and opened new accounts in the name of each limited partnership that he had sole control over. Stenger transferred investor funds from accounts at People's Bank—where investors had deposited their money—to the accounts controlled by Quiros. Plaintiffs submit that Stenger violated terms of the applicable limited partnership agreements and breached his

fiduciary duty as general partner to the investors in the limited partnerships each time he transferred the funds. Plaintiffs suggest this occurred with every limited partnership. Plaintiffs also maintain that Quiros's establishment of the margin loans violated the terms of the limited partnership agreements because the agreements prohibited general partners from encumbering or pledging investor funds as collateral without investor approval. Lastly, Plaintiffs allege that Quiros and Stenger commingled Phase I investor monies with funds from other limited partnerships.

Among the offering materials purportedly given to investors was an escrow agreement with People's Bank. To purchase a limited partnership interest in any phase, each investor was required to (1) enter into the escrow agreement; and (2) transfer funds to People's Bank, with $500,000 as the limited partnership investment and an additional sum, usually $50,000 for administrative fees. *Id.* Further, the escrow agreements stated that People's Bank would release the funds to the specific limited partnership account at Raymond James that the investor purchased an interest in. However, the Phase I-III offering materials provided that the investors' funds could only be held in bank accounts, and the Phases I and II documents required that the transferee bank accounts be "insured by an agency of the federal government." Plaintiffs allege that as a brokerage firm, Raymond James is neither a bank, nor is ensured by the Federal Deposit Insurance Corporation, and thus, the transfer of investor funds for Phases I-III was prohibited by the offering materials given to investors. For the following reasons, the Court grants the Motions to Dismiss.

II. **Legal Standard**

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When ruling on a

motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986). To survive a motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Detailed factual allegations are not required, but a pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action." *Twombly*, 550 U.S. at 555; *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1263 (11th Cir. 2004) ("To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions; they are required to allege some specific factual bases for those conclusions or face dismissal of their claims."). In short, the complaint must not merely allege misconduct, but must demonstrate that the pleader is "entitled to relief." *Iqbal*, 556 U.S. at 677-78.

On a motion to dismiss for lack of personal jurisdiction, the court accepts as true all allegations in the complaint and decides whether the plaintiff has met its burden of establishing a *prima facie* case of personal jurisdiction. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). "[W]here the defendant challenges the court's exercise of jurisdiction over its person, the plaintiff bears the ultimate burden of establishing personal jurisdiction is present." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009).

When determining whether personal jurisdiction exists over a defendant, courts generally partake in a two-step analysis. *Verizon Trademark Servs., LLC v. Producers, Inc.*, 810 F. Supp. 2d 1321, 1324-25 (M.D. Fla. 2011). A court may exercise personal jurisdiction over a nonresident if: (1) the forum state's long-arm statute confers jurisdiction and (2) jurisdiction

would not "offend traditional notions of fair play and substantial justice." *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 807 (11th Cir. 2010) (citation and internal quotations omitted). Courts proceed to the second step only if the long-arm statute provides for jurisdiction. *Id.* A court must strictly construe the long-arm statute in assessing whether a plaintiff has satisfied its burden of producing affidavits, documents, or testimony that overcome a defendant's evidence challenging personal jurisdiction. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (citations omitted).

III. **Analysis**

Defendants Quiros, People's United Financial, Inc., and People's United Bank, N.A. move to dismiss the Amended Complaint. Quiros makes ten arguments in his Motion to Dismiss Counts I, IV, VII, XII, and XIII of the Amended Complaint: (1) Plaintiffs do not allege a Ponzi scheme; (2) Plaintiffs lack standing to bring derivative claims; (3) Plaintiffs have not alleged investment injury for Phases I-V of the alleged Ponzi scheme; (4) Plaintiffs cannot bring claims on behalf of limited partnerships in which they did not invest; (5) Plaintiffs' claims against Quiros fail because they are breach of contract claims disguised as tort claims; (6) Plaintiffs have not pled falsity of offering documents with requisite particularity as required by Federal Rule of Civil Procedure 9(b); (7) Aiding and Abetting Breach of Fiduciary Duty (Count IV) fails because Plaintiffs do not allege that Quiros owed a fiduciary duty to investors or that he had knowledge of the purported fiduciary duties at issue; (8) Civil Conspiracy (Count VII) fails because Plaintiffs have not alleged an actual agreement by the alleged co-conspirators; (9) Racketeer Influenced and Corrupt Organizations Act claims (Counts XII and XIII) fail because Plaintiffs have not adequately pleaded criminal wrongdoing and Plaintiffs have not sufficiently alleged

Quiros's participation in a pattern of racketeering activity; and (10) the statutes of limitation bar claims for aiding and abetting breach of fiduciary duty and civil conspiracy (Counts IV and VII).

Quiros's motion relies on procedural and substantive arguments. The Court will address his procedural arguments first, because standing and statutes of limitation are dispositive threshold matters. *See Varga v. Palm Beach Capital Mgmt., LLC*, No. 09-82398-CIV, 2010 WL 8510622, at *1 (S.D. Fla. Sept. 3, 2010) ("[V]enue and standing issues are threshold legal issues that are case-dispositive."); *Bethke v. Stetson*, 521 F. Supp. 488, 489 (N.D. Ga. 1979), *aff'd*, 619 F.2d 81 (5th Cir. 1980) ("A determination as to whether the claim is barred by the statute of limitations is dispositive of the issues in the case."). Quiros's procedural arguments include: (1) Plaintiffs lack standing to bring derivative claims; (2) Plaintiffs lack standing because they have not alleged investment injury for phases I-V; (3) Plaintiffs lack standing to bring claims on behalf of limited partnerships in which they did not invest; and (4) the statutes of limitation bar claims for aiding and abetting breach of fiduciary duty (Count IV) and civil conspiracy (VII).

The Peoples' Defendants also seek dismissal of the Amended Complaint with three principal arguments: (1) the Court lacks personal jurisdiction over them; (2) Plaintiffs' claims fail because they are based upon the Peoples' Defendants transfers of funds consistent with the terms of the escrow agreements; and (3) Plaintiffs' fail to plausibly plead claims against the Peoples' Defendants. Like Quiros, the Court will address the Peoples' Defendants' procedural arguments under Florida law[4] at the outset.

A.    **Standing as to Defendant Quiros**

---

[4] As a preliminary matter, the Court must undertake a choice of law analysis. The basis for this Court's jurisdiction is the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332, 1453, 1711-1715. Cases brought pursuant to the Class Action Fairness Act are diversity cases, and thus, federal courts must apply state substantive law. *Coll v. Abaco Operating LLC*, No. 2:08-CV-345-TJW, 2011 WL 1831748, at *3 (E.D. Tex. May 12, 2011) (citing *Erie R.R. Co. Thompkins*, 304 U.S. 64, 78 (1938)) (internal citation omitted). The Parties did not brief choice of law, but instead agreed that the Limited Partnership Agreements governing Plaintiffs' investments have a Vermont choice of law provision. The Parties then concede, for purposes of the motions, that Vermont and Florida law are not materially distinct. Accordingly, the Court will apply Florida law to Plaintiffs' claims.

Quiros argues that Plaintiffs lack standing to bring any of their claims because any breach of duty by the general partners would be to the limited partnership itself, not the individual limited partners (investor Plaintiffs). The crux of Quiros's argument is that Plaintiffs have not suffered an injury distinct from that of the limited partnerships as a whole, and therefore, they lack standing to bring these derivative claims. Plaintiffs counter that they have standing because their claims are direct, not derivative.

The threshold question is whether Plaintiffs have a cause of action in their own right, or whether their causes of action are derived from the limited partnerships' right to bring the action. In traditional derivative suits, under federal and Florida law, shareholders sue to enforce a right belonging to the corporation for which the corporation itself could have brought suit. *Medsker v. Feingold*, 307 F. App'x 262, 264 (11th Cir. 2008) (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 528-29 (1984)); *see also Citizens Nat. Bank of St. Petersburg v. Peters*, 175 So. 2d 54, 56 (Fla. 2d DCA 1965). In contrast, a claim may be brought in a direct action where the injury was sustained directly by the plaintiff bringing the suit and is separate and distinct from injuries sustained by the corporation and all other shareholders equally. *Medsker*, 307 F. App'x at 264 (internal citations omitted).

The Eleventh Circuit's decision in *Medsker* is instructive. In *Medsker*, the plaintiffs alleged that the defendants engaged in fraud and civil conspiracy to induce them to invest in a hedge fund. 307 F. App'x at 263. Specifically, the plaintiffs alleged that the defendants made knowingly false misrepresentations upon which the plaintiffs relied in deciding to invest in the hedge fund, thereby violating the Securities Exchange Act of 1934, and committing common law fraud and civil conspiracy. *Id.* The court held that the plaintiffs could bring their common law fraud claim only as a direct action because the complaint "states that the defendants made

intentional misrepresentations to **these** plaintiffs and thereby fraudulently induced them to invest their money into [the hedge funds,] which they would not otherwise have done. This is not an injury to the corporation, but to **these** investors . . ." *Id.* at 265 (emphasis added). Importantly, the *Medsker* plaintiffs suffered an injury separate and distinct from other shareholders because they alleged that "these plaintiffs" relied upon the misrepresentations and invested their money, *vis-à-vis* other investors. *Id.*

The civil conspiracy claim, however, had to be brought as a derivative claim because it focused on the defendants' actions converting the plaintiffs' funds and transferring those funds to the defendants' personal accounts. *Id.* This rationale is consistent with decisions of other circuits. *See Cowin v. Bresler*, 741 F.2d 410, 416 (D.C. Cir. 1984) (holding that claims involving self-dealing and diversion of assets are "fundamentally claims belonging to the corporation and to the [shareholder] only derivatively"). The *Medsker* court noted that "both federal and Florida state law [on shareholder standing] are similar and . . . [any] discrepancies [were] not relevant." *Id.* at 264.

Under Florida law[5], a direct action may be brought if: (1) there is a direct harm to the shareholder or member such that the alleged injury does not flow subsequently from an initial harm to the company and (2) there is a special injury to the shareholder or member that is separate and distinct from those sustained by the other shareholders or members. *Dinuro Investments, LLC v. Camacho*, 141 So. 3d 731, 739-40 (Fla. 3d DCA 2014). A shareholder or member need not satisfy the two-prong test when there is a separate duty owed by the defendant to the individual plaintiff under contractual or statutory mandates. *Id.* at 740. *Dinuro* aimed to

---

[5] The standing requirement to bring a direct action in Vermont appears to be materially indistinguishable from Florida law. *See Bovee v. Lyndonville Sav. Bank 7 Trust Co.*,174 Vt. 507, 508 (Vt. 2002) ("[T]he shareholder must allege an injury separate and distinct from other shareholders, or a wrong involving a contractual right of the shareholder that exists independently of any right of the corporation.").

reconcile nearly fifty years of "divergent case law" because Florida intermediate appellate court decisions varied significantly. *Id.* at 739. *See Peters*, 175 So. 2d at 56 (holding that a stockholder could bring a suit in his own right to redress an injury sustained directly by him, and which is separate and distinct from that sustained by other stockholders); *but see Harrington v. Batchelor*, 781 So. 2d 1133 (Fla. 3d DCA 2001) (applying only the direct harm test and stating that a shareholder can still maintain a direct action if there is a special injury or specific and separate duty owed).

In the absence of Florida Supreme Court precedent, federal district courts applying Florida law are bound by intermediate appellate decisions in diversity cases. *Blanchard v. State Farm Mut. Auto. Ins. Co.*, 903 F.2d 1398, 1399 (11th Cir. 1990). Thus, the Court relies on the Third District Court of Appeal's decision in *Dinuro* because it succinctly lays out the two-prong, one-exception test Florida courts have applied for decades—albeit with different language. *Compare Dinuro*, 141 So. 3d 731, 739-40 (requiring direct harm and special injury but making an exception from the test for a specific duty), *with Harrington*, 781 So. 3d 1133 (requiring direct harm and special injury or a specific duty).

Plaintiffs contend that they were directly harmed by Quiros's fraudulent omissions that induced them to purchase their limited partnership interests, and as a result, lost their investments because of their reliance on the fraudulent omissions. This harm resembles the plaintiffs' injuries in *Medsker*. Plaintiffs likely satisfy the direct harm requirement because the injury did not flow from an initial harm to the company, as the alleged reliance on fraudulent omissions occurred prior to any harm to the limited partnerships. Irrespective of the direct harm requirement, Plaintiffs' standing fails on the second *Dinuro* prong because unlike the *Medsker* plaintiffs, Plaintiffs in this case have not alleged a special injury, separate and distinct from those sustained

by other limited partners. In fact, Plaintiffs brought this suit as a putative class action in which they allege that "more than 800" individuals were harmed by Defendants' actions. D.E. 55 ¶ 232. Absent a showing that **these** Plaintiffs suffered injuries separate and distinct from other investors, Plaintiffs lack standing to sue Quiros under Florida law.

Plaintiffs' next standing argument is that the "special duty" exception applies because Plaintiffs, as limited partners, entered into partnership agreements, and a claim brought to enforce the terms of the agreements are direct, not derivative. However, Plaintiffs overlook the necessary fact that Quiros was not in contractual privity with Plaintiffs, as there are no allegations that Quiros was a party to the limited partnership agreements, and as such, he owes no duty to Plaintiffs as limited partners. *See Harrington*, 781 So. 2d at 1135 (allowing derivative claims directly between a shareholder and a contractual counterparty). In fact, Plaintiffs concede that "Quiros is not a party to any contract with any Plaintiff . . ." D.E. 129 at 12.

Lastly, Plaintiffs argue that the Ponzi scheme exception observed by this Court in *Walco Investments, Inc. v. Thenen*, 947 F. Supp. 491 (S.D. Fla. 1996) (Moreno, J.), permits a direct action against Quiros because Plaintiffs alleged that Quiros was masterminding the Ponzi scheme. However, Plaintiffs' reliance on *Walco* is misplaced. In *Walco*, this Court found that the plaintiffs sufficiently alleged direct claims because the entity that the plaintiffs were investing in existed "**solely** as a fund raising conduit" for a fraudulent scheme. *Id.* at 502. The funding entities had no independent existence other than to collect money for the fraudulent scheme, thus, the entities were *in pari delicto*. *Id.* (emphasis added). *Walco's* facts are materially distinguishable from this case. Here, Plaintiffs have not alleged that the limited partnerships existed **solely** as a fundraising conduit for Quiros. Rather, by their own admission, Plaintiffs

concede that the overwhelming majority of the limited partnerships built and opened the projects, just as Plaintiffs expected when they made their investments.

Indeed, the *in pari delicto* exception expounded in *Walco* is limited to its facts. In *Tradex Glob. Master Fund SPC Ltd. v. Palm Beach Capital Mgmt., LLC*, No. 09-21622-CIV, 2010 WL 11442322, at *1 (S.D. Fla. Mar. 1, 2010), this Court affirmed a Report and Recommendation by Magistrate Judge Edwin G. Torres finding that the *in pari delicto* exception did not apply, because the plaintiff investors had not alleged that the hedge fund they were investing in was in cahoots with the third party allegedly perpetrating the fraud. Accordingly, because Plaintiffs have not alleged that the limited partnerships existed solely as a fundraising conduit for the alleged Ponzi scheme, the *in pari delicto* exception does not apply.

When, as here, limited partners claim to be "damaged to the extent of their proportionate interest in the partnership and the alleged harm was suffered by all limited partners . . . claims were derivative rather than direct and were properly dismissed for lack of standing." *Lewis v. Seneff*, 654 F. Supp. 2d 1349, 1364 (S.D. Fla. 2009) (citation omitted). Accordingly, Plaintiffs lack standing to bring these claims because they have not suffered an injury distinct from that of the limited partnerships. A finding of standing in this instance would authorize Plaintiffs to "double dip" on the recoveries of the Receiver in the related action, seeing as the Receiver has brought many of the same claims seeking effectively the same relief as this case.[6]

**B.    Standing as to the Peoples' Defendants**

The Peoples' Defendants' motion does not brief whether Plaintiffs have standing to sue them in this purported direct suit. Instead, the Peoples' Defendants argue that Plaintiffs Eijmberts, Morris, Sanchez, Pietri, Casseres-Pinto, and Wang have not alleged any improper transfer of funds from Phases IV-VIII, and because those were the only phases they invested in,

---

[6] *See Michael I. Goldberg, as Receiver v. Raymond James Financial, Inc.*, Case No. 16-CV-21831-JAL.

they have no standing to assert any claim against them. The Peoples' Defendants also argue, in a discrete footnote, that Plaintiffs have no standing as to allegations of improper transfers of funds in Phase I because none of the plaintiffs invested in that phase. The gravamen of the Peoples' Defendants' argument appears to be two-fold: (1) Plaintiffs have alleged improper transfers of funds relating to Phases I-III only, but none of the Plaintiffs invested in Phase I, so they lack standing as to that phase because there was no Article III injury-in-fact and (2) certain Plaintiffs that only invested in Phases IV-VIII did not suffer an Article III injury-in-fact as to Phases I-III because there was no improper transfer of funds alleged as to Phases IV-VIII.

Plaintiffs counter that Quiros used investor funds from later phases to pay off margin loans that were collateralized by funds from Phases I-III, thereby applying investor funds to phases that Plaintiffs never agreed to. For instance, Plaintiffs allege that Quiros used investor funds from Phases I through V to pay down margin loan III, which was a consolidation of margin loans collateralized by Phases I and II. Thereafter, Quiros took out margin loan IV, pledging investor funds from Phases V and VI as collateral. This "pay-down and pay-off" scheme allegedly led to Phase VII's "shortfall." Thus, Plaintiffs claim, the Peoples' Defendants' improper transfers from earlier phases damaged investors in later phases as well.

Although not raised by the parties, the Court finds it necessary to undertake a Quiros-like analysis of Plaintiffs' standing as limited partners against the Peoples' Defendants. A brief recitation of the relationship between Plaintiffs and the Peoples' Defendants, according to the Amended Complaint, is as follows: as investors, Plaintiffs were required to deposit funds into project-specific escrow accounts maintained by the Peoples' Defendants. The escrow agreements required that the Peoples' Defendants release the escrowed funds only to the limited partnership in which the investor had purchased an interest. The Peoples' Defendants allegedly violated the

terms of the agreement by releasing the funds to accounts controlled by Quiros at Raymond James and accounts that were designated for another project (*i.e.*, from the Phase I account at People's Bank to the Q Resorts account at Raymond James).

Under Florida law, a shareholder or member must show a direct harm that does not flow subsequent from an initial harm to the company, and a special injury that is separate and distinct from the other shareholders, unless there is a separate duty owed by the defendant to the individual plaintiff under contractual or statutory mandates. *Dinuro*, 141 So. 3d at 739-40. By its own admission, the Peoples' Defendants concede that a contract exists between the parties. *See* D.E. 111 at 1 ("People's did nothing more than fulfill its contractual obligations as [P]laintiffs' escrow agent under the [P]arties' agreements."). As a result, Plaintiffs meet the separate duty exception under *Dinuro* because of the Parties' contractual privity.

However, Plaintiffs must also satisfy the Article III injury-in-fact requirement, irrespective of whether they comply with the separate duty exception to bring a direct claim. Article III limits federal "judicial power" to the resolution of actual "cases and controversies." *See* U.S. Const. art. III § 2. To construe an Article III case or controversy, the plaintiff must have standing. "[T]he irreducible constitutional minimum of standing contains three elements:" (1) the plaintiff must have suffered an "injury in fact;" (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). At issue here, is whether Plaintiffs have sufficiently alleged an injury-in-fact. The Peoples' Defendants submit that any allegations of wrongdoing are limited to Phases I-III. *See* D.E. 55 ¶ 107 (alleging that the improper transfer of funds occurred solely between Phases I-III). Plaintiffs contend that "People's Bank knew that these and other transfers were improper"

but do not allege that a single Plaintiff invested in Phases I-III and was injured by the Peoples' Defendants' wrongful activity. *See* D.E. 55 ¶¶ 9-17 (describing that all Plaintiffs in this suit invested in Phases IV-VIII).

Plaintiffs' closest allegation of an injury in Phases IV-VIII occurred when Quiros purportedly took funds from a Phase VII account at Raymond James and sent them to People's Bank, who then transmitted them to another account Quiros had opened at Raymond James. Plaintiffs suggest this was wrongful but do not allege with specificity why. The Peoples' Defendants argue that the release of funds to the accounts at Raymond James were all done in accordance with the escrow agreements. The only Plaintiffs that allegedly invested in Phase VII were Carlos Enrique Hiller Sanchez, Jose Antonio Pietri, and Jose R. Casseres-Pinto. Plaintiffs have not identified financial losses or any other injury based on the commingling of funds. Thus, on the face of the Amended Complaint, the only Plaintiffs that can establish that they suffered a cognizable injury are those that invested in Phase VII, because it was the only phase that resulted in a "shortfall." *Id.* at ¶ 89. Accordingly, only Plaintiffs that invested in Phase VII have standing to sue the Peoples' Defendants.

### C.     Personal Jurisdiction as to the Peoples' Defendants

Next, the Peoples' Defendants argue that the Amended Complaint should be dismissed because the Court lacks personal jurisdiction over them. Personal jurisdiction over a nonresident defendant requires a two-part analysis. *Exhibit Icons, LLC v. XP Companies, LLC*, 609 F. Supp. 2d 1282, 1292 (S.D. Fla. 2009). When jurisdiction is based on diversity—which it is here because cases brought pursuant to the Class Action Fairness Act are essentially diversity cases— Rule 4(e) of the Federal Rules of Civil Procedure requires that the assertion of jurisdiction be determined by the state long-arm statute. *Id.*; *see Burgess v. Religious Tech. Ctr., Inc.*, 600 F.

App'x 657, 659 (11th Cir. 2015) (applying Georgia's long-arm statute in a Class Action Fairness Act case). If there is a basis for personal jurisdiction under the state long-arm statute, the Court must next determine whether (1) sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment and (2) maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Id.* (quoting *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)).

Minimum contacts in the context of specific jurisdiction[7] involve three criteria. First, the contacts must be related to the plaintiff's cause of action or have given rise to it. *Id.* Second, the contacts must involve some purposeful availment of the privilege of conducting activities within the forum, thereby invoking the benefits and protections of its laws. *Id.* Third, the defendant's contacts within the forum state must be such that it should reasonably anticipate being haled into court there. *Id.* Plaintiffs' principal argument is that specific personal jurisdiction is proper pursuant to the "tortious acts within Florida" provision of the state long-arm statute. *See* Fla. Stat. § 48.193(1)(a)(2) ("A person . . . submits himself or herself . . . to the jurisdiction of the courts of this state for . . . [c]ommitting a tortious act within this state.").[8]

"A plaintiff seeking to establish personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (internal quotations omitted). When the defendant challenges personal jurisdiction "by submitting affidavit evidence in support of its position, the burden shifts back to the plaintiff to produce evidence supporting jurisdiction." *Id.* (quoting *Madara v. Hall*, 916 F.2d 1510, 1514

---

[7] Plaintiffs specifically argue that the Court has specific personal jurisdiction over the Peoples' Defendants, rather than general personal jurisdiction.

[8] "Vermont's long-arm statute, 12 V.S.A. § 913(b), permits state courts to exercise jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause of the U.S. Constitution" *Fox v. Fox*, 197 Vt. 466, 471 (Vt. 2014).

(11th Cir. 1990)). In this case, the Peoples' Defendants submitted two affidavits. First, the affidavit of Kevin Cocchiola, Jr., the First Vice President of Branch Administration of People's United Bank, *see* D.E. 112, states that the Peoples' Defendants are not registered to do business in Florida and have no offices, assets, or bank accounts in Florida. Second, the affidavit of Kevin W. Smith, the First Vice President in the Institutional Trust & Custody Services Department of People's United Bank, *see* D.E. 113, states that "[a]ll of the alleged conduct of [the Peoples' Defendants] relating to the Jay Peak transactions in this lawsuit occurred . . . from Vermont." Further, the escrow agreements were prepared and executed in Vermont, notices related to the agreements were received by the Peoples' Defendants in Vermont, and all transfers of funds from the investors' escrow accounts were made from Vermont or Connecticut. *Id.* Finally, Smith states that no agents traveled to Florida to conduct business relating to the Jay Peak escrow agreements.

Plaintiffs submit that the burden should not shift back to them to produce evidence supporting jurisdiction because the affidavits do not speak to the fiduciary relationships People's Bank entered into with Florida investors or the transfers of funds by People's Bank into Florida. D.E. 135 at 7. Independently, even if the burden does shift back to Plaintiffs, they claim that the following events give rise to personal jurisdiction: (1) the Peoples' Defendants released monies escrowed for investors (including Florida investors) in accounts designated for particular limited partnerships to accounts at Raymond James in Florida and (2) the Peoples' Defendants acted as escrow agents with fiduciary duties to Florida investors and never attempted to alert the investors to Quiros's alleged fraud. Because Plaintiffs established a *prima facie* case of jurisdiction,[9] the next question is whether the Peoples' Defendants have sufficiently challenged personal

---

[9] The Court finds that the Amended Complaint minimally alleges sufficient facts to establish a *prima facie* case of personal jurisdiction over the Peoples' Defendants.

jurisdiction with the affidavits of Cocchiola and Smith, and if so, whether one of Plaintiffs' two proffered events is sufficient to find that the Peoples' Defendants committed a tortious act in Florida, thereby conferring this Court with personal jurisdiction over them.

Cocchiola's affidavit contains general assertions that the Peoples' Defendants are "not registered to do business in Florida . . . [do] not have any offices, mailing addresses or phone numbers in Florida, and [do] not own any assets, bank accounts or investments that are maintained in Florida. [They] do not engage in advertising in, or directed to, Florida." D.E. 112 ¶ 3. The Complaint specifically alleges that the Peoples' Defendants "participated in tortious acts committed in Florida or caused damage to investors in Florida." D.E. 55 ¶ 47. However, Smith's affidavit contains specific assertions that the escrowed monies allegedly released into Florida were released from Vermont, not Florida. D.E. 113 at 2. Neither of the affidavits contradicted the allegation that owing fiduciary duties to Florida investors gives rise to personal jurisdiction. Because the affidavits contain more than mere conclusory assertions, the burden shifts back to Plaintiffs to produce evidence supporting jurisdiction. *See Stubbs*, 447 F.3d at 1360 (establishing that the burden does not shift back to the plaintiff when "the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction."). Thus, assuming Plaintiffs met their burden, the next question is whether the tortious acts alleged by them sufficiently comply with Florida's long-arm statute and the Due Process Clause.

Generally, "[t]he plaintiff beards the burden of proving by affidavit the basis upon which jurisdiction may be obtained only if the defendant challenging jurisdiction files affidavits in support of his position." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999) (citing *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989)) (internal quotations omitted). Because Plaintiffs have not proffered evidence to contradict the Peoples' Defendants'

affidavits, the inquiry ends and the Court finds that Plaintiffs have failed to meet their burden of establishing personal jurisdiction over the Peoples' Defendants. However, even if Plaintiffs had filed rebutted affidavits, it would be unavailing, as the Court finds that the Due Process Clause prohibits the Court from exercising personal jurisdiction over the Peoples' Defendants, *see* Section 2., *infra*.

### 1. Florida's Long-Arm Statute

The Amended Complaint sufficiently alleges that the Peoples' Defendants committed a tortious act outside of Florida that caused injury in the state, thereby satisfying Florida's long-arm statute. In applying Florida Statute 48.193(1)(a)(2),[10] a person who commits a tortious act outside the state that results in harm within the state generally confers personal jurisdiction over the out-of-state entity. *Elandia Int'l, Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1329 (S.D. Fla. 2010) (holding that personal jurisdiction over an out of state entity was proper because the defendant owed fiduciary duties to the plaintiff that were allegedly breached). *See also Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 257 (11th Cir. 1996) (holding that the long-arm statute extends jurisdiction over a defendant whom plaintiff alleged caused injury in Florida through negligent drafting and review of a will that occurred out of Florida).

In *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002), the Florida Supreme Court established that "committing a tortious act" can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida. However, the cause of action must arise from the communications. *Id.* "The threshold question that must be determined is whether the allegations of the complaint state a cause of action." *Id.* (internal citation omitted); *see also 8100 R.R. Ave. Realty Trust v. R.W. Transill Constr. Co.*, 638 So. 2d 149, 151 (Fla. 4th

---

[10] Florida's long-arm statute was amended in 2013. Cases decided prior to 2013 analyzed the "tortious act" version of Florida's long-arm statute as section 48.193(1)(b), which was amended to present day 48.193(1)(a)(2). The substance of the statute, however, remained unchanged.

DCA 1994) (where the threshold question of personal jurisdiction turns on whether a tort is committed in Florida, the court necessary must review the allegations of the complaint to determine if a cause of action is stated); *Silver v. Levinson*, 648 So. 2d 240 (Fla. 4th DCA) (same). It follows that if a complaint states a cause of action, then it must be determined whether the alleged cause of action arises from the purported tortious acts into Florida. *Id.* The Court will address each of Plaintiffs' causes of action in turn to determine if Plaintiffs have adequately stated a cause of action and whether they arise from the purported tortious acts.

### a.     Aiding and Abetting Common Law Fraud (Count III)

To state a cause of action for aiding and abetting fraud, a plaintiff must allege: (1) there existed an underlying fraud; (2) the defendant had knowledge of the fraud; and (3) the defendant provided substantial assistance to advance the commission of the fraud. *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Maryland*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005).[11] Aiding and abetting common law fraud is subject to the requirements of Federal Rule of Civil Procedure 9(b). *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064 (11th Cir. 2007). The Peoples' Defendants contest the elements of "actual knowledge" or "substantial assistance." Plaintiffs' counter by relying on *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985), where the court held that a person may be held as an aider and abettor if the accused party has a general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation. Importantly, *Woods* was a case brought pursuant to § 10(b) of the Securities Exchange Act, not a claim for common law fraud.

---

[11] Aiding and abetting under Vermont law has similar requirements. A person is subject to liability for harm resulting to a third person from the tortious conduct of another if the person: (1) commits a tortious act as part of a common design with the other; (2) gives substantial assistance to the other knowing that the other's conduct is a breach of duty; (3) gives substantial assistance to the other to accomplish a tortious result while also acting in a manner that is a breach of duty to the third person. *Montgomery v. Devoid*, 915 A.2d 270, 281 (Vt. 2006).

Plaintiffs rely on two allegations to meet the 9(b) pleading requirement. First, the Peoples' Defendants improperly transferred funds from accounts in the name of a specific phase of the EB-5 projects to accounts at Raymond James belonging to other phases. *See* D.E. 55 ¶ 107 (detailing nine alleged illegal transfers on specified dates spanning 2008-2012). Second, the Peoples' Defendants knew that the transfers violated the escrow agreements because the partnership agreements required that funds were "immediately and irrevocably" committed to a specific phase of the EB-5 project once the funds were released by the Peoples' Defendants. According to Plaintiffs, commingling of partnership funds and transfers to accounts at Raymond James, a non-bank, should have put the Peoples' Defendants on notice because they were "red flags." Red flags do not amount to actual knowledge and are insufficient to meet the particularity requirement of Federal Rule of Civil Procedure 9(b). Therefore, the Court finds that the Amended Complaint fails to allege that the Peoples' Defendants had actual knowledge they were aiding and abetting a fraudulent scheme. Accordingly, Plaintiffs have not adequately stated a claim for aiding and abetting common law fraud and the Court cannot exercise personal jurisdiction over the Peoples' Defendants based on this claim.

**b.      Aiding and Abetting Breach of Fiduciary Duty (Count VI)**

In Florida, "[a]n individual commits the intentional tort of aiding and abetting a breach of fiduciary duty if: (1) the primary wrongdoer owes a fiduciary duty to the company; (2) the primary wrongdoer breaches her fiduciary duty; (3) the alleged aider and abettor has knowledge of this breach; and (4) the aider and abettor substantially assisted or encouraged the wrongdoing." *Elandia Int'l Inc.*, 690 F. Supp. 2d at 1331.[12] Plaintiffs point out that the Amended Complaint explicitly alleges that the Jay Peak general partners breached their fiduciary duties by

---

[12] Similarly, in Vermont, "[a]ny one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby . . ." *Cooper v. Cooper*, 783 A.2d 430, 443 (Vt. 2001) (citing *S & K Sales Co. v. Nike Inc.*, 816 F.2d 843, 848 (2d Cir. 1987).

commingling, misappropriating, and misusing the limited partnerships' money. Plaintiffs claim that the Peoples' Defendants substantially assisted the general partners' breaches of fiduciary duties with knowledge that the general partners were breaching those duties. The Amended Complaint is "replete with allegations of specific wrongful transfers by People's Bank of investor funds, including transfers from escrow accounts at People's Bank to accounts at Raymond James belonging to another phase, transfers to accounts of Quiros-controlled entities . . . transfers to a non-bank in violation of the Limited Partnership Agreements." As discussed above in section a., *supra*, Plaintiffs have not adequately alleged that the Peoples' Defendants had knowledge that it was aiding and abetting a breach of fiduciary duty. Accordingly, Plaintiffs have not adequately stated a claim for aiding and abetting a breach of fiduciary duty and the Court cannot exercise personal jurisdiction over the Peoples' Defendants based on this claim.

### c.     Civil Conspiracy (Count VII)

A civil conspiracy requires: (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to the plaintiff as a result of the acts done under the conspiracy. *Phelan v. Lawhon*, No. 3D16-1675, 2017 WL 1177595, at *4 (Fla. 3d DCA 2017) (citing *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997)). The conspiracy must demonstrate "an actionable underlying tort or wrong," and that tort or wrong must "constitute a cause of action if the wrong were done by one person." *Id.* (internal citation omitted).

Plaintiffs allege that "[a]n agreement was made in the first half of 2008 by Quiros [with] Raymond James, Burstein, and People's Bank to induce Plaintiffs and the Class into investing millions of dollars into the Limited Partnerships and to commit the fraud and fiduciary breaches described above." The Peoples' Defendants maintain that Plaintiffs have not met the heightened

pleading standard under Federal Rule of Civil Procedure 9(b) because the allegation is devoid of any factual details concerning the Peoples' Defendants' participation in the conspiracy. "[W]here a conspiracy claim alleges that two or more parties agreed to commit fraud, the plaintiff must also plead this act with specificity." *Martinez*, 480 F.3d at 1065.

Although the Amended Complaint is viewed in the light most favorable to Plaintiff and the Court is to accept all of the well-pleaded facts as true, Plaintiffs have not met their burden of asserting sufficient well-pleaded facts to overcome the Rule 9(b) hurdle. Rule 9(b) dictates that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). In other words, the plaintiff must "plead the who, what, when, where, and how of the allegedly false statements." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citations omitted). Plaintiffs state, in conclusory fashion, that the Peoples' Defendants were a party to an agreement made in the first half of 2008 to induce Plaintiffs to invest and thereby commit fraud and breaches of fiduciary duty. None of the allegations identify the Peoples' Defendants' agents or corporate representatives who participated in the alleged fraud. Nor do they identify specifically on which date(s) the alleged conspiracy was perpetuated, outside of the vague "first half of 2008" allegation. Moreover, Plaintiffs assert conflicting allegations as to what entities participated in the fraud. At first, Plaintiffs allege that:

During the first half of 2008, Quiros met with Burstein . . . and Frank Amigo . . . During this meeting, Quiros, Burstein, and Amigo discussed a financial structure for the Limited Partnerships . . . The financial structure devised by Raymond James and Burstein was contrary to what was represented in the offering materials . . . Quiros, Burstein, and Raymond James were able to put their plan into action. Fifty pages later in their Amended Complaint, Plaintiffs assert that the Peoples' Defendants were a party to that agreement in "the first half of 2008." Plaintiffs

have not pleaded sufficient facts to comport with Rule 9(b)'s specificity requirement. Accordingly, Plaintiffs have not adequately stated a claim for civil conspiracy and the Court cannot exercise personal jurisdiction over the Peoples' Defendants based on this claim.

### d.   Negligence (Count IX)

Plaintiffs argue that the Peoples' Defendants were negligent in its disbursement of escrowed investor funds. A negligence claim has four elements: (1) a duty by a defendant to conform to a certain standard of conduct; (2) a breach by defendant of that duty; (3) a causal connection between the breach and injury to the plaintiff; and (4) loss or damage to the plaintiff. *Bartsch v. Costello*, 170 So. 3d 83, 86 (Fla. 4th DCA 2015) (citing *Clay Elec. Co-Op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003)). The Amended Complaint alleges that the Peoples' Defendants had a duty to exercise reasonable skill and ordinary diligence in disbursing the invested funds entrusted to it, the release of escrowed funds to improper accounts and non-bank financial institutions breached its duties to Plaintiffs, and Plaintiffs have suffered damages as a result of the breach. The Peoples' Defendants dispute whether a breach occurred by arguing that it complied with the provisions of the contract and had no duty to investigate the recipient of funds prior to releasing them.

The parties disagree on a material fact—namely, whether a breach occurred. However, at this stage, Plaintiffs' allegations, viewed in the light most favorable to them, sufficiently give rise to an entitlement of relief. Therefore, the Court may exercise personal jurisdiction over the Peoples' Defendants based on this claim, unless doing so violates the Due Process Clause, *see* Section 2., *infra*.

### e.   Breach of Fiduciary Duty (Count X)

Plaintiffs allege that the Peoples' Defendants, as Plaintiffs' escrow agents, breached their fiduciary duties by transferring investors' funds in violation of the escrow agreements. Escrow holders have a fiduciary duty to exercise reasonable skill and ordinary diligence. *Watkins v. NCNB Nat'l Bank of Fla.*, 622 So. 2d 1063, 1064 (Fla. 3d DCA 1993). To establish a breach of fiduciary duty, a plaintiff must show: (1) that the defendant owed a fiduciary duty to the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach proximately caused the plaintiff's damages. *Fed. Deposit Ins. Corp. v. Smith*, No. 13-14151-CIV, 2013 WL 12077490, at *4 (S.D. Fla. Nov. 13, 2013) (citing *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002)). The Peoples' Defendants admit they owed fiduciary duties to Plaintiffs as their escrow agents, but the question is whether the Peoples' Defendants breached that duty. Accordingly, viewed in the light most favorable to them, Plaintiffs' allegations that the Peoples' Defendants released investor funds to Raymond James in violation of the escrow agreements are sufficient to plausibly state an entitlement to relief for a breach of fiduciary duty. Therefore, the Court may exercise personal jurisdiction over the Peoples' Defendants based on this claim, unless doing so violates the Due Process Clause, *see* Section 2., *infra*.

### f.      **Breach of Contract (Count XI)**

Plaintiffs claim that the Peoples' Defendants breached the escrow agreements by transferring investors' escrowed funds to the wrong accounts. To prevail on a breach of contract claim the plaintiff must show: (1) a valid contract; (2) a material breach; and (3) damages. *Murciano v. Garcia*, 958 So. 2d 423 (Fla. 3d DCA 2007) (internal citation omitted). The element at issue is breach. In their motion, the Peoples' Defendants argue that nothing in the escrow agreements required the Peoples' Defendants to investigate the ultimate recipient of funds prior to releasing the funds. The Peoples' Defendants submit they complied with the conditions when

they released the funds pursuant to the terms of the agreements. However, the Court must take all well-pleaded allegations as true and view them in the light most favorable to Plaintiffs. In doing so, the Court finds that Plaintiffs adequately alleged a breach of contract in connection with released escrowed funds to improper accounts. Therefore, the Court may exercise personal jurisdiction over the Peoples' Defendants based on this claim, unless doing so violates the Due Process Clause, *see* Section 2., *infra.*

Having found that the Amended Complaint states causes of action for at least, negligence, breach of contract, and breach of fiduciary duty, the Court must next look to whether those causes of action arise from the purported tortious acts in Florida.[13] The Court finds that they do. The gravamen of Plaintiffs' allegations is that the Peoples' Defendants improperly transferred funds into Florida in contravention of the escrow agreements. This Florida nexus is the epicenter of Plaintiffs' claims against the Peoples' Defendants and the injuries Plaintiffs allegedly suffered. Stated differently, without the Peoples' Defendants' fund transfers into Florida, there would be no cause of action for breach of contract or fiduciary duty, or negligence. Accordingly, Florida's long-arm statute is satisfied.

## 2.     Due Process Clause of the United States Constitution

Because Plaintiffs' allegations satisfy Florida's long-arm statute, the next question is whether subjecting the Peoples' Defendants to personal jurisdiction in this Court comports with the Due Process Clause. Where a forum seeks to assert specific personal jurisdiction over a nonresident defendant, due process requires the defendant to have "fair warning" that a particular activity may subject him to the jurisdiction of a foreign sovereign. *Robinson*, 74 F.3d at 258 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal citation omitted)).

---

[13] Even if Plaintiffs could amend the counts in their Amended Complaint that fail to state a claim, the result would be the same, because the Due Process Clause prohibits the Court from exercising personal jurisdiction over the Peoples' Defendants.

This "fair warning" requirement is met if the defendant has purposefully directed his activities at the forum and the litigation results from alleged injuries that arise out of or relate to those activities. *Id.* (internal quotations and citations omitted). The defendant's contact with the forum state should give rise to a reasonable anticipation of being haled into court there. *Id.* (internal citations omitted).

Wire transfers are insufficient contacts with the forum state to justify exercising personal jurisdiction. In *Steinberg v. A Analyst Ltd.*, No. 04-60898-CIV, 2009 WL 838989, at *5 (S.D. Fla. Mar. 26, 2009), this Court was faced with the question of whether a wire transfer through an account in New York was sufficient contact to justify personal jurisdiction under New York's long-arm statute and the Due Process Clause. New York's long-arm statute stated that a nonresident "transacts business" in New York when he purposefully avails himself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws. *Id.* at *4. The Court found that personal jurisdiction was not warranted over the defendant partnership because its "sole contact with New York was to route, via wire transfer, the monies . . . through an account . . . in New York . . . per the instructions in the subscription documents." *Id.* at *5. Similarly, the Peoples' Defendants complied with the terms of the escrow agreements by releasing the escrowed funds to the accounts at Raymond James in Florida. Notwithstanding whether the transfers were proper, as the Peoples' Defendants submit, or improper, as Plaintiffs allege, wiring money into Florida is insufficient contact with this state to justify personal jurisdiction and comply with the Due Process Clause.

Further, in *Aeropower Ltd. v. Matherly*, 511 F. Supp. 2d 1139, 1155 (M.D. Ala. 2007), the court found that the defendant escrow agent did not have minimum contacts with Alabama for the court to exercise personal jurisdiction. In *Matherly*, the defendant mailed documents,

disbursed fraudulently obtained funds, wired money, made telephone calls, and faxed documents into Alabama. *Id.* at 1155-56. However, the defendant escrow agent was not incorporated in Alabama; licensed, registered, or authorized to do business in Alabama; and had no offices, agents, bank accounts, officers or employees located in Alabama. *Id.* at 1156. Ultimately, the court found that none of the defendants' contacts with Alabama could support a finding of purposeful activity invoking the benefits and protections of Alabama law. *Id.; see also Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8th Cir. 2011) (holding that scattered e-mails, phone calls, and wire transfers into Missouri did not constitute a "deliberate" and "substantial connection" such that the defendant could reasonably anticipate being haled into court there).

Like *Matherly*, the Peoples' Defendants contacts with Florida are insufficient for this Court to exercise personal jurisdiction. Plaintiffs allege that the Peoples' Defendants contacts with Florida are two-fold: (1) they released monies escrowed for investors (including Florida investors) in accounts designated for particular limited partnerships to accounts at Raymond James in Florida and (2) they were an escrow agent with fiduciary duties to Florida investors and never attempted to alert the investors to Quiros's alleged fraud.

To accept Plaintiffs' argument that personal jurisdiction exists by the mere fact that the Peoples' Defendants acted as escrow agents with fiduciary duties to Florida investors, would mean that likely every state in the Union—or at least every state in which an investor is domiciled—would have the requisite "minimum contacts" with the Peoples' Defendants, because Plaintiffs bring this as a putative class action. The facts of this case are materially distinct from situations where a defendant allegedly breached a fiduciary duty to an entity incorporated in or with a principal place of business in Florida. *See Elandia Int'l, Inc.*, 690 F.

Supp. 2d at 1329 ("If an individual breaches a fiduciary duty to a company that has a principal place of business or place of incorporation in Florida the individual is subject to jurisdiction in Florida under [the] long-arm statute."); *Frederick Siegmund v. Xuelian Bian, et al.*, No. 16-CV-62506 FAM (D.E. 97) (S.D. Fla. April 2, 2018) (finding personal jurisdiction over directors of a corporation incorporated in Florida who allegedly breached their fiduciary duties to the corporation) (Moreno, J.). Plaintiffs have not met their burden of proving that the Peoples' Defendants had fair warning that wiring money to an account in Florida would subject it to personal jurisdiction in this state. Accordingly, this Court lacks personal jurisdiction over the Peoples' Defendants because they did not have minimum contacts with Florida as required by the Due Process Clause.

Assuming *arguendo* that minimum contacts with Florida were established, the next question would be whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *Exhibit Icons, LLC*, 609 F. Supp. 2d at 1292 (quoting *International Shoe Co.*, 326 U.S. at 320). The factors to decide whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice" are: (1) the defendant's burden in defending the lawsuit; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. *Id.* (internal citations omitted).

In *Robinson*, the Eleventh Circuit found that a Michigan attorney who was retained to design a will for a Florida resident was subject to personal jurisdiction under Florida's long-arm statute. 74 F.3d at 259. The court relied on the following factors in its decision: the attorney knew the client resided in Florida and the will would be probated in Florida, the attorney mailed

correspondence to the client in Florida, and the assets were intended to be devised pursuant to Florida law. *Id.* The linchpin of *Robinson's* holding is that the defendants were "fully aware that their actions or omissions would have a substantial effect in Florida." *Id.* The attorney should have "reasonably anticipated the possibility of a suit arising from conduct directed towards [their client in Florida]." *Id.*

In contrast, the Peoples' Defendants contacts with Florida are limited to one instance—transferring investor funds to Raymond James—an entity serendipitously located in Florida. Unlike the defendant in *Robinson*, the Peoples' Defendants were not "fully aware" that they were purposefully availing themselves of the benefits and privileges of doing business with Florida residents, they were merely satisfying the terms of the escrow agreements by transferring funds to accounts conveniently located in Florida.

Furthermore, the Peoples' Defendants would have a greater burden in defending this suit in Florida, rather than Vermont, because they have no offices, nor do business in Florida, and their headquarters are in Vermont. To boot, Florida has no overwhelming interest in adjudicating this dispute. In fact, Vermont would be the more proper forum because, not only are the Peoples' Defendants domiciled there, but the investments in this case were premised on the understanding that resorts in Vermont—not Florida—would reap the benefits. Accordingly, exercising personal jurisdiction over the Peoples' Defendants would not comport with the concept of fair play and substantial justice.

IV.   **Conclusion**

Plaintiffs lack standing to sue Quiros because their claims are derivative under Florida law as they have not sufficiently alleged an injury separate and distinct from other investors. Additionally, the Court lacks personal jurisdiction over the Peoples' Defendants because

Plaintiffs failed to meet their burden in rebutting the Peoples' Defendants affidavits, but even if they had, exercising personal jurisdiction over them would not comport with the Due Process Clause. Accordingly, it is

**ADJUDGED** that:

- The Peoples' Defendants Motion to Dismiss **(D.E. 111)** is GRANTED.

- Quiros's Motion to Dismiss **(D.E. 114)** is GRANTED.

DONE AND ORDERED in Chambers at Miami, Florida, this _____ of May 2018.

                    FEDERICO A. MORENO
                    UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record